## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE; METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION | * * * * | Master File No. 1:00-1898 MDL NO. 1358 (SAS) |
| This document relates to | * * | **AMENDED COMPLAINT** |
| *Commonwealth of Pennsylvania, etc. v. Exxon Mobil Corporation, et al*, No. 1:14-cv-06228-SAS | * * * | |

---

**THE COMMONWEALTH OF PENNSYLVANIA**, by and through Pennsylvania Attorney General Kathleen G. Kane, the Pennsylvania Insurance Department, the Pennsylvania Department of Environmental Protection and the Pennsylvania Underground Storage Tank Indemnification Fund,

        Plaintiff,

        v.

**EXXON MOBIL CORPORATION**, individually and as f/k/a, d/b/a and/or successor in liability to ExxonMobil Refining and Supply Company, Exxon Chemical U.S.A., ExxonMobil Chemical Corporation, ExxonMobil Chemical U.S.A., Exxon Corporation, and Mobil Corporation;

**EXXONMOBIL OIL CORPORATION**, individually and as f/k/a, d/b/a and/or successor in liability to Mobil Oil Corporation;

**AMERICAN REFINING GROUP, INC.**;

**ATLANTIC RICHFIELD COMPANY**, individually and as f/k/a, d/b/a and/or successor in liability to Atlantic Richfield Delaware Corporation, Atlantic Richfield

Company (a Pennsylvania corporation), ARCO Products Company, ARCO Chemical Company, a division of Atlantic Richfield Company, and ARCO Chemical Company, a Delaware Corporation;

**BP AMERICA INC.**, individually and as f/k/a, d/b/a and/or successor in liability to BP Products North America Inc., BP West Coast Products LLC, Atlantic Richfield Company, BP Amoco Corporation, Amoco Corporation, Amoco Oil Company, BP Exploration & Oil Inc., Sohio Oil Company, Standard Oil of Ohio (SOHIO), Standard Oil (Indiana), BP Amoco plc, BP Oil Inc., BP Oil Company, Atlantic Richfield Delaware Corporation, Atlantic Richfield Company (a Pennsylvania corporation), ARCO Products Company, ARCO Chemical Company, a division of Atlantic Richfield Company, and ARCO Chemical Company, a Delaware corporation;

**BP AMOCO CHEMICAL COMPANY**, individually and as f/k/a, d/b/a and/or successor in liability to Amoco Chemical Company, Amoco Chemicals Company, and Amoco Chemicals Corporation;

**BP HOLDINGS NORTH AMERICA LIMITED**, individually and as f/k/a, d/b/a and/or successor in liability to BP America Inc., BP Products North America Inc., BP West Coast Products LLC, Atlantic Richfield Company, BP Amoco Corporation, Amoco Corporation, Amoco Oil Company, BP Exploration & Oil Inc., Sohio Oil Company, Standard Oil of Ohio (SOHIO), Standard Oil (Indiana), BP Amoco plc, BP Oil Inc., BP Oil Company, Atlantic Richfield Delaware Corporation, Atlantic Richfield Company (a Pennsylvania corporation), ARCO Products Company, ARCO Chemical Company, a division of Atlantic Richfield Company, and ARCO Chemical Company, a Delaware corporation;

**BP p.l.c.**, individually and as f/k/a, d/b/a

and/or successor in liability to BP Holdings North America Limited, BP America Inc., BP Products North America Inc., BP West Coast Products LLC, Atlantic Richfield Company, BP Amoco Corporation, Amoco Corporation, Amoco Oil Company, BP Exploration & Oil Inc., Sohio Oil Company, Standard Oil of Ohio (SOHIO), Standard Oil (Indiana), BP Amoco plc, BP Oil Inc., BP Oil Company, Atlantic Richfield Delaware Corporation, Atlantic Richfield Company (a Pennsylvania corporation), ARCO Products Company, ARCO Chemical Company, a division of Atlantic Richfield Company, and ARCO Chemical Company, a Delaware corporation;

**BP PRODUCTS NORTH AMERICA INC**., individually and as f/k/a, d/b/a and/or successor in liability to BP Amoco Corporation, Amoco Corporation, Amoco Oil Company, BP Exploration & Oil Inc., Sohio Oil Company, BP Oil Inc. and BP Oil Company;

**BP WEST COAST PRODUCTS LLC**, individually and as f/k/a, d/b/a and/or successor in liability to Atlantic Richfield Company, Atlantic Richfield Company (a Pennsylvania corporation), and ARCO Products Company;

**CHEVRON CORPORATION**, individually and as f/k/a, d/b/a and/or successor in liability to Chevron U.S.A. Inc., Gulf Oil Corporation, Gulf Oil Corporation of Pennsylvania, Chevron Products Company and Chevron Chemical Company;

**CHEVRON U.S.A. INC.**, individually and as f/k/a, d/b/a and/or successor in liability to Gulf Oil Corporation, Gulf Oil Corporation of Pennsylvania, Chevron Products Company and Chevron Chemical Company;

**CITGO PETROLEUM CORPORATION**;

**CITGO REFINING AND CHEMICALS**

**COMPANY L.P.**;

**COASTAL EAGLE POINT OIL COMPANY**;

**CONOCOPHILLIPS**, individually and as f/k/a, d/b/a and/or successor in liability to ConocoPhillips Company, Phillips 66, Phillips 66 Company, Phillips Petroleum Company, Conoco, Inc., Tosco Corporation, and Tosco Refining Co.;

**CONOCOPHILLIPS COMPANY**, individually and as f/k/a, d/b/a and/or successor in liability to Phillips Petroleum Company, Conoco, Inc., Tosco Corporation, and Tosco Refining Co.;

**CROWN CENTRAL LLC**, individually and as f/k/a, d/b/a and/or successor in liability to Crown Central Petroleum Corporation;

**CUMBERLAND FARMS, INC.**;

**DUKE ENERGY MERCHANTS, LLC**;

**EL PASO MERCHANT ENERGY-PETROLEUM COMPANY**, individually and as f/k/a, d/b/a and/or successor in liability to Coastal Refining and Marketing, Inc. and Coastal States Trading, Inc.;

**ENERGY MERCHANT, LLC**;

**ENERGY TRANSFER PARTNERS, L.P.**, individually and as f/k/a, d/b/a and/or successor in liability to ETP Holdco Corporation, Sunoco, Inc., Sun Oil Company (PA) and Sun Oil Company;

**EQUILON ENTERPRISES LLC**, individually and as f/k/a, d/b/a and/or successor to Shell Oil Products US, Shell Oil Products Company LLC, Shell Oil Company, and Texaco Refining and Marketing Inc.;

**ETP HOLDCO CORPORATION**, individually and as f/k/a, d/b/a and/or successor in liability to Sunoco, Inc., Sun Oil Company (PA) and Sun Oil Company;

**GEORGE E. WARREN CORPORATION**;

**GETTY PROPERTIES CORPORATION**;

**GULF OIL LIMITED PARTNERSHIP**;

**HESS CORPORATION**, individually and as f/k/a, d/b/a and/or successor in liability to Amerada Hess Corporation;

**KINDER MORGAN, INC.,** individually and as f/k/a, d/b/a and/or successor in liability to El Paso Holdco LLC, El Paso Corporation, El Paso CGP Company LLC, El Paso Remediation Company, Coastal Corporation, Coastal Holding Corporation, CIC Industries Inc., Coastal Refining & Marketing Inc., Coastal Fuels Marketing Inc., Coastal Mart Inc., Derby Refining Co., Union Petroleum Corporation, Belcher Oil Company, Pester Marketing Company, and Coastal Branded Marketing, Inc.;

**LUKOIL AMERICAS CORPORATION**, individually and as f/k/a, d/b/a and/or successor in liability to Getty Petroleum Marketing Inc.;

**MARATHON OIL CORPORATION**, individually and as f/k/a, d/b/a and/or successor in liability to Marathon Oil Co., Marathon DE, Marathon PC, Marathon Petroleum Corporation, Marathon Holdings, and Marathon Pipeline;

**MARATHON PETROLEUM COMPANY LP**, individually and as f/k/a, d/b/a and/or successor in liability to Marathon Petroleum Company, LLC and Marathon Ashland Petroleum Company LLC;

**MARATHON PETROLEUM CORPORATION**, individually and as f/k/a, d/b/a and/or successor in liability to Marathon Oil Co., Marathon DE, Marathon PC, Marathon Petroleum, Marathon Holdings, and Marathon Pipeline;

**MOTIVA ENTERPRISES LLC**, individually and as f/k/a, d/b/a and/or successor in liability to Shell Oil Products Company, LLC, Shell Oil Products Company, Star Enterprise, and Texaco Refining and Marketing, Inc. East (a/k/a

TRMI East);

**NORTH ATLANTIC REFINING LTD.**;

**NUSTAR TERMINALS OPERATIONS PARTNERSHIP LP**, individually and as f/k/a, d/b/a and/or successor in liability to Support Terminals Operating Partnership, LP and ST Services, Inc.;

**PHILLIPS 66**, individually and as f/k/a, d/b/a and/or successor in liability to ConocoPhillips Company, Phillips Petroleum Company, Conoco, Inc., Tosco Corporation, and Tosco Refining Co.;

**PHILLIPS 66 COMPANY**, individually and as f/k/a, d/b/a and/or successor in liability to ConocoPhillips Company, Phillips Petroleum Company, Conoco, Inc., Tosco Corporation, and Tosco Refining Co.;

**THE PREMCOR REFINING GROUP INC.**;

**PREMCOR USA INC.**;

**SHELL OIL COMPANY**, individually and as f/k/a, d/b/a and/or successor in liability to Deer Park Refining LP, Shell Oil, Shell Oil Products, Shell Chemical, Shell Trading US, Shell Energy Services, Texaco Inc., The Pennzoil Company and Pennzoil-Quaker State Company;

**SHELL OIL PRODUCTS COMPANY LLC**, individually and as f/k/a, d/b/a and/or successor in liability to Shell Oil Products Company;

**SUN COMPANY, INC.**, individually and as f/k/a, d/b/a and/or successor in liability to Sunoco Inc;

**SUNOCO, INC.**, individually and as f/k/a, d/b/a and/or successor in liability to Sun Oil Company (PA) and Sun Oil Company;

**SUNOCO, INC. (R&M)**, individually and as f/k/a, d/b/a and/or successor in liability to Sun Company, Inc. (R&M), Sun Refining and Marketing Company, and Sun Oil Company of Pennsylvania;

**TEXACO INC.**, individually and as f/k/a, d/b/a and/or successor in liability to Texaco Refining and Marketing Inc.;

**TMR COMPANY,** individually and as f/k/a, d/b/a and/or successor in liability to Texaco Refining and Marketing Inc. and TRME Company (f/k/a Texaco Refining and Marketing (East), Inc.);

**TRMI-H LLC,** individually and as f/k/a, d/b/a and/or successor in liability to TRMI Holdings Inc., Texaco Refining and Marketing Inc., Getty Refining and Marketing Company, and Getty Oil Company (Eastern Operations), Inc.;

**TOTAL PETROCHEMICALS & REFINING USA, INC.;**

**UNITED REFINING COMPANY;**

**VALERO ENERGY CORPORATION**, individually and as f/k/a, d/b/a and/or successor in liability to Premcor Inc. and Valero R&M;

**VALERO MARKETING AND SUPPLY COMPANY;**

**VALERO REFINING AND MARKETING COMPANY;**

**VITOL S.A., INC.;**

**WESTERN REFINING YORKTOWN, INC.**, individually and as f/k/a, d/b/a and/or successor in liability to Giant Yorktown, Inc.;

**WILCOHESS LLC,**

Defendants.

---

## AMENDED COMPLAINT

Plaintiff Commonwealth of Pennsylvania, by and through Pennsylvania Attorney General Kathleen G. Kane, the Pennsylvania Department of Environmental Protection, the Pennsylvania Insurance Department and the Pennsylvania Underground Storage Tank Indemnification Fund (collectively the "Commonwealth"), files this Amended Complaint against the above-named defendants and in support thereof alleges as follows:

## SUMMARY OF THE CASE

1.      As more specifically set forth herein, the Commonwealth brings this action to:

a.      redress injury and the threat of future injury to waters of the Commonwealth caused by methyl tertiary butyl ether ("MTBE") and its derivative and breakdown products. MTBE is a chemical additive used in gasoline that was widely distributed in Pennsylvania as a result of efforts of the MTBE Defendants identified below;

b.      recover damages from the MTBE Defendants, including monies expended by the Commonwealth and its agencies (including the Pennsylvania Underground Storage Tank Indemnification Fund) ("USTIF" or the "Fund") and the Pennsylvania Department of Environmental Protection ("DEP") in investigating and remediating MTBE contamination caused by the MTBE Defendants;

c.      recover appropriate civil penalties, restitution and other equitable relief for the MTBE Defendants' unfair and deceptive acts and practices in marketing MTBE and gasoline containing MTBE ("MTBE gasoline") in Pennsylvania (the foregoing collectively the "MTBE Claims"); and

d.      recover monies paid by USTIF to the Insurance Defendants identified below (or to their contractors or vendors on those defendants' behalf) for claims relating to releases from underground storage tank systems owned or operated by the Insurance Defendants, in instances where the Insurance Defendants also received payment from their private insurers on the same claims (the "Insurance Claims").

## THE COMMONWEALTH'S MTBE CLAIMS

2.      Article I, § 27 of the Pennsylvania Constitution states: "The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of

the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people."

3. The Commonwealth is vested with the authority under its Constitution and laws to protect and seek compensation and other remedies for injury, and threat of injury, to the natural resources of the Commonwealth, in its own right, in its *parens patriae* capacity on behalf of its citizens and as trustee of the Commonwealth's natural resources.

4. The waters of the Commonwealth, both above and below ground, are an indivisible public natural resource in which the Commonwealth has substantial property and other interests and for which the Commonwealth acts as trustee for all its citizens.

5. The Commonwealth has an interest as a sovereign in protecting the health, safety and well-being, both physical and economic, of its citizens with respect to the waters of the Commonwealth, which serve the statewide water needs of Commonwealth's citizens.

6. The Commonwealth has the right and authority to protect, conserve, manage and redress injury, and threatened injury, to the waters of the Commonwealth for its own interests and the interests of its citizens and future generations.

7. The injuries and threatened injuries from MTBE contamination of Pennsylvania waters are statewide and involve and affect in a substantial way a significant portion of the state's population.

8. The Commonwealth's MTBE Claims seek to recover (i) the costs paid or incurred to date and in the future, including by USTIF and DEP, to detect, define the extent of, monitor, treat, abate, remove and/or otherwise remediate MTBE contamination and threatened contamination of groundwater and both public and private water wells (which are sourced from

groundwater) throughout Pennsylvania, including the costs to restore all MTBE contaminated waters to their pre-discharge condition; (ii) damages to the waters of the Commonwealth from MTBE contamination, including the loss of use and diminution in value of waters of the Commonwealth; and (iii) equitable remedies for harm caused by MTBE Defendants' unfair and deceptive acts and practices in the marketing of MTBE and MTBE gasoline.

9.      As a result of releases of MTBE from various gasoline stations and gasoline storage, transfer, delivery and dispensing systems ("gasoline storage and delivery systems"), MTBE has been detected in waters of the Commonwealth throughout the state.

10.     The waters of the Commonwealth that have been contaminated by these releases of MTBE include groundwater and other waters located directly beneath, on, or adjacent to these release sites, waters connected to waters beneath, on, or adjacent to these release sites, and public and private drinking water wells.

11.     MTBE is more persistent and mobile in groundwater than other constituents of gasoline. As a result of these characteristics, MTBE spreads farther and contaminates more groundwater than other gasoline ingredients.

12.     MTBE can cause adverse health effects. MTBE is a carcinogen. MTBE can also render drinking water foul, putrid and unfit for human consumption at low concentrations.

13.     MTBE contamination has injured, continues to injure and threatens to injure the waters of the Commonwealth, and the health, safety and welfare of the citizens of Pennsylvania.

14.     MTBE Defendants designed, manufactured, formulated, refined, set specifications for, exchanged, promoted, stored, marketed and/or otherwise supplied (directly or indirectly) MTBE and MTBE gasoline that was delivered, stored and sold in Pennsylvania (or to areas

outside Pennsylvania affecting the waters of the Commonwealth) resulting in contamination of the waters of the Commonwealth.

15. MTBE Defendants include MTBE manufacturers and MTBE gasoline refiners and major-brand gasoline marketers and distributors. At all times relevant, MTBE Defendants together controlled all or substantially all the entire market in Pennsylvania for MTBE and MTBE gasoline.

16. MTBE Defendants acted as aforesaid with respect to MTBE and MTBE gasoline despite the availability of reasonable alternatives and the MTBE Defendants' actual or constructive knowledge that MTBE and MTBE gasoline was hazardous, would be released into the environment from various gasoline delivery and storage systems, and would contaminate the waters of the Commonwealth.

17. MTBE Defendants knew or reasonably should have known that MTBE contamination would interfere with the Commonwealth's interests in protecting and preserving its public natural resources, including the waters of the Commonwealth, and otherwise impact and threaten the public health, safety and welfare, as has occurred and is continuing to occur within Pennsylvania.

18. As a result of MTBE Defendants' acts as alleged herein, the Commonwealth has suffered damages to its water resources and has incurred and will incur costs in defining the extent of MTBE contamination throughout the state and in monitoring and remediating MTBE.

19. MTBE Defendants are strictly liable for manufacturing and/or supplying defective products and failing to provide adequate warnings or instructions in connection with likely releases of the products. MTBE Defendants are also liable for creating public nuisances by the foreseeable release of MTBE and MTBE gasoline into the waters of the Commonwealth, for

trespass thereby upon the waters of the Commonwealth, for negligently causing damage to the waters of the Commonwealth and for all resulting damages from the release of MTBE and MTBE gasoline into the environment.  MTBE Defendants also are liable for punitive damages to reflect the aggravating circumstances of their wanton, malicious, oppressive and fraudulent conduct as set forth herein and for civil penalties and equitable relief under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P. S. § 201-1 *et seq.*, ("UTPCPL") based upon defendants' efforts to deceptively and unfairly market MTBE and MTBE gasoline as safe for the environment.

## THE COMMONWEALTH'S INSURANCE CLAIMS

20.     The Pennsylvania General Assembly, through The Storage Tank and Spill Prevention Act, Act 32 of 1989, 35 P. S. §§ 6021.101 *et seq.*, as amended ("STSPA" or "Act"), created USTIF to assist underground storage tank ("UST") owners and operators in meeting the financial responsibility requirements set forth in regulations established by the Pennsylvania Department of Environmental Protection with respect to UST releases.

21.     The Insurance Defendants owned or operated USTs and associated dispensing equipment ("UST systems") in Pennsylvania and, at all relevant times, were participants in USTIF.

22.     Regulations adopted pursuant to the STSPA required at all times relevant that USTIF participants be eligible for Fund coverage or corrective action costs.  25 Pa. Code § 977.1 *et seq.*  Regulations adopted pursuant to STSPA also establish release reporting, release confirmation and corrective action requirements.  25 Pa. Code § 245.301 *et seq.*

23.     USTIF made claim payments to eligible UST owners or operators for corrective action costs incurred as a result of an eligible claim upon the Fund.

24. To be eligible for Fund coverage, a claimant who was a tank owner or operator was required to meet the eligibility criteria set forth in 25 Pa. Code § 977.31, specifically:

a. The claimant was the owner or operator of the tank which is the subject of the claim;

b. All necessary state fees were paid;

c. The tank was registered as required by the Act;

d. The claimant had obtained all necessary permits or certifications under the Act;

e. The release that was the subject of the claim occurred after February 1, 1994;

f. The claimant cooperate, as defined in 25 Pa. Code § 977.32, with the Fund in its eligibility determination process, claims investigation, the defense of any suit, the pursuit of a subrogation action and other matters as requested; and

g. The claimant meet the notification requirements set forth in 25 Pa. Code § 977.34.

25. Pursuant to the Act, owners and operators of USTs were required to maintain financial responsibility and continuously participate in USTIF. 25 Pa Code § 245.704.

26. Pursuant to the Act, owners and operators are liable for corrective action costs, and nothing contained in the regulations is intended to limit or waive that liability. 25 Pa. Code § 245.705.

27. USTIF provided primary indemnity benefits for corrective action costs incurred as a result of an eligible claim. 25 Pa. Code § 977.38.

28. If a UST owner or operator fails to comply with the participant cooperation requirements set forth in 25 Pa. Code § 977.32, USTIF could deny payments on a claim. 25 Pa. Code § 977.40(b).

29.     After any Fund payment, USTIF was subrogated to all of the rights of recovery of an owner or operator against any person for the costs of remediation or other indemnity payments by the Fund.  25 Pa. Code § 977.40(a).

30.     All participants in USTIF, including the Insurance Defendants, were and are subject to the laws of Pennsylvania regarding indemnity claims made to the Fund, including, but not limited to, Pennsylvania's common law, statutes, regulations and rules pertaining to the Fund's subrogation rights and interests in or to any and all rights, actions and claims of an insured relating to a subject indemnity claim.

31.     Each of the Insurance Defendants made one or more claims to USTIF for indemnity payments to effect remediation of releases from their respective UST systems.  These indemnity claims in turn resulted in the Fund making indemnity payments to the Insurance Defendants.  Many of these UST releases were also the subject of claims by Insurance Defendants to private insurers which resulted in Insurance Defendants receiving multiple payments for the same remediation.  This occurred without the knowledge, consent or agreement of USTIF and in violation of the Commonwealth's rights, including its right of subrogation to all the claims, interests and rights of the Insurance Defendants with respect to payments made by USTIF for the costs of remediation.

## JURISDICTION AND VENUE

32.     The MTBE claims were removed to federal court by defendants pursuant to 28 USC § 1441 and the Court has supplemental subject matter jurisdiction under 28 USC § 1367 as to the Insurance Claims.  The MTBE Claims and the Insurance Claims were originally asserted in separate actions in the same Pennsylvania state court with the intention that the two actions would be subsequently consolidated for discovery and trial purposes under Pennsylvania Rules

of Civil Procedure.  Before the cases could be consolidated both the MTBE Defendants and the

Insurance Defendants filed Notices of Removal to the United States District Court for the

Eastern District of Pennsylvania  pursuant to Section 1503 of the Energy Policy Act of 2005, 119

Stat. 594.  The action asserting the Insurance Claims was subsequently dismissed voluntarily by

Plaintiff under F.R.C.P. 41 (a).  The Insurance Claims are now being asserted together with the

MTBE Claims in this action through this Amended Complaint.  The MTBE Claims and the

Insurance Claims arise in substantial part out of a common nucleus of operative facts.  Both sets

of claims involved gasoline releases from defendants' UST systems in Pennsylvania.  To the

extent Plaintiff's MTBE Claims and its Insurance Claims involve the same releases for which

indemnity payments were made by USTIF, both claims are seeking recovery of the same monies,

albeit from different defendants.

33.     The transferor court (the United States District Court for the Eastern District for

Pennsylvania) has personal jurisdiction over both MTBE Defendants and Insurance Defendants

as they are either Pennsylvania corporations or entities authorized to do business in

Pennsylvania, are foreign corporations or entities registered with the Pennsylvania Department of

State to do business in the state, do sufficient business with sufficient minimum contacts in the

state or otherwise intentionally avail themselves of the Pennsylvania market through the sale,

manufacturing, distribution or processing of petroleum products in the state or have committed

torts in this state so as to render the exercise of jurisdiction over all defendants consistent with

notions of fair play and substantial justice.

34.     Venue is proper in the transferor court (the United States District Court for the

Eastern District for Pennsylvania) under 28 USC § 1391 as both MTBE Defendants and

Insurance Defendants either have their registered offices or principal place of business in the

Eastern District or have regularly conducted business in the Eastern District, or a substantial portion of the events or omissions giving rise to the claims herein arose, or a substantial portion of the property that is the subject of the action, is situated in the Eastern District.

## PLAINTIFF

35.　Plaintiff Commonwealth of Pennsylvania, pursuant to the Pennsylvania Constitution Art. 1, § 27, is charged with conserving and maintaining Pennsylvania's natural resources, including the waters of the Commonwealth, for the benefit of all its citizens.  The Pennsylvania Constitution provides that public natural resources, including the waters of the Commonwealth, are the common property of the people, including those generations yet to come.

36.　The Commonwealth brings this action as a trustee of the waters of the Commonwealth and pursuant to its police powers, which include but are not limited to, its powers to prevent and abate pollution of the waters of the Commonwealth, to prevent and abate nuisances and to prevent and abate hazards to the public health, safety, and welfare, and to the environment.

37.　The Commonwealth has a significant property interest in the waters of the Commonwealth and a quasi-sovereign and a natural resource trustee interest in protecting the waters of the Commonwealth from contamination.  The contamination of the waters of the Commonwealth by MTBE and MTBE gasoline constitutes injury to the waters of the Commonwealth which are held in trust by the Commonwealth on behalf of all its citizens.  The Commonwealth brings this action directly in its own right, in its *parens patriae* capacity and as trustee of the natural resources.

38.     The Pennsylvania Department of Environmental Protection ("DEP") is a department within the Executive Branch of the Commonwealth government, vested with the authority to protect the environment, prevent and remediate pollution and protect the public health, comfort, safety and welfare.

39.     The Pennsylvania Insurance Department is a department within the Executive Branch of the Commonwealth government which administers the Pennsylvania Underground Storage Tank Indemnification Fund.  USTIF is a special, restricted fund of the State Treasury and was created by the Storage Tank and Spill Prevention Act, Act 32 of 1989, 35 P. S. §§ 6021.101 *et seq*., as amended for the purpose of making payments to eligible owners or operators of USTs for remedial action arising from releases therefrom.

40.     In addition to asserting its direct damage claims, the Commonwealth sues pursuant to its statutory right of subrogation under 25 Pa. Code § 977.40(a) to the third party claims against MTBE Defendants of the UST owners and operators who received payments under USTIF and pursuant to the third party insurance and indemnity rights, interests and claims of the Insurance Defendants who as USTIF indemnitees received insurance or other third party indemnification payments for the same costs for which they were paid by USTIF.  In its quasi-sovereign, *parens patriae,* trustee and other governmental capacities, the Commonwealth's interests in these claims are separate and apart from the interests of the private parties to which it is subrogated.

41.     The Commonwealth, through its Attorney General, also brings this action against the MTBE Defendants pursuant to the Commonwealth Attorneys Act, 71 P. S. § 732-204, and the UTPCPL to obtain equitable relief, restoration of moneys acquired by defendants by means of their violations of the statute, and civil penalties against defendants.

## DEFENDANTS

42.     Defendant Exxon Mobil Corporation is a New Jersey corporation with a registered Pennsylvania office c/o Corporation Service Company, 2595 Interstate Drive, Suite 103, Harrisburg, Pennsylvania 17110, and its principal place of business at 5959 Las Colinas Boulevard, Irving, Texas 75039.  Defendant Exxon Mobil Corporation was formerly known as, did business as, and/or is the successor in liability to ExxonMobil Refining and Supply Company, Exxon Chemical U.S.A., ExxonMobil Chemical Corporation, ExxonMobil Chemical U.S.A, Exxon Corporation and Mobil Corporation.  The terms "Exxon" and "Mobil" as used in this Complaint refer to Defendants Exxon Mobil Corporation and ExxonMobil Oil Corporation, and their related entities ExxonMobil Refining and Supply Company, Exxon Chemical U.S.A., ExxonMobil Chemical Corporation, ExxonMobil Chemical U.S.A., Exxon Corporation, and Mobil Corporation.

43.     Defendant ExxonMobil Oil Corporation is a New York corporation with a registered Pennsylvania office c/o Corporation Service Company, 2595 Interstate Drive, Suite 103, Harrisburg, Pennsylvania 17110, and its principal place of business at 5959 Las Colinas Boulevard, Irving, Texas 75039.  Defendant ExxonMobil Oil Corporation was formerly known as, did business as, and/or is the successor in liability to Mobil Oil Corporation.

44.     Defendant American Refining Group, Inc. is a Pennsylvania corporation with a registered Pennsylvania office at 100 Four Falls Corporate Ctr., Ste. 215, West Conshohocken, Pennsylvania 19428, and its principal place of business at 77 N Kendall Ave., Bradford, Pennsylvania 16701.  The term "American Refining" as used in this Complaint refers to Defendant American Refining Group, Inc.

45.     Defendant Atlantic Richfield Company is a Delaware corporation with a registered Pennsylvania office c/o CT Corporation System, 1515 Market St., Philadelphia, PA 19102, and its principal place of business at 501 Westlake Park Boulevard, Houston, Texas 77079. Defendant Atlantic Richfield Company was formerly known as, did business as, and/or is the successor in liability to Atlantic Richfield Delaware Corporation, Atlantic Richfield Company (a Pennsylvania corporation), ARCO Products Company, ARCO Chemical Company, a division of Atlantic Richfield Company, and ARCO Chemical Company, a Delaware corporation.

46.     BP America Inc. is a Delaware corporation with a registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101, and its principal place of business at 4101 Winfield Road, Warrenville, Illinois 60555. The term "BP America" as used in this Complaint refers to Defendant BP America Inc. Defendant BP America Inc. was formerly known as, did business as, and/or is the successor in liability to Defendant BP Products North America Inc., Defendant BP West Coast Products LLC, Defendant Atlantic Richfield Company, BP Amoco Corporation, Amoco Corporation, Amoco Oil Company, BP Exploration & Oil Inc., Sohio Oil Company, Standard Oil of Ohio (SOHIO), Standard Oil (Indiana), BP Amoco plc, BP Oil Inc., BP Oil Company, Atlantic Richfield Delaware Corporation, Atlantic Richfield Company (a Pennsylvania corporation), ARCO Products Company, ARCO Chemical Company, a division of Atlantic Richfield Company, and ARCO Chemical Company, a Delaware corporation.

47.     Defendant BP Amoco Chemical Company is a Delaware corporation with a registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101, and its principal place of business at 150 West Warrenville

Road, Naperville, Illinois 60563. Defendant BP Amoco Chemical was formerly known as, did business as, and/or is the successor in liability to Amoco Chemical Company, Amoco Chemicals Company and Amoco Chemicals Corporation. The term "BP Amoco Chemical" as used in this Complaint refers to Defendant BP Amoco Chemical Company and its related entities Amoco Chemical Company, Amoco Chemicals Company, and Amoco Chemicals Corporation.

48. Defendant BP Holdings North America Limited is a corporation organized under the laws of England and Wales with its principal offices in England. In December 2006, Defendant BP p.l.c. transferred all of its holdings in Defendant BP America Inc. to Defendant BP Holdings North America Limited. Defendant BP p.l.c. is the owner of all of the holdings of Defendant BP Holdings North America Limited. Defendant BP Holdings North America was formerly known as, did business as, and/or is the successor in liability to Defendant BP America Inc., Defendant BP Products North America Inc., Defendant BP West Coast Products LLC, Defendant Atlantic Richfield Company, BP Amoco Corporation, Amoco Corporation, Amoco Oil Company, BP Exploration & Oil Inc., Sohio Oil Company, Standard Oil of Ohio (SOHIO), Standard Oil (Indiana), BP Amoco plc, BP Oil Inc., BP Oil Company, Atlantic Richfield Delaware Corporation, Atlantic Richfield Company (a Pennsylvania corporation), ARCO Products Company, ARCO Chemical Company, a division of Atlantic Richfield Company, and ARCO Chemical Company, a Delaware corporation.

49. Defendant BP p.l.c. is a corporation organized under the laws of England and Wales with its principal offices at One St. James Square in London, England. Defendant BP p.lc. was formerly known as, did business as, and/or is the successor in liability to Defendant BP Holdings North America Limited, Defendant BP America Inc., Defendant BP Products North America Inc., Defendant BP West Coast Products LLC, Defendant Atlantic Richfield Company,

BP Amoco Corporation, Amoco Corporation, Amoco Oil Company, BP Exploration & Oil Inc.,

Sohio Oil Company, Standard Oil of Ohio (SOHIO), Standard Oil (Indiana), BP Amoco plc, BP

Oil Inc., BP Oil Company, Atlantic Richfield Delaware Corporation, Atlantic Richfield

Company (a Pennsylvania corporation), ARCO Products Company, ARCO Chemical Company,

a division of Atlantic Richfield Company, and ARCO Chemical Company, a Delaware

corporation.

50.     Defendant BP Products North America Inc. is a Maryland corporation with a

registered Pennsylvania office c/o The Prentice-Hall Corporation System, Inc., 2595 Interstate

Drive, Suite 103, Harrisburg, Pennsylvania 17110, and its principal place of business at 28100

Torch Parkway, Warrenville, Illinois 60555.  BP Products North America Inc. is a subsidiary of

BP America Inc. that manages, owns and operates the refining and retail marketing assets of BP

America Inc. in the United States.  Defendant BP Products North America Inc. was formerly

known as, did business as, and/or is the successor in liability to BP Amoco Corporation, Amoco

Corporation, Amoco Oil Company, BP Exploration & Oil Inc., Sohio Oil Company, BP Oil Inc.

and BP Oil Company.   The terms "BP Products NA" and "BP Amoco" as used in this

Complaint refer to Defendants BP Holdings North America Limited, BP p.l.c., BP Products

North America Inc., and their related entities BP Amoco Corporation, Amoco Corporation,

Amoco Oil Company, BP Exploration & Oil Inc., Sohio Oil Company, Standard Oil of Ohio

(SOHIO), Standard Oil (Indiana), BP Amoco plc, BP Oil Inc., and BP Oil Company.

51.     Defendant BP West Coast Products LLC is a Delaware limited liability company

with its principal place of business at 4 Centerpointe Drive, La Palma, California 90623.

Defendant BP West Coast Products LLC was formerly known as, did business as, and/or is the

successor in liability to Atlantic Richfield Company, Atlantic Richfield Company (a

Pennsylvania corporation) and ARCO Products Company. The terms "BP West Coast Products" and "ARCO" as used in this Complaint refer to Defendants BP West Coast Products LLC and Atlantic Richfield Company, and their related entities Atlantic Richfield Delaware Corporation, Atlantic Richfield Company (a Pennsylvania corporation), ARCO Products Company, ARCO Chemical Company, an unincorporated division of Atlantic Richfield Company, and ARCO Chemical Company, a Delaware corporation.

52.     Defendant Chevron Corporation is a corporation organized under the laws of the State of Delaware with its principal offices at 6001 Bollinger Canyon Road in San Ramon, California 94583. Defendant Chevron Corporation was formerly known as, did business as, and/or is the successor in liability to Defendant Chevron U.S.A. Inc. and its related entities Gulf Oil Corporation, Gulf Oil Corporation of Pennsylvania, Chevron Products Company, and Chevron Chemical Company.

53.     Defendant Chevron U.S.A. Inc. is a Pennsylvania corporation with a registered Pennsylvania office c/o Corporation Service Company, 2595 Interstate Drive, Suite 103, Harrisburg, Pennsylvania 17110, and its principal place of business at 6001 Bollinger Canyon Road, San Ramon, California 94583. In approximately 1986, Chevron U.S.A. Inc. sold substantially all of its retail outlets and other marketing assets in the Northeast region of the United States to Cumberland Farms. Defendant Chevron U.S.A. Inc. was formerly known as, did business as, and/or is the successor in liability to Gulf Oil Corporation, Gulf Oil Corporation of Pennsylvania, Chevron Products Company and Chevron Chemical Company. The term "Chevron" as used in this Complaint refers to Defendants Chevron Corporation and Chevron U.S.A. Inc., and their related entities Chevron Products Company, Gulf Oil Corporation of Pennsylvania, and Gulf Oil Corporation.

54.     Defendant CITGO Petroleum Corporation is a Delaware Corporation with a registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101, and its principal place of business at 1293 Eldridge Pkwy, Houston, Texas 77077.  Defendant CITGO Petroleum Corporation is a wholly-owned subsidiary of PDV America, Inc., an indirect, wholly-owned subsidiary of Petróleos de Venezuela, S.A., the national oil company of the Bolivarian Republic of Venezuela.  The term "CITGO" as used in this Complaint refers to Defendants CITGO Petroleum Corporation and CITGO Refining and Chemicals Company L.P., and their related entities PDV America, Inc. and Petróleos de Venezuela, S.A.

55.     Defendant CITGO Refining and Chemicals Company L.P. is a Delaware limited partnership with its principal place of business at 1802 Nueces Bay Blvd., Corpus Christi, Texas 78469.

56.     Defendant Coastal Eagle Point Oil Company is a Delaware corporation with a registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101, and its principal place of business at 1001 Louisiana Street, Houston, Texas 77002.  The term "Coastal Eagle" as used in this Complaint refers to Defendant Coastal Eagle Point Oil Company.

57.     Defendant ConocoPhillips is a corporation organized under the laws of the State of Delaware with its principal offices in Houston, Texas.  Defendant ConocoPhillips was formerly known as, did business as, and/or is the successor in liability to Defendants ConocoPhillips Company, Phillips 66, Phillips 66 Company, and their related entities Phillips Petroleum Company, Conoco, Inc., Tosco Corporation and Tosco Refining Co.  The term "ConocoPhillips" as used in this Complaint refers to Defendants ConocoPhillips, ConocoPhillips

Company, Phillips 66 and Phillips 66 Company, and to their related entities Phillips Petroleum

Company, Conoco Inc., Tosco Corporation, and Tosco Refining Co.

58.     Defendant ConocoPhillips Company is a Delaware corporation with a registered

Pennsylvania office c/o Corporation Service Company, 2595 Interstate Drive, Suite 103,

Harrisburg, Pennsylvania 17110, and its principal place of business at 600 North Dairy Ashford,

Houston, Texas 77079.  ConocoPhillips Company was formerly known as, did business as,

and/or is the successor in liability to Phillips Petroleum Company, Conoco, Inc., Tosco

Corporation and Tosco Refining Co.  The term "ConocoPhillips" as used in this Complaint refers

to Defendants ConocoPhillips, ConocoPhillips Company, Phillips 66, and Phillips 66 Company,

and to their related entities Phillips Petroleum Company, Conoco Inc., Tosco Corporation, and

Tosco Refining Co.

59.     Defendant Crown Central LLC is a Maryland limited liability company with a

registered Pennsylvania office c/o Corporation Service Company, 2595 Interstate Drive, Suite

103, Harrisburg, Pennsylvania 17110, and its principal place of business at One North Charles

Street, Baltimore, Maryland 21201.  Defendant Crown Central LLC was formerly known as, did

business as, and/or is the successor in liability to Crown Central Petroleum Corporation.  The

term "Crown Central" as used in this Complaint refers to Defendant Crown Central LLC and its

related entity Crown Central Petroleum Corporation.

60.     Defendant Cumberland Farms, Inc. is a Delaware corporation with a registered

Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg,

Pennsylvania 17101, and its principal place of business at 100 Crossings Boulevard,

Framingham, MA 01702.  In approximately 1986, Defendant Chevron U.S.A. Inc. sold

substantially all of its retail outlets and other marketing assets in the Northeast region of the

United States to Defendant Cumberland Farms, Inc. The term "Cumberland Farms" as used in this Complaint refers to Defendant Cumberland Farms, Inc.

61.     Defendant Duke Energy Merchants, LLC is a Delaware limited liability company with a registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101, and its principal place of business at 5555 San Felipe Road, Houston, Texas 77056. The term "Duke Energy" as used in this Complaint refers to Defendant Duke Energy Merchants, LLC.

62.     Defendant El Paso Merchant Energy-Petroleum Company is a Delaware limited liability company with a registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101, and its principal place of business at 1001 Louisiana Street, Houston, Texas 77002. Defendant El Paso Merchant Energy-Petroleum Company was formerly known as, did business as, and/or is the successor in liability to Coastal Refining and Marketing, Inc. and Coastal States Trading, Inc. The term "El Paso" as used in this Complaint refers to Defendants Kinder Morgan, Inc. and El Paso Merchant Energy-Petroleum Company, and their related entities Coastal Refining and Marketing, Inc. and Coastal States Trading, Inc.

63.     Defendant Energy Merchant, LLC is a Delaware limited liability company with a registered Pennsylvania office c/o Lexis Document Services Inc., 2595 Interstate Drive, Suite 103, Harrisburg, Pennsylvania 17110, and its principal place of business at 5 Lake Fanny Road, Bel Air, Maryland 21014. The term "Energy Merchant" as used in this Complaint refers to Defendant Energy Merchant, LLC.

64.     Defendant Energy Transfer Partners, L.P. is a publicly traded limited partnership organized under the laws of the State of Delaware with its principal place of business at 3738

Oak Lawn Ave., Dallas, Texas 75219.  On October 5, 2012, Defendant Energy Transfer Partners, L.P. through its wholly owned subsidiary, Defendant ETP Holdco Corporation, merged with Defendant Sunoco, Inc.  Defendant Energy Transfer Partners, L.P. was formerly known as, did business as, and/or is the successor in liability to Defendants ETP Holdco Corporation and Sunoco, Inc., and their related entities Sun Oil Company (PA) and Sun Oil Company.

65.     Defendant Equilon Enterprises LLC is a Delaware limited liability company with a registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101, and its principal place of business at 910 Louisiana Street, Suite 2200, Houston, Texas 77002.  Defendant Equilon Enterprises LLC was formerly known as, did business as, and/or is the successor in liability to Shell Oil Products US, Shell Oil Products Company LLC, Shell Oil Company and Texaco Refining and Marketing Inc.  The term "Equilon" as used in this Complaint refers to Defendant Equilon Enterprises LLC and its related entities Shell Oil Products US, Shell Oil Products Company LLC, Shell Oil Company, and Texaco Refining and Marketing Inc.

66.     Defendant ETP Holdco Corporation is a Delaware corporation with its principal place of business at 3738 Oak Lawn Ave., Dallas, Texas 75219.  On October 5, 2012, Defendant Energy Transfer Partners, L.P. through its wholly owned subsidiary, Defendant ETP Holdco Corporation, merged with Defendant Sunoco, Inc.  Defendant ETP Holdco Corporation was formerly known as, did business as, and/or is the successor in liability to Defendant Sunoco, Inc., and its related entities Sun Oil Company (PA) and Sun Oil Company.

67.     Defendant George E. Warren Corporation is a Massachusetts corporation with a registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101, and its principal place of business at 3001 Ocean Drive, Vero

Beach, Florida 32963. The term "George E. Warren" as used in this Complaint refers to Defendant George E. Warren Corporation. .

68. Defendant Getty Properties Corporation is a Delaware corporation with a registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101, and its principal place of business at 125 Jericho Turnpike, Jericho, New York 11753.

69. Defendant Gulf Oil Limited Partnership is a Delaware limited partnership with a registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101, and its principal place of business at 100 Crossing Boulevard, Framingham, Massachusetts 01702. Gulf Oil Limited Partnership is a subsidiary of Cumberland Farms, Inc. and is controlled by Cumberland Farms, Inc. The term "GOLP" as used in this Complaint refers to Defendant Gulf Oil Limited Partnership and Cumberland Farms, Inc.

70. Defendant Hess Corporation is a Delaware corporation with a registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101, and its principal place of business at 1185 Avenue of the Americas, 40th Floor, New York, New York 10036. Defendant Hess Corporation was formerly known as, did business as, and/or is the successor in liability to Amerada Hess Corporation. The term "Hess" as used in this Complaint refers to Defendants WilcoHess LLC and Hess Corporation, and their related entity Amerada Hess Corporation.

71. Defendant Kinder Morgan Inc. is a corporation organized under the laws of the State of Delaware with its principal offices at 500 Dallas Street, Suite 1000 in Houston, Texas 77002. Defendant Kinder Morgan, Inc. was formerly known as, did business as, and/or is the successor in liability to El Paso Holdco LLC, El Paso Corporation, El Paso CGP Company LLC,

El Paso Remediation Company, Coastal Corporation, Coastal Holding Corporation, CIC Industries Inc., Coastal Refining & Marketing Inc., Coastal Fuels Marketing Inc., Coastal Mart Inc., Derby Refining Co., Union Petroleum Corporation, Belcher Oil Company, Pester Marketing Company, and Coastal Branded Marketing, Inc.

72.     Defendant Lukoil Americas Corporation is a Delaware corporation with its principal place of business at 505 Fifth Avenue, 9th Floor, New York, New York 11554. Defendant Lukoil Americas Corporation was formerly known as, did business as, and/or is the successor in liability to Getty Petroleum Marketing, Inc. The term "Lukoil" as used in this Complaint refers to Defendant Lukoil Americas Corporation and its related entity Getty Petroleum Marketing, Inc.

73.     Defendant Marathon Oil Corporation is a Delaware corporation with its principal place of business at 5555 San Felipe Road, Houston, Texas 77056. Defendant Marathon Oil Corporation was formerly known as, did business as, and/or is the successor in liability to Marathon Oil Co., Marathon DE, Marathon PC, Marathon Petroleum Corporation, Marathon Holdings and Marathon Pipeline. The term "Marathon" as used in this Complaint refers to Defendants Marathon Oil Corporation, Marathon Petroleum Company LP and Marathon Petroleum Corporation, and their related entities Marathon Oil Co., Marathon DE, Marathon PC, Marathon Ashland Petroleum Company LLC, Marathon Holdings, and Marathon Pipeline.

74.     Defendant Marathon Petroleum Company LP is a limited partnership organized and existing under the laws of the State of Delaware with a registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101, and its principal place of business at 539 South Main Street, Findlay, Ohio 45840. Defendant Marathon Petroleum Company LP was formerly known as, did business as, and/or is the successor in

liability to Marathon Petroleum Company LLC and Marathon Ashland Petroleum Company LLC.

75.     Defendant Marathon Petroleum Corporation is a Delaware corporation with its principal place of business at 539 South Main Street, Findlay, Ohio 45840.  Defendant Marathon Petroleum Corporation was formerly known as, did business as, and/or is the successor in liability to Marathon Oil Co., Marathon DE, Marathon PC, Marathon Petroleum, Marathon Holdings, and Marathon Pipeline.

76.     Defendant Motiva Enterprises LLC is a Delaware limited liability company with a registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101, and its principal place of business at 700 Milam Street, Suite 2028, Houston, Texas 77002.  Defendant Motiva Enterprises LLC was formerly known as, did business as, and/or is the successor in liability to Shell Oil Products Company, LLC, Shell Oil Products Company, Star Enterprise, and Texaco Refining and Marketing, Inc. East (a/k/a TRMI East).  The term "Motiva" as used in this Complaint refers to Defendant Motiva Enterprises LLC, Shell Oil Products Company, LLC, Star Enterprise, and Texaco Refining and Marketing, Inc. East (a/k/a TRMI East).

77.     Defendant North Atlantic Refining Ltd. is a Canadian company with its principal place of business at 1 Refinery Road, Come By Chance, Newfoundland, Canada.  The term "North Atlantic Refining" as used in this Complaint refers to Defendant North Atlantic Refining Ltd.

78.     Defendant NuStar Terminals Operations Partnership, LP is a Delaware limited partnership with a registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101, and its principal place of business at 17304 Preston

Road, Suite 1000, Dallas, Texas 75252. Defendant NuStar Terminals Operations Partnership, LP was formerly known as, did business as, and/or is the successor in liability to Support Terminals Operating Partnership, LP and ST Services, Inc. The term "NuStar" as used in this Complaint refers to Defendant NuStar Terminals Operations Partnership, LP and its related entities Support Terminals Operating Partnership, LP and ST Services, Inc.

79.     Defendant Phillips 66 is a Delaware corporation with its principal place of business at P.O. Box 4428, Houston, Texas. Phillips 66 was formerly known as, did business as, and/or is the successor in liability to ConocoPhillips Company, Phillips Petroleum Company, Conoco, Inc., Tosco Corporation, and Tosco Refining Co.

80.     Defendant Phillips 66 Company is a Delaware corporation with a registered Pennsylvania office c/o Corporation Service Company, 2595 Interstate Drive, Suite 103, Harrisburg, Pennsylvania 17110, and its principal place of business in Houston, Texas. Defendant Phillips 66 Company was formerly known as, did business as, and/or is the successor in liability to ConocoPhillips Company, Phillips Petroleum Company, Conoco, Inc., Tosco Corporation, and Tosco Refining Co.

81.     Defendant The Premcor Refining Group Inc. is a Delaware corporation with a registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101, and its principal place of business at 1700 East Putnam Ave., Old Greenwich, Connecticut 06870. Defendant The Premcor Refining Group Inc. is a wholly-owned subsidiary of and is controlled by Defendant Valero Energy Corporation. The term "Premcor" as used in this Complaint refers to Defendants The Premcor Refining Group, Inc. and Premcor USA Inc.

82.     Defendant Premcor USA Inc. is a Delaware corporation with its principal place of business at 1700 East Putnam Ave., Old Greenwich, Connecticut 06870.  Defendant Premcor USA Inc. is a wholly-owned subsidiary of and is controlled by Defendant Valero Energy Corporation.

83.     Defendant Shell Oil Company is a Delaware corporation with a registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101, and its principal place of business at One Shell Plaza, 910 Louisiana Street, Houston, Texas 77002.  Shell Oil Company is a wholly-owned subsidiary of Royal Dutch Shell PLC.  Shell Oil Company was formerly known as, did business as, and/or is the successor in liability to Deer Park Refining LP, Shell Oil, Shell Oil Products, Shell Chemical, Shell Trading US, Shell Energy Services, The Pennzoil Company, and Pennzoil-Quaker State Company. The term "Shell" as used in this Complaint refers to Defendants Shell Oil Company and Shell Oil Products Company LLC, and their related entities Deer Park Refining LP, Shell Oil Products, Shell Oil Products Company, Shell Chemical, Shell Trading US, Shell Energy Services, Texaco Inc., Motiva, The Pennzoil Company, and Pennzoil-Quaker State Company.

84.     Defendant Shell Oil Products Company LLC is a Delaware limited liability company with a registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101, and its principal place of business at One Shell Plaza, 910 Louisiana Street, Houston, Texas 77002.  Shell Oil Products Company LLC was formerly known as, did business as, and/or is the successor in liability to Shell Oil Products Company.

85.     Defendant Sun Company, Inc. is a Pennsylvania corporation with a registered Pennsylvania office c/o Corporation Service Company, 2595 Interstate Drive, Suite 103,

Harrisburg, Pennsylvania 17110, and its principal place of business in Philadelphia, Pennsylvania. Defendant Sun Company, Inc. was formerly known as, did business as, and/or is the successor in liability to Sunoco Inc. The term "Sunoco" as used in this Complaint refers to Defendants Energy Transfer Partners, L.P., ETP Holdco Corporation, Sun Company, Inc., Sunoco, Inc., and Sunoco, Inc. (R&M), and their related entities Sunoco Inc, Sun Company, Inc. (R&M), Sun Refining and Marketing Company, Sun Oil Company of Pennsylvania, Sun Oil Company (PA), and Sun Oil Company.

86.     Defendant Sunoco, Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania with a registered Pennsylvania office c/o Corporation Service Company, 2595 Interstate Drive, Suite 103, Harrisburg, Pennsylvania 17110, and its principal offices at 1735 Market Street, Philadelphia, Pennsylvania 19103-7583. Defendant Sunoco, Inc. was formerly known as, did business as, and/or is the successor in liability to Sun Oil Company (PA) and Sun Oil Company.

87.     Defendant Sunoco, Inc. (R&M) is a Pennsylvania corporation with a registered Pennsylvania office c/o Corporation Service Company, 2595 Interstate Drive, Suite 103, Harrisburg, Pennsylvania 17110, and its principal place of business at 1735 Market Street, Philadelphia, Pennsylvania 19103. Defendant Sunoco, Incorporated (R&M) was formerly known as, did business as, and/or is the successor in liability to Sun Company, Inc. (R&M), Sun Refining and Marketing Company, and Sun Oil Company of Pennsylvania.

88.     Defendant Texaco Inc. is a Delaware corporation with a registered Pennsylvania office c/o Corporation Service Company, 2595 Interstate Drive, Suite 103, Harrisburg, Pennsylvania 17110, and its principal place of business at 6001 Bollinger Canyon Road, San Ramon, California 94583. Defendant Texaco Inc. was formerly known as, did business as,

and/or is the successor in liability to Texaco Refining and Marketing Inc. The term "Texaco" as used in this Complaint refers to Defendant Texaco Inc. and its related entity Texaco Refining and Marketing, Inc.

89.     Defendant TMR Company is a Delaware corporation with its principal place of business at 910 Louisiana, Houston, Texas 77002. Defendant TMR Company was formerly known as, did business as and/or is the successor in liability to Texaco Refining and Marketing Inc. and TRME Company (f/k/a Texaco Refining and Marketing (East), Inc.).

90.     Defendant TRMI-H LLC is a Delaware corporation with its principal place of business at 6001 Bollinger Canyon Road, San Ramon, California 94583. Defendant TRMI-H LLC was formerly known as, did business as and/or is the successor in liability to TRMI Holdings Inc., Texaco Refining and Marketing Inc., Getty Refining and Marketing Company, and Getty Oil Company (Eastern Operations), Inc.

91.     Defendant Total Petrochemicals & Refining USA, Inc. is a Delaware corporation with a registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101, and its principal place of business at Total Plaza, 1201 Louisiana Street, Suite 1800, Houston, Texas 77002. The term "Total" as used in this Complaint refers to Defendant Total Petrochemicals & Refining USA, Inc.

92.     Defendant United Refining Company is a Pennsylvania corporation with its registered office and principal place of business at 15 Bradley St., Warren, Pennsylvania 16365. The term "United Refining" as used in this Complaint refers to Defendant United Refining Company.

93.     Defendant Valero Energy Corporation is a Delaware corporation with its principal place of business at One Valero Way, San Antonio, Texas 78249. Defendant Valero Energy

Corporation was formerly known as, did business as, and/or is the successor in liability to Premcor Inc., Premcor Refining, Premcor Pipeline and Valero PA. The term "Valero" as used in this Complaint refers to Defendants Valero Energy Corporation, Valero Marketing and Supply Company and Valero Refining and Marketing Company, and their related entities Premcor Inc., Premcor Refining, Premcor Pipeline, and Valero PA.

94. Defendant Valero Marketing and Supply Company is a Delaware corporation with a registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101, and its principal place of business at One Valero Way, San Antonio, Texas 78249.

95. Defendant Valero Refining and Marketing Company is a Delaware corporation with its principal place of business at One Valero Way, San Antonio, Texas 78249.

96. Defendant Vitol S.A. is a Swiss corporation with its principal place of business at 1270 6th Avenue, Suite 1030, New York, New York 10020. Defendant Vitol S.A. also does business as Vitol S.A., Inc. The term "Vitol" as used in this Complaint refers to Defendant Vitol S.A. and its related entity Vitol S.A., Inc.

97. Defendant Western Refining Yorktown, Inc. is a Delaware corporation with a registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101, and its principal place of business at 1250 West Washington Street, Suite 101, Tempe, AZ 85281. Defendant Western Refining Yorktown, Inc. was formerly known as, did business as, and/or is the successor in liability to Giant Yorktown, Inc. The term "Western Refining" as used in this Complaint refers to Defendant Western Refining Yorktown, Inc. and its related entity Giant Yorktown, Inc.

98.     Defendant WilcoHess LLC is a Delaware limited liability corporation with a registered Pennsylvania office c/o CT Corporation System, 116 Pine Street, Suite 320, Harrisburg, Pennsylvania 17101, and its principal place of business at 5446 University Parkway, Winston-Salem, NC 27105.  The company was formed as a joint venture between A.T. Williams Oil Company and Defendant Hess Corporation, and became a subsidiary of Defendant Hess Corporation in 2014.

99.     For purposes of this Amended Complaint, "defendant" shall mean and refer to all of the defendants named herein.

100.     For purposes of this Amended Complaint, "MTBE Defendants" shall mean and refer to the following parties: Exxon Mobil Corporation, ExxonMobil Oil Corporation, American Refining Group, Inc., Atlantic Richfield Company, BP America Inc., BP Amoco Chemical Company, BP Holdings North America Limited, BP p.l.c., BP Products North America Inc., BP West Coast Products LLC, Chevron Corporation, Chevron U.S.A. Inc., CITGO Petroleum Corporation, CITGO Refining and Chemicals Company L.P., Coastal Eagle Point Oil Company, ConocoPhillips, ConocoPhillips Company, Crown Central LLC, Cumberland Farms, Inc., Duke Energy Merchants, LLC, El Paso Merchant Energy-Petroleum Company, Energy Merchant, LLC, Equilon Enterprises LLC, George E. Warren Corporation, Getty Properties Corporation, Gulf Oil Limited Partnership, Hess Corporation, Lukoil Americas Corporation, Marathon Oil Corporation, Marathon Petroleum Company LP, Marathon Petroleum Corporation, Motiva Enterprises LLC, North Atlantic Refining Ltd., Nustar Terminals Operations Partnership LP, Phillips 66, Phillips 66 Company, The Premcor Refining Group Inc., Premcor USA Inc., Shell Oil Company, Shell Oil Products Company LLC, Sun Company, Inc., Sunoco, Inc., Sunoco Inc. (R&M), Texaco Inc., TMR Company, TRMI-H, LLC, Total Petrochemicals & Refining USA,

Inc., United Refining Company, Valero Energy Corporation, Valero Marketing and Supply Company, Valero Refining and Marketing Company, Vitol S.A., Inc., and Western Refining Yorktown, Inc.

101.    For purposes of this Amended Complaint, "Insurance Defendants" shall mean and refer to the following parties: Atlantic Richfield Company, BP America Inc., BP Holdings North America Limited, BP p.l.c., BP Products North America Inc., BP West Coast Products LLC, Chevron Corporation, Chevron U.S.A. Inc., CITGO Petroleum Corporation, CITGO Refining and Chemicals Company L.P., ConocoPhillips, ConocoPhillips Company, Cumberland Farms, Inc., El Paso Merchant Energy-Petroleum Company, Energy Transfer Partners, L.P., Equilon Enterprises LLC, ETP Holdco Corporation, Getty Properties Corporation, Gulf Oil Limited Partnership, Hess Corporation, Kinder Morgan, Inc., Lukoil Americas Corporation, Marathon Oil Corporation, Marathon Petroleum Company LP, Marathon Petroleum Corporation, Motiva Enterprises LLC, Phillips 66, Phillips 66 Company, The Premcor Refining Group Inc., Premcor USA Inc., Shell Oil Company, Shell Oil Products Company LLC, Sun Company, Inc., Sunoco, Inc., Sunoco Inc. (R&M), Texaco Inc., TMR Company, TRMI-H, LLC, United Refining Company, Valero Energy Corporation, Valero Marketing and Supply Company, Valero Refining and Marketing Company, and WilcoHess LLC.

102.    Each of the defendants has done, or is doing, business in Pennsylvania at all times material hereto.

103.    At all times material hereto, MTBE Defendants Atlantic Richfield Company, Equilon, Exxon, Hess, Motiva, Shell, Texaco, Total and Valero manufactured and sold MTBE to manufacturers of MTBE gasoline distributed, stored and sold in Pennsylvania.

104. At all times material hereto, MTBE Defendants American Refining, Atlantic Richfield Company, BP America, BP Amoco Chemical, BP Products NA, BP West Coast Products, Chevron, CITGO, Crown Central, Equilon, Exxon, George E. Warren, Hess, Motiva, Shell, Sunoco, Texaco, TMR Company, TRMI-H LLC, Total, and Valero manufactured MTBE used in MTBE gasoline which they manufactured, distributed, stored and sold in Pennsylvania.

105. At all times material hereto, MTBE Defendants Coastal Eagle, ConocoPhillips, Duke Energy, Energy Merchant, Marathon, North Atlantic Refining, Premcor, United Refining and Western Refining manufactured and sold MTBE gasoline distributed, stored and sold in Pennsylvania.

106. At all times material hereto, MTBE Defendants Cumberland Farms, El Paso, Getty, GOLP, Lukoil, NuStar, and Vitol distributed, stored and sold MTBE gasoline in Pennsylvania.

107. Any and all references to defendant, defendants, MTBE Defendants, Insurance Defendants or a particular defendant by name in this Complaint include all predecessors, successors, parents, subsidiaries, affiliates, divisions and agents of the referenced defendants.

108. In committing the acts alleged in this Complaint, defendants acted in their own right and/or in the capacity of joint venturers, partners, agents, principals, successors-in-interest, surviving corporations, transferees, transferors, controllers, alter-egos, licensees, licensors, patent holders and/or indemnitors of each of the other defendants.

109. To the extent any act or omission of any of the defendants is alleged in this Complaint, the officers, directors, agents, employees or representatives of each such defendant committed or authorized each such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or

control of the affairs of such defendants, and did so while acting within the scope of their duties, employment or agency.

110.     Without limiting the Commonwealth's rights, including its rights to pursue theories of liability other than those enumerated below on the claims set forth in this Complaint, each of the MTBE Defendants is jointly and severally liable to the Commonwealth.  In addition, or in the alternative to joint and several liability, market share liability and/or the commingled product theory may be an appropriate theory for liability in this case.

## MTBE GENERALLY

111.     At all times relevant hereto, MTBE Defendants manufactured, distributed, sold, controlled or otherwise represented substantially all of the market in Pennsylvania for MTBE and MTBE gasoline.

112.     MTBE and MTBE gasoline are both fungible products and lack traits that would make it possible to identify either product as being manufactured, distributed or sold by a particular defendant.

113.     At all times relevant hereto, MTBE Defendants routinely commingled their MTBE and/or MTBE gasoline with the MTBE and/or MTBE gasoline of one or more of the other MTBE Defendants and produced, distributed or sold such commingled MTBE or MTBE gasoline in Pennsylvania.

114.     As a result of product fungibility and the commingling by MTBE Defendants, in certain instances of contamination, such as where releases of MTBE and MTBE gasoline have occurred from sites not branded by particular MTBE Defendants or where records do not exist tracing the products from particular MTBE Defendants to the sites, it may not be possible to identify the actual source of the MTBE or MTBE gasoline released as having come from a

particular defendant other than it was manufactured, distributed, sold or otherwise marketed in Pennsylvania by one or more of the MTBE Defendants who, as alleged, together represented substantially all of the market in Pennsylvania for MTBE and MTBE gasoline.

115.    Any inability of the Commonwealth to identify the actual source of the MTBE or MTBE gasoline released into the groundwater in particular instances at particular sites is a result of the fungibility of the products, MTBE Defendants' actions in commingling their products and/or the foreseeable actions of others, and not as a result of any action or inaction by the Commonwealth.

## MTBE AS A GASOLINE ADDITIVE

116.    MTBE is a chemical compound produced by combining methanol, a derivative of natural gas, and isobutylene, a by-product of the gasoline refining process.  Because methanol and isobutylene are readily available compounds, MTBE was inexpensive to manufacture.  As used in this Complaint, MTBE means not only methyl tertiary butyl ether, but also the degradation byproducts of, and contaminants in, commercial grade MTBE, including tertiary butyl alcohol ("TBA").

117.    TBA is used as a raw material in the production of isobutylene.  It is also an intermediate product of MTBE biodegradation, and, as a result, TBA often appears in groundwater where MTBE contamination exists.

118.    Crude oil is converted to petroleum products, including gasoline, at refineries. Many of the MTBE Defendants have owned and operated petroleum refineries.  At the refinery, MTBE, which may have been manufactured by a separate defendant and purchased by a refinery defendant, or may have been manufactured at the refinery itself by a defendant, was blended into

gasoline as an octane enhancer and/or as an oxygenator for use in areas of the United States, including Pennsylvania where oxygenated gasoline was sold.

**THE ROUTINE SALE OF COMMINGLED**
**GASOLINE IN PENNSYLVANIA**

119.     The gasoline sold at a gas station in Pennsylvania, and elsewhere across the nation, is generally not the product of just one refiner.  The gasoline present in any particular station's underground storage tanks, whether a branded or non-branded station, is often a commingled product because of how gasoline, after it is manufactured, is transported, stored and distributed prior to reaching a particular gas station for retail sale.  Once manufactured by a refiner to certain industry standards, the batch of gasoline is then transported for marketing in different regions of the United States via a network of national and regional pipelines, tank ships and barges.  Through these pipelines and other bulk transport means, the gasoline is sent to common storage tanks located at terminals throughout the country.  As the gasoline is piped into storage tanks at these terminals, it often becomes mixed or blended together.  From the terminals, it is then further transshipped in bulk by pipeline or other transportation means to secondary terminals or depots, where again it is commingled with other refiners' gasoline. From these secondary terminals or depots, gasoline is then taken by truck to gas stations for retail sale.

120.     MTBE Defendants added MTBE to their gasoline products as an oxygenate. Oxygenated fuel is very similar to normal gasoline except that it contains a particular additive, termed an oxygenate, that purports to reduce tailpipe emissions of carbon monoxide.

**MTBE IS A PERSISTENT ENVIRONMENTAL CONTAMINANT**

121.     MTBE does not occur naturally in the environment and is not present therein unless introduced by the actions of man.

40

122.    MTBE is introduced into and contaminates the environment through disposals, deposits, releases, leaks, overfills, spills and evaporative releases (collectively "releases") from a variety of sources, principally releases from gasoline storage and delivery systems.

123.    When released into the environment, MTBE behaves differently from other constituents of concern in gasoline such as benzene, toluene, ethylbenzene and xylene (collectively, "BTEX compounds").  MTBE separates from other gasoline constituents in the presence of moisture.  In contrast to the BTEX compounds, MTBE has a strong affinity for water, is easily dissolved and does not readily adhere to soil particles, making it more mobile and able to migrate great distances from the source of the release.  MTBE is more than thirty times more soluble in water than the BTEX compounds in gasoline.

124.    In groundwater, MTBE moves freely at approximately the rate of the water's movement, unlike BTEX compounds, which tend to adhere to soil and/or float on the surface of water.  This renders MTBE more difficult to locate and remediate than BTEX compounds.

125.    MTBE can also migrate into subsurface soil regions where it may leach out of these soil regions into nearby groundwater for many years following the initial release.

126.    MTBE is also more persistent than BTEX compounds because it does not readily biodegrade in groundwater.  If and when MTBE does degrade in the environment, the process creates other contaminants, including TBA, which are similarly problematic in groundwater.

127.    Because of its chemical and physical characteristics, when MTBE gasoline is released into the environment, it migrates farther and faster than gasoline without MTBE through soil and water, penetrates deeply into aquifers, resists biodegradation and results in persistent contamination.  As a result, MTBE is and has been more difficult and more expensive to remove from groundwater.  Where TBA is also present at a site subject to MTBE remediation, the risks

of adverse health and environmental harms are increased, as are the costs to fully remediate the contaminated site.

128.     Given the properties of MTBE and the long history of gasoline releases during distribution, storage, sale and use of MTBE gasoline, widespread MTBE contamination of groundwater from MTBE gasoline was substantially certain and foreseeable by MTBE Defendants.

129.     MTBE has contaminated, continues to contaminate and threatens to contaminate, the waters of the Commonwealth throughout Pennsylvania.

**MTBE DEFENDANTS' PRODUCTION AND USE OF MTBE AS A CHEAP AND PROFITABLE GASOLINE ADDITIVE**

130.     In the late 1970s, pursuant to section 211 of the Clean Air Act, 42 U.S.C.A. § 7545 ("the CAA"), the United States Environmental Protection Agency ("EPA") registered MTBE as a fuel additive that did not cause or contribute to the failure of any emission control device or system.  ARCO began commercial production of MTBE in April 1979, less than two months after the EPA approved MTBE as a blending component of unleaded gasoline.  ARCO sold MTBE to other oil refiners to be blended into gasoline as an octane enhancer.

131.     As the market for MTBE grew, other oil refiners also began producing MTBE for blending into gasoline.  In 1979, MTBE production was estimated at approximately 75 million gallons.

132.     Sometime after 1979, MTBE Defendants started manufacturing, distributing and/or selling gasoline with MTBE in concentrations averaging approximately 2% to 4% in order to boost the octane level in higher grades of gasoline.

133.     By 1985, MTBE production in the United States was estimated at 420 million gallons per year.  In terms of weight, MTBE ranked 44th among the top 50 chemicals produced

42

in the United States. Virtually all of this MTBE was blended into gasoline in concentrations of up to 11 percent, making MTBE among the largest components of a typical gallon of gasoline. Overall, MTBE was present in about 10 percent of the nation's gasoline, though it was much more common in the eastern than the western United States.

134.    When, prior to 1990, the EPA began considering options to reduce air pollution, the petroleum industry, including some of the MTBE Defendants, lobbied Congress to adopt the Reformulated Gasoline Program ("RFG Program") as part of the 1990 Amendments to the Clean Air Act. According to the EPA, "The concept of reformulated gasoline (RFG) was originally generated, developed and promoted by industry, not the Environmental Protection Agency ("EPA") or other parts of the federal government."

135.    In the 1990 Amendments to the Clean Air Act, Congress established the RFG Program, as Section 211 (k) of the CAA, 42 U.S.C.A. § 7545 (k), which mandated the use of reformulated gasoline containing at least 2% oxygen by weight in those areas of the country with the worst ozone or smog problems. If a particular area of the country, such as a large metropolitan area, was designated as a "non-attainment area" for carbon monoxide ("CO"), the EPA was authorized to direct the area to participate in the RFG Program.

136.    In 1992, in conjunction with the CAA, the EPA initiated the Oxygenated Fuel Program ("Oxyfuel Program"), which required at least 2.7% oxygen by weight in gasoline in certain metropolitan areas to reduce carbon monoxide during the fall and winter months.

137.    Much of the gasoline sold in non-attainment areas under the RFG Program exceeded that program's minimum 2% or 2.7% oxygenate requirements. MTBE comprised up to 15% of every gallon of gasoline used in those areas. MTBE gasoline also comprised a significant amount of the gasoline used in areas that were not participating in the RFG Program.

138.     MTBE Defendants started shipping high-content MTBE gasoline for sale in certain metropolitan areas in 1992 as part of the Oxyfuel Program.  In or around January 1995, MTBE Defendants introduced into the stream of commerce MTBE gasoline containing even higher levels of MTBE.

139.     As of 1995, five counties in southeastern Pennsylvania (Bucks, Chester, Delaware, Montgomery and Philadelphia) were required to implement the RFG Program.

140.     At its peak, most if not all gasoline supplied to the Pennsylvania RFG areas had high concentrations (11% to 15%) of MTBE.  In addition, MTBE gasoline containing elevated concentrations of MTBE was often sold at locations throughout Pennsylvania outside of RFG areas at the discretion of MTBE Defendants.

141.     MTBE was not the only viable oxygenate option available to MTBE Defendants to achieve higher octane in gasoline.  The Clean Air Act requires the use of some oxygenate, but it does not require that oxygenate to be MTBE.  MTBE became MTBE Defendants' "oxygenate of choice" because it was the most inexpensive oxygenate to produce and offered MTBE Defendants the highest profit margin of all available oxygenates.  MTBE Defendants could manufacture MTBE from their already available refinery by-products and were therefore not forced to purchase a different available oxygenate, such as ethanol, from a third-party.

142.     Before the 1980s, production and sales totals for MTBE were negligible, but by 1996, MTBE ranked second among all organic chemicals produced in the United States, with virtually the entire production going into gasoline.

143.     Since gasoline containing MTBE at increased levels was introduced, the United States Geological Survey ("USGS") has reported that MTBE is the second most frequently detected volatile organic chemical in groundwater in the United States.  MTBE-contaminated

wells have been found throughout the United States. The USGS annually tests the groundwater and has detected MTBE in over 20% of aquifers tested in places where high MTBE-content gasoline was used.

**MTBE DEFENDANTS KNEW THAT MTBE IS HARMFUL TO THE ENVIRONMENT AND THAT IT IS DIFFICULT TO REMEDIATE MTBE CONTAMINATION**

144. At all times material hereto, MTBE Defendants recognized the need to assess and study the long-term risks of MTBE contamination, including the potential health effects of low-level ingestion of MTBE, as well as the difficulties associated with remediating a MTBE release. Information exchanges among MTBE Defendants as well as their internal documents evidence MTBE Defendants' awareness of the severe environmental harms arising from MTBE contamination.

145. By virtue of their tremendous economic power and analytical resources, including the employment of scientists such as hydrogeologists, chemists, engineers and toxicologists, MTBE Defendants have at all times relevant to this litigation known or been in a position to know the threats which MTBE poses to the environment, including groundwater, and to human health.

146. In addition, by virtue of MTBE Defendants' superior knowledge, and/or by virtue of MTBE Defendants' dissemination of statements regarding the nature and impacts of MTBE, MTBE Defendants had a duty to disclose the truth and to act in accordance with the truth about MTBE and its ability to contaminate the environment.

147. MTBE Defendants knew at least as early as 1980 of the harmful impact of MTBE and its propensity to contaminate groundwater following a release event.

45

148. For example, the American Petroleum Institute ("API") formed a Toxicology Committee in or around 1980. The API is a trade association that represents the domestic petroleum industry, including MTBE Defendants, in a broad range of topics. The Toxicology Committee included representatives of various MTBE Defendants, including Exxon, Mobil, Shell, ARCO, Tosco and Chevron.

149. API's Toxicology Committee pursued a specific program to study MTBE. Meeting minutes reveal that committee members shared information and repeatedly discussed MTBE's propensity to contaminate groundwater. The committee specifically acknowledged the need for certain toxicological information due to MTBE's propensity to contaminate groundwater and the likelihood of extensive ingestion of MTBE through drinking water.

150. In April 1984, an internal Exxon memorandum raised concerns about manufacturing MTBE gasoline, stating there are "ethical and environmental concerns that are not too well defined at this point." Among these concerns was the "possible leakage of s/s [service station] tanks into underground water systems of a gasoline component [MTBE] that is soluble in water to a much greater extent [than other components of gasoline]." The memorandum proposed that a study be undertaken to thoroughly review the issue with management, including a suggested proviso that any decision to manufacture MTBE gasoline should be reviewed by E. J. Hess, then the "Executive in Charge" of Exxon.

151. A second internal Exxon memorandum in April 1984 contained another evaluation of the consequences of MTBE use. The memorandum noted that MTBE had much higher solubility than other gasoline components and this could lead to "higher levels of soluble organic contamination when [MTBE] gasoline comes in contact with water."

152.     A third internal Exxon memorandum, prepared in June 1984, reported some field information concerning groundwater contamination with MTBE.  The memorandum reveals that Exxon personnel had communications with Shell personnel who had found that MTBE had a very low odor threshold of about 5 ppb, a much lower odor threshold when compared to other constituents of gasoline.  This finding, the memorandum observed, is consistent with the recognized characteristics of ethers which "generally have a more objectionable odor than the alcohols or aromatic hydrocarbons."  A lower odor threshold requires very high levels of cleanup efficiency to remove a contaminant, in this case MTBE, from groundwater to the point where it could no longer be detected.

153.     An internal ARCO memorandum, dated June 14, 1984, summarized a meeting of the API's "Ad Hoc Committee" on MTBE, which included representatives from those MTBE Defendants then operating as Shell, Texaco, Phillips and ARCO.  While this committee focused primarily on toxicological issues involving MTBE, the memorandum noted that "MTBE is a possible contaminant of groundwater, especially in association with leaking gasoline storage tanks."  The committee members decided to distribute funds to a sister API committee, the Environmental Biology and Community Health Committee, for the purpose of studying taste and odor issues associated with MTBE.

154.     In August 1984, an internal Exxon memorandum evaluated the consequences of adding MTBE to Exxon's gasoline.  The memorandum cautioned that a large-scale addition of MTBE to Exxon's gasoline would likely increase the number of well contamination incidents by a factor of three and increase the cost of cleaning up these incidents by a factor of five.  The memorandum cited a number of reasons supporting this conclusion, including:

a.     MTBE would travel farther than the other constituents of gasoline, creating the need to clean up larger plumes;

b.     MTBE's low odor and taste thresholds would force the need to cleanup to more stringent levels; and

c.     the ineffectiveness of carbon absorption clean-up techniques would force greater use of more expensive air-stripping technologies to remediate a MTBE release.

155.     By 1986, various MTBE Defendants were aware that the EPA had assembled data indicating "a leak rate of 35 percent based on a national survey of underground fuel storage tanks…."

156.     An internal Chevron memorandum, dated May 23, 1986, recognized MTBE's propensity to contaminate groundwater and soil.  The memorandum recognized the relatively high water solubility of MTBE, the impracticality of removing it from water with activated carbon, that using air stripping to remove it from water would be difficult, and "that MTBE will migrate more rapidly with the groundwater in the soil."  The memorandum recommended that additional testing of MTBE should be conducted.

157.     An internal Chevron memorandum, "Marketing Environmental Concerns Regarding the Use of MTBE in Mogas [Motor Gasoline]," dated June 11, 1986, identified a number of concerns about the potential increased use of MTBE by Chevron.  Referencing a cleanup in Maryland where MTBE was a contaminant, as well as an API study of MTBE, the memorandum stated MTBE had "several disturbing properties," including: a relatively high solubility and mobility, low odor and taste thresholds, low rate of biodegradation, and difficulty of removal from water.  The memorandum noted concern over the expected increased utilization

of MTBE in Chevron gasoline because, "MTBE utilization could increase the cost to clean up leaks at service stations and terminals."

158.     In December 1986, an internal Amoco memorandum addressing potential groundwater research proposals stated that groundwater contamination was the "environmental issue of the decade" and one that had the potential to cost Amoco millions of dollars.  One of the proposed research projects discussed was to examine the propensity for MTBE to be absorbed into monitoring-well-casing materials, thus compromising the possibility of an early detection of a gasoline release and the opportunity to minimize remediation costs that early detection provides.

159.     In May, 1987, an internal Exxon memorandum analyzed data on MTBE groundwater contamination in New York State and elsewhere in the region, including laboratory analyses verifying MTBE in water samples from three wells in Harrison, New York and four wells in Port Jefferson, New York.  In this report, Exxon stated: "We agree that MTBE in gasoline will dissolve in groundwater at a faster rate than any gasoline hydrocarbon, including benzene."  The report further stated that "[b]ecause of its more frequent occurrence, even when other hydrocarbons are not found, we feel it is important for you to be aware of MTBE.  From an environmental and engineering standpoint, you may need to be informed of its presence to assist you in responding effectively to regulatory and remedial requirements."

160.     An internal 1987 Chevron memorandum raised concerns about the dangers of MTBE gasoline released into the environment:

> Two considerations impact MTBE. One is potential health risk, and the second is increased solubility over normally regulated constituents of interest, i.e. benzene, toluene and xylene (BTX).
>
> MTBE is significantly more soluble in water than BTX.  Consequently, the dissolved "halo" from a leak containing MTBE can be expected to extend

farther and spread faster than a gasoline leak that does not include MTBE as one of its constituents.

Further compounding the problem of increased solubility, MTBE is more difficult to remove from groundwater using current technology (air stripping or carbon adsorption). Because of its lower volatility, MTBE requires more than double the air stripping capacity to reach a 95 percent reduction. Removal using carbon adsorption is even worse. MTBE breaks through activated carbon four times faster than BTX.

161.    Amoco prepared an internal document, dated July 1, 1992, concerning MTBE, entitled *Guideline for Handling & Storage of Ethers Used in Gasoline*. The document stated, "Our new blended gasoline products containing ethers will also require increased levels of attention, exceeding that associated with our storage and handling of traditional gasoline products." The warnings contained in the document were intended for Amoco personnel. No warnings were provided by Amoco, however, to marketers, customers or others handling MTBE gasoline of the extra care required when handling this product.

162.    Amoco further emphasized in its July 1, 1992 document that MTBE gasoline required greater care in handling: "The avoidance of environmental incidences and serious environmental damage will require a greater vigilance than might be common practice for non-oxygenated gasolines." The guidelines also recommended the use of double-walled storage tanks with leak detection systems. The information and analysis contained in this document were based, in part, on Amoco's knowledge of MTBE's properties (flammability, solubility, low rate of biodegradation) and Amoco's experience cleaning up an MTBE release at one of its terminals.

163.    In 1992, an internal Shell white paper described the dangers of MTBE once released into the environment. The document stated that MTBE is nearly 25 times more soluble than benzene and, therefore, an MTBE plume emanating from a gasoline spill was expected to

move faster and farther than a benzene plume. The white paper indicated that MTBE does not

biodegrade in the subsurface environment. It further indicated that MTBE has a low odor and

taste threshold, and that "at many locations odor and taste criteria may determine clean-up

levels." The white paper cautioned:

> MTBE has had impact on groundwater management at only a few Shell
> marketing terminals and service stations to date. However, as the usage of this
> oxygenate begins to increase, a stringent clean-up criteria for MTBE will become
> adopted in more states [and] we should anticipate increased concerns over how its
> release to groundwater is managed.

164.    A February 2002 Shell "MtBE Policy Review" document noted with respect to

warnings regarding MTBE: "At present little, if any, information is supplied to our customers on

the environmental aspects of storing gasoline that contains MtBE….Some customers could claim

that, in the absence of such information or vetting, we are responsible for their remediation

costs…."

165.    Hess discussed in a 1998 internal document the reasons that MTBE created

environmental risks and then stated "Releases involving gasoline which contains MTBE pose a

significantly greater cost to remediate and have greater potential for offsite migration. As such,

these facts underscore the importance of release prevention and rapid leak detection programs."

166.    Similarly, Texaco in a 1998 document specifically discussed the need to handle

MTBE gasoline differently at service stations.

167.    In 1994, Amoco determined to utilize MTBE rather than ethanol as it's oxygenate

in the U.S. east and south. Amoco elected to do so despite the information in its internal

memoranda that MTBE was highly water soluble, extremely mobile in groundwater, would

migrate quickly off site from service station release sites, was not biodegradable under natural

conditions and, as a result, would foreseeably cause significant environmental contamination at

hundreds of its service stations. Amoco noted in its memoranda that its own studies showed "MTBE has nil biodegradability and moves with groundwater quickly" and "poses major estimated costs for accidental discharges of gasoline with MTBE." On the other hand, ethanol, a competitor oxygenate, was found by Amoco to be "easily biodegraded" and to "present no more estimated costs [to remediate] than gasoline itself."

168.     Amoco estimated at the time that the annual environmental remediation costs that would result from the use of MTBE in its gasoline would be, as of 2002, $183 million to $211 million per year compared with $33 million if non-oxygenated gasoline was used. However, in apparent reference to indemnification programs like the Commonwealth's USTIF program where public funds could be tapped to pay for cleanup of Amoco's MTBE contamination, Amoco noted that "state reimbursements program will reduce remediation costs by 10%." Accordingly, despite recognizing internally the harmful effects of MTBE on the environment and concluding that using ethanol would have no impact on the environment, Amoco chose MTBE as its gasoline additive to meet its oxygenate requirements for RFG in the east and south.

169.     In January 1996, a CITGO memorandum summarized a conference call on MTBE among members of the API's Soil and Groundwater Technical Task Force. It reported that "[t]he consensus of the API member company remediation experts is that MTBE poses a serious future remediation concern." This consensus was based, in part, on the fact that MTBE did not naturally biodegrade and that the concentration of MTBE in gasoline would increase to the range of 12% to 16%, up from the earlier concentrations of 1% to 2%.

170.     An internal Shell document prepared in June 1997 shows that Shell was aware at least as of that time that remediating a MTBE spill would be difficult:

> MTBE is relatively quite soluble in water (compared to other components in Gasoline, like BTEX), and it moves essentially with the ground water, thus

MTBE tends to "lead the plume" whenever there is a gasoline spill or leak. MTBE also has a very low biodegradation potential, which makes it more difficult to remove from ground water than other gasoline components such as BTEX.

171.    At all times relevant to this litigation, MTBE Defendants knew or should have known of the substantial harm caused by expected MTBE gasoline releases and the substantial difficulty of remediating groundwater and soil contaminated by MTBE.

## MTBE DEFENDANTS PUBLICLY DEFENDED AND PROMOTED MTBE DESPITE THEIR KNOWLEDGE OF THE ENVIRONMENTAL RISKS POSED BY MTBE RELEASES

172.    MTBE Defendants defended and promoted the use of and distributed MTBE and/or MTBE gasoline in Pennsylvania when they knew or should have known that MTBE releases from various gasoline storage and delivery systems were likely, and that such releases could and would pollute the waters of the Commonwealth.

173.    Further, MTBE Defendants defended and promoted the use, marketing and distribution of MTBE and/or MTBE gasoline when they knew or should have known the unique and difficult problems to remediate MTBE contamination from groundwater and soil, and which problems could and would increase the costs and time associated with such remediation.

174.    In 1986, Peter Garrett and Marcel Moreau of the Maine Department of Environmental Protection authored a paper titled "Methyl Tertiary Butyl Ether as a Groundwater Contaminant" ("Garrett Report").  Based upon the authors' analysis of approximately 30 Maine wells contaminated with MTBE, the report stated that: (a) groundwater contaminated with MTBE is difficult to remediate; (b) MTBE is more soluble than the other constituents of gasoline and therefore a plume of MTBE in groundwater will be more extensive than the plume of the other gasoline components; and (c) MTBE has a distressing "terpene-like" odor in low

concentrations. The Garrett Report's authors recommended that MTBE be banned as a gasoline additive, or, at least, be stored in double-contained facilities.

175. The Garrett Report authors planned to present their report at proceedings of the "Petroleum Hydrocarbons and Organic Chemicals in Ground Water Conference," in November 1986. This conference was jointly sponsored by the National Well Water Association and the API.

176. Before its publication and public presentation, a draft of the Garrett Report was widely circulated in the oil industry. Oil industry representatives, including many of the MTBE Defendants, joined forces to pressure the authors to radically revise their negative conclusions and recommendations about MTBE, and/or to discredit the report in order to protect and maintain MTBE's competitive advantage as a gasoline additive.

177. On or about December 23, 1986, a staff member of the API's Groundwater Technical Task Force ("GTTF") forwarded the Garrett Report to other GTTF members, including representatives of Shell and Exxon. Comments from GTTF members concerning the report culminated in a letter from the API to the National Well Water Association. The letter attacked the Garrett Report:

> The [Garrett Report] authors' "recommendations" that MTBE … be either banned as gasoline additives or require double-lined storage is clearly a policy statement and not an objective credible scientific conclusion. Further, data presented in this paper as well as those generated by ongoing API research indicate that such a policy is reactionary, unwarranted, and counter-productive.

178. Amongst themselves, however, MTBE Defendants knew their criticisms of the Garrett Report were inaccurate and misleading. For example, ARCO, in a communication to others within the oil industry stated in a letter dated February 4, 1987, "we don't have any data to

refute comments made in the paper that MTBE may spread farther in a plume or may be more difficult to remove/clean up than other gasoline constituents."

179.    In l986, the federal Interagency Testing-Committee ("ITC"), established pursuant to the Toxic Substances Control Act, recommended testing and review to assess MTBE's health and environmental risks.  The ITC characterized MTBE as having relatively high water solubility, and stated that MTBE's persistence in groundwater following spills was unknown but that it was likely not "to be readily biodegradable."  The ITC recommended chemical fate monitoring of MTBE to determine the risk MTBE poses to the environment.  The ITC also recommended additional medical testing of MTBE and invited written comments.  The oil industry, including MTBE Defendants, mobilized to convince the EPA that additional testing of MTBE was not needed.

180.    On or about December 12, 1986, ARCO, on behalf of and/or with the approval of MTBE Defendants, responded to the 1986 ITC Notice in an effort to derail further testing of MTBE.  ARCO's comments included a critique of the information review of MTBE on which the ITC had relied. ARCO's submission stated that its "critique of the report revealed that some erroneous assumptions had been made that cause the hazards of MTBE to be seriously overestimated."  In further comments to the EPA, ARCO also stated:

Characteristics - Moderate water solubility is reported. However, an ARCO Technical Bulletin states that "MTBE is only slightly soluble in water..."

* * *

The … report states that potential environmental exposure is "high."  This conclusion is not supported by the available information.

* * *

Exposure from accidental spills of MTBE could occur, but should be regarded as a minimal possibility.  The closed nature of the manufacturing and

transportation process reduces worker exposure and product loss. Training and safety programs also lower the possibility of accidental spills. Many current programs at EPA and industry are underway to monitor and reduce the possibility of gasoline loss from leaking underground storage tanks … MTBE losses would be extremely small from this source.

* * *

VI.     Environmental Information

As has been reportedly stated, environmental entry would not occur in every stage of the gasoline marketing chain…. Environmental entry of MTBE from this course would be considerably less than the report indicates.

MTBE is only slightly soluble so environmental fate projections based on this assumption will not be correct.

181.    ARCO's comments to EPA in response to the ITC Notice, which were made with other MTBE Defendants' explicit or implicit approval, were false and misleading when made, improperly downplayed the risks of MTBE contamination of groundwater and omitted material facts known to ARCO and other MTBE Defendants at the time.

182.    On or about December 17, 1986, EPA held a Public Focus Meeting to hear comments on the need for additional testing of MTBE. ARCO and Exxon made a presentation supporting the industry position that additional medical testing of MTBE was unnecessary.

183.    In or around early 1987, a multi-company task group was formed by MTBE Defendants, known as the "MTBE Committee." This committee's express purpose, as set forth in a written agreement, was "addressing the environmental, health, safety, legislative and regulatory issues concerning MTBE of importance to the public and the producers and users of MTBE." MTBE Defendants' MTBE Committee included representatives of defendants ARCO, BP Amoco, Chevron, CITGO, Exxon, Shell and Sunoco, among others industry companies. Neither EPA nor any government entities were included in the Committee.

184.     On January 29, 1987, the MTBE Technical Subcommittee, a subcommittee of MTBE Defendants' MTBE Committee, held its first meeting to coordinate their "plan of attack" on the 1986 ITC recommendations.

185.     Although MTBE Defendants were aware that EPA was interested in obtaining more information about MTBE in groundwater, MTBE Defendants were not forthcoming in their responses to EPA and failed to fully and fairly disclose what they knew about MTBE's environmental and health hazards.

186.     On or about February 12, 1987, ARCO responded to the EPA's request for information about "data gaps" concerning MTBE's environmental and health effects, stating:

> Item D requests more information on the presence and persistence of MTBE in groundwater. We are not aware of any incidents where MTBE contaminated groundwater at manufacturing facilities. Where gasoline containing MTBE is stored at refineries, terminals, or service stations, there is little information on MTBE in groundwater. We feel there are no unique handling problems when gasoline containing MTBE is compared to hydrocarbon-only gasoline.

> ARCO knew these statements were false and misleading.

187.     On or about February 27, 1987, MTBE Defendants' MTBE Committee submitted written comments to the EPA in an improper effort to deter it from requiring additional health and environmental testing of MTBE. The information provided by MTBE Defendants was misleading and false. MTBE Defendants' information to the EPA falsely represented, *inter alia*, that MTBE is only slightly soluble in water, that potential environmental exposure is not high, and that MTBE has excellent biodegradation characteristics. The MTBE Defendants' MTBE Committee's statement to EPA further falsely stated:

> there is no evidence that MTBE poses any significant risk of harm to health or the environment, that human exposure to MTBE and release of MTBE to the environment is negligible, that sufficient data exists to reasonably determine or predict that manufacture, processing, distribution, use and disposal of MTBE will not have an adverse effect on health or the environment, and that testing is

therefore not needed to develop such data. Furthermore, issuance of a test rule requiring long term chronic testing will have a significant adverse environmental impact.

188. MTBE Defendants consistently misstated to EPA the environmental benefits of MTBE while understating or concealing its serious environmental hazards, which doing so, MTBE Defendants knew was false and misleading. By such actions MTBE Defendants intended to a) forestall public scrutiny of their decision to increase concentrations of MTBE in gasoline, and, at the same time, b) avoid or obstruct health and environmental safety research that would have revealed what MTBE Defendants already knew of MTBE's harmful effects on groundwater.

189. In April 1987, George Dominguez, a member of MTBE Defendants' MTBE Committee, gave a presentation at an oil industry event, the Conference on Alcohols and Octane. Mr. Dominguez represented during his presentation that "MTBE removal from groundwater is consistent with commercial experience. MTBE gasoline spills have been effectively dealt with." These statements were false and misleading in view of what the MTBE Committee members knew or had reason to know about MTBE.

190. Although MTBE Defendants' MTBE Committee represented to the EPA that the Committee was going to "address environmental issues related to MTBE by a) collecting data from member companies and other sources, and b) sponsoring programs to develop data unavailable from other sources," the Committee did no such thing and disbanded approximately one year after achieving its goal of limiting testing.

191. In April 1987, ARCO, a major manufacturer of MTBE at the time, published a bulletin describing the "proper" handling of MTBE during storage and shipping, including material compatibility and safety information. The document stated that "[g]asoline containing

MTBE is handled in the same manner as hydrocarbon-only gasoline. There are no extraordinary handling or safety precautions." These statements were false and misleading when made and ARCO knew they were false.

192.    In February 1993, the Lyondell Chemical Company ("Lyondell")[1], which at this time was the world's leading producer of MTBE, published a Product Safety Bulletin describing Lyondell's recommendations for receipt, unloading, storage, transfer, processing, and disposal of neat MTBE. While indicating that the water solubility of neat MTBE made some special handling necessary, the Bulletin asserted that "Blended gasoline that contains lower levels of MTBE is generally handled in the same manner as hydrocarbon-only gasoline and requires no extraordinary precautions." These statements about MTBE gasoline were false and misleading when made and Lyondell knew they were false.

193.    MTBE Defendants knew or had reason to know that the aforesaid statements by ARCO and Lyondell were false and misleading and that the environmental hazards, dangers and harms of MTBE required much greater precaution and heightened safety measures.

194.    As widespread MTBE groundwater contamination began to appear, MTBE Defendants further acted to conceal or obfuscate the true facts of the dangers that MTBE posed to the environment. For example, in April 1996, the Oxygenated Fuels Association ("OFA"), a captive entity of MTBE Defendants, published and distributed a pamphlet entitled "Public Health Issues and Answers." The pamphlet falsely stated: "On rare occasions, MTBE has been discovered in private drinking water wells where the source of MTBE has been attributed to leaks from nearby underground storage tanks." OFA's pamphlet further expressed confidence that federal regulations and industry practices made such contamination largely a thing of the

---

[1] The term "Lyondell" as used in this Complaint refers to Lyondell Chemical Company, Lyondell Chemical Worldwide, Inc., Arco Chemical Company and Arco Chemical Corporation.

past. These statements were false and misleading when made and OCF and its defendant members knew or had reason to know they were false.

195. Through these kinds of misleading communications, MTBE Defendants failed to properly, adequately and timely alert and inform persons and entities engaged in the storage, transport, handling, retail sale, use, and responding to spills of such gasoline (hereinafter referred to as "downstream handlers"), intended users and consumers and the general public to the unapparent environmental hazards and dangers posed by MTBE and omitted and concealed information required to minimize such dangers.

196. A September 15, 1999 report by a special EPA Blue Ribbon Panel stated that MTBE is found in 21% of ambient groundwater tested in areas where MTBE is used in RFG areas, that MTBE "has caused widespread and serious contamination," and EPA's review of existing information on contamination of drinking water resources by MTBE "indicates substantial evidence of a significant risk to the nation's drinking water supply."

197. In its September 15, 1999 report, the EPA Blue Ribbon Panel recommended substantial reductions in the use of MTBE and some Panel members recommended that it be eliminated entirely. The Panel also recommended accelerating assessments of drinking water protection areas required under the Safe Drinking Water Act, particularly in those areas where high MTBE-content gasoline was used. The Panel further recommended "a nationwide assessment of the incidence of contamination of private wells by components of gasoline" and "regular water quality testing of private wells."

198. In making MTBE their oxygenate of choice, MTBE Defendants decided to forego safer oxygenates, such as ethanol. In fact, only belatedly after massive MTBE environmental harm had already occurred, did some gasoline sellers publicly acknowledge that MTBE is neither

environmentally safe nor necessary.  Getty Marketing, for example, placed full page ads in the

New York Times on October 13, 1999, that stated:

> Protecting our water supply means making a commitment to doing business in environmentally-friendly ways.  That's what we're doing at Getty. We have replaced MTBE with ethanol in our gasoline because it helps clean the air without harming our drinking water.

## MTBE DEFENDANTS BREACHED THEIR DUTIES TO PLAINTIFF AND THE GENERAL PUBLIC CONCERNING THE PROPER, SAFE MANAGEMENT AND USE OF MTBE AND MTBE GASOLINE

199.    MTBE Defendants, who promoted the use of MTBE gasoline for its purported

environmental benefits, knew or reasonably should have known of the grave harm and threat to

public health, safety and welfare and the environment represented by the proliferating use of

MTBE, including, but not limited to: a) widespread contamination of surface and groundwater

with MTBE; b) the rendering of groundwater unfit, unpalatable and unusable for consumption;

and c) the increased costs to the Commonwealth and others in addressing MTBE contamination

of waters of the Commonwealth.

200.    MTBE Defendants, as the manufacturers, refiners and suppliers of MTBE and

MTBE gasoline, knew or reasonably should have known the MTBE being sold or

acquired would be used primarily to compound and manufacture MTBE gasoline.  MTBE

Defendants were aware or reasonably should have been aware of the peculiar environmental

risks involved in such use of MTBE.  MTBE Defendants had a non-delegable duty and breached

their duty to inform and warn downstream handlers of MTBE gasoline, including jobbers and

station operators, of the peculiar risks and necessary precautions associated with the products.

201.    MTBE Defendants, as the manufacturers, refiners and suppliers of MTBE and

MTBE gasoline, had a duty and breached their duty to evaluate and test MTBE and MTBE

gasoline adequately and thoroughly to determine the environmental impact and transport

characteristics, including the potential harm to human health, comfort, safety and welfare, before they produced and sold MTBE and MTBE gasoline.

202.    MTBE Defendants had a duty and breached their duty to minimize the environmental harm caused by MTBE and MTBE gasoline.

203.    MTBE Defendants had a duty and breached their duty to take precautions, including warnings and/or instructions, necessary to ensure that MTBE gasoline was properly and safely used, transported, stored and dispensed and that all necessary measures to promptly detect, contain, abate and respond to spills and leaks were instituted.

204.    MTBE Defendants failed to adequately evaluate, test, store, warn, mitigate or otherwise ensure that MTBE gasoline would not contaminate waters of the Commonwealth.

205.    As a direct, indirect and proximate result of MTBE Defendants' failures and breaches of duties as aforesaid, MTBE was released into the environment, causing, and threatening to cause, widespread contamination of the waters of the Commonwealth.

206.    In addition to their negligent and/or reckless conduct alleged herein, MTBE Defendants intentionally failed to warn downstream handlers and intended users and consumers as to the danger that MTBE Defendants knew MTBE presented to the environment and to public health, safety and welfare, and which dangers were not known and readily apparent to the general public. MTBE Defendants also engaged in separate and joint activity to mislead the public regarding these same dangers.

**MTBE DEFENDANTS KNEW THAT MTBE RELEASES WOULD
OCCUR IN PENNSYLVANIA FROM GASOLINE
STORAGE AND DELIVERY SYSTEMS**

207.     The widespread problems of gasoline releases from leaking gasoline storage and delivery systems were well known to MTBE Defendants prior to the introduction of MTBE and MTBE gasoline into Pennsylvania.

208.     At all times material hereto, MTBE Defendants knew, or reasonably should have known, that gasoline storage and delivery systems in Pennsylvania and elsewhere a) generally suffered significant and widespread leaks and/or failures, and b) released gasoline products into the environment, including into groundwater.

209.     Certain MTBE Defendants obtained first-hand knowledge and experience of the these leaks and releases because they owned and operated individual gasoline stations with leaking gasoline storage and delivery systems, including gasoline stations in Pennsylvania and/or exercised control over such gasoline stations through a variety of means, including written agreements, inspection rights, prescribing certain procedures and operating practices, prescribing specifications for products, conditions on sale of branded goods, agreements obligating such stations to acquire, store and sell MTBE gasoline, and training.

210.     For most of the 20th century, the petroleum industry had an indifferent attitude towards small-volume gasoline leaks and spills.  The components of traditional gasoline are relatively insoluble and biodegrade fairly readily.  Because of these characteristics they rarely caused significant health, financial and/or remediation problems to MTBE Defendants and low-level gasoline (without MTBE) releases were tolerated and accepted as part of normal business practices.  Delivery spills were thus common, maintenance activities frequently involved spilling fuel, and inventory control, which MTBE Defendants were aware or had reason to know could

not detect small leaks, was generally considered to be adequate for leak and release detection. Because the solubility of the gasoline constituents was quite low generally, relatively few traditional gasoline contaminants made their way into the groundwater.

211.    The introduction of MTBE into gasoline, however, changed things dramatically and meant that small or minor types of leaks and spills could and did significantly impact groundwater. Even a small release of MTBE gasoline could result in MTBE concentrations in groundwater that were above taste and odor threshold levels, rendering the water unusable without expensive treatment.

212.    Downstream handlers and intended users and consumers had been releasing gasoline into the environment for decades. These people continued to routinely spill or release gasoline after MTBE was added to gasoline as an additive because they did not know and were not told by MTBE Defendants they needed to do anything different. Protection of groundwater and human health, however, required that downstream handlers and intended users and consumers needed to receive instructions and information alerting them that routine behavior was not suitable for handling MTBE gasoline and that even very small releases of MTBE or MTBE gasoline could lead to harmful consequences to the environment and human health.

213.    Among other things, MTBE Defendants knew, or reasonably should have known, at the time they were utilizing and promoting MTBE as a gasoline additive that:

a.       the gasoline distribution and retail system throughout Pennsylvania contained leaking gasoline storage and delivery systems;

b.       large areas of Pennsylvania were and are highly dependent upon groundwater as the source for domestic water; and

c.       release of MTBE into the environment would be an expected consequence of

marketing and placing MTBE and MTBE gasoline into the stream of commerce, especially in the absence of precautionary measures necessary to prevent or mitigate such releases, which measures MTBE Defendants failed to take.

214.    MTBE Defendants also knew, or reasonably should have known, that to a greater extent than the other constituents of gasoline MTBE, when released into the environment, would move great distances, mix easily with water, resist biodegradation, render drinking water unpalatable and non-potable, and require significant expenses to define the extent of, monitor, treat and remediate the contamination.

215.    Despite knowing the risk of groundwater contamination posed by MTBE, and despite the availability of reasonable alternatives and risk minimization or elimination, including adequate warnings or instructions, MTBE Defendants failed to warn or instruct retailers, customers, other downstream handlers, intended users and consumers and the public on the dangers of and/or the proper handling of MTBE and MTBE gasoline.  MTBE Defendants further failed to take appropriate precautionary measures to prevent or mitigate MTBE contamination. Instead, MTBE Defendants falsely promoted MTBE and MTBE gasoline as environmentally sound products suitable for widespread use.

216.    Manufacturers of hazardous substances typically address Occupational Safety and Health Administration ("OSHA") hazard communication requirements by providing material safety data sheets ("MSDSs") to their customers.  MTBE Defendants did not adequately address MTBE in their MSDSs.  The public position of MTBE Defendants was that MTBE gasoline could be handled just like traditional gasoline and that the traditional standard-of-care for gasoline without MTBE was adequate for MTBE gasoline.

217.     Among other things, these false representations by MTBE Defendants provided their MTBE gasoline with an unfair competitive advantage and with greater profit margins over other gasolines in the marketplace utilizing alternative safer, but more expensive, octane and oxygenation additives.

218.     Moreover, MTBE Defendants engaged in separate and/or joint activities to suppress, conceal, downplay and/or discredit studies and other information regarding the hazards of MTBE.  MTBE Defendants' wrongful conduct in this regard, among other things, proximately caused

a.     a dramatic increase in the use and corresponding presence of MTBE gasoline in Pennsylvania;

b.     the consequent contamination and damage to the waters of the Commonwealth as and when inevitable releases of MTBE gasoline occurred;

c.     substantial economic losses and damages incurred by the Commonwealth in its efforts to define the extent of , monitor, treat and remediate the contamination; and

d.     negative impact upon competitive, safe alternative oxygenate additives such as ethanol.

219.     MTBE Defendants knew at all times material that it was substantially certain that their acts and omissions as set forth herein would threaten public health, cause extensive contamination of groundwater and drinking water supplies and otherwise cause the injuries described herein.  MTBE Defendants acted or failed to act as aforesaid knowingly, wilfully and fraudulently, maliciously and/or wantonly with conscious disregard of plaintiff's rights, public health and safety and probable injury to the environment, and/or with gross negligence.

## THE IMPACT OF MTBE AND MTBE GASOLINE ON THE
## WATERS OF THE COMMONWEALTH

220. At all times relevant to this action, despite their knowledge that contamination of waters of the Commonwealth with MTBE was the inevitable result of their conduct, MTBE Defendants continued to refine, market, promote, and supply MTBE gasoline in the Commonwealth.

221. Reformulated gasoline containing significant quantities of MTBE was sold on a virtually universal basis throughout Pennsylvania beginning in the 1990s as a result of MTBE Defendants' efforts.

222. MTBE contamination is associated with all transportation, storage and use of MTBE gasoline.

223. MTBE contamination has injured, and continues to injure and threaten, the waters of the Commonwealth, and the health, safety and welfare of the citizens of Pennsylvania on a wide-spread and substantial basis throughout the state.

224. MTBE is a "regulated substance" under Commonwealth environmental statutes, including under 35 P.S. §§ 6021.101 – 6021.2105 and 35 P.S. §§ 6026.101 – 6026.909.

225. At all times material hereto, the Commonwealth has established a Statewide Health Standard ("SHS") for MTBE at 20 parts per billion ("ppb") for groundwater in most aquifers in Pennsylvania.

226. Since its introduction into gasoline, MTBE has been found in groundwater throughout Pennsylvania in varying significant concentrations as high as 2,100,000 ppb. MTBE contamination has been found in groundwater in every county in Pennsylvania.

227. Pennsylvania relies heavily on groundwater for public drinking-water supplies. There are nearly one million private and public water supply wells in Pennsylvania. As of 2003,

the combined populations served by (1) community systems with groundwater as a primary source of drinking water, (2) community systems with at least one groundwater source, and (3) private on-lot wells accounted for nearly half of the population of Pennsylvania. In 2005, about 210 million gallons of groundwater were used per day for public drinking-water supply, or nearly 15 percent of all water used for public drinking water in Pennsylvania.

228.    Under Pennsylvania law, all groundwater in aquifers is presumed to be used or currently planned for human use, unless determined otherwise by DEP. 25 Pa. Code § 250.303.

229.    MTBE has been found throughout the Commonwealth in varying concentrations and at varying times in both public water supply wells and private domestic wells.

230.    The Commonwealth and its citizens are entitled under law to clean groundwater uncontaminated by MTBE.

231.    Whether or not previously remediated to levels at or below the SHS of 20 ppb, groundwater that contains MTBE is and remains damaged as a result of MTBE Defendants' acts and omissions as alleged herein.

232.    Since the inception of USTIF program in 1994, there have been approximately 3,400 documented releases of gasoline into the environment from USTIF indemnified facilities. Releases have occurred in every county in Pennsylvania. A substantial portion of these gasoline releases have involved MTBE gasoline and resulted in MTBE contamination of groundwater and the expenditure of significant funds by the Commonwealth to define the extent of, monitor, treat and remediate MTBE contamination. Such releases of MTBE gasoline include by way of example, but are in no way limited to, the following:

1)    Release detected on or about August 11, 1999 of MTBE gasoline from Maloy Amoco Station located at 101 Altman Road, Jeannette, PA (Westmoreland County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,381,081.82;

2)	Releases detected on or about November 1998 and March 23, 2001 of MTBE gasoline from Neffsville Sunoco Station (formerly Neffsville Amoco Station) located at 2548 Lititz Pike, Borough of Neffsville (Lancaster County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,000,000.00;

3)	Release detected on or about May 22, 2001 of MTBE gasoline from the Five Gables Amoco station located at 5869 Business Route 220, Cessna, PA (Bedford County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,089,578.44;

4)	Release detected on or about May 14, 1996 of MTBE gasoline from the Route 119 Dunbar Amoco located at 1809 University Drive, Dunbar, PA (Fayette County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,036,118.01;

5)	Release detected on or about August 2, 1999 of MTBE gasoline from the Market Street BP located at the corner of Market Street & Loveland Avenue, Kingston, PA (Luzerne County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,033,594.85;

6)	Release detected on or about February 13, 2006 of MTBE gasoline from the Ruff Creek BP located at 720 Washington Road, Prosperity, PA (Greene County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $949.990.81;

7)	Release detected on or about October 1995 of MTBE gasoline from the Center Square CITGO Station, 1273 DeKalb Pike, Center Square, PA (Montgomery County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,000,000.00;

8)	Release detected on or about February 1996 of MTBE gasoline from the Rick's CITGO station, 87 N. Main Street, Mansfield, PA (Tioga County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $836,152.32;

9)	Release detected on or about January 6, 1998 of MTBE gasoline from the Pikes Creek CITGO station, SR 118 & SR 29, Pikes Creek, PA (Luzerne County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,000,000.00;

10)	Release detected on or about May 28, 2002 of MTBE gasoline from the Mt. Cobb CITGO station, Route 348 & Route 247, Lake Ariel, PA (Lackawanna County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,006,381.20;

11)	Release detected on or about November 5, 1998 of MTBE gasoline from the Jim's Food Rite/Coastal Mart #7430, State Route 54, Turbotville, PA (Northumberland County),

resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,092,876.37;

12)     Release detected on or about October 17, 2001 of MTBE gasoline from the Fairway Coastal station, 320 South Chester Road, Wallingford, PA (Delaware County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $378,268.10;

13)     Release detected on or about December 16, 2002 of MTBE gasoline from the Honeybrook Coastal station, 2500 Conestoga Avenue, Honey Brook, PA (Chester County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $880,704.43;

14)     Release detected on or about December 15, 1993 of MTBE gasoline from the Ron Matz Exxon Station (PADEP Facility ID 25-3638), 9088 W. Main Road, McKean Borough, PA (Erie County), resulting in investigation, personnel and filtration costs paid to date by the Commonwealth in excess of $400,000. In 2009, the local community obtained a $4.5 million grant and $700,000 loan from PENNVEST to fund a project to extend water supply lines to the affected area;

15)     Release detected on or about December 12, 1994 of MTBE gasoline from the Ted Sobek's Exxon station, 3091 South Pittsburgh Road, Star Junction, PA (Fayette County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $988,292.87;

16)     Release detected on or about October 31, 1995 of MTBE gasoline from the Bitner's Exxon station, 201 Susquehanna Avenue, Lock Haven, PA (Clinton County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $992,188.50;

17)     Release detected on or about February 14, 2000 of MTBE gasoline from the Lehigh Marts Exxon station, Route 313 & Route 113, Perkasie, PA (Bucks County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,272,554.83;

18)     Release detected on or about March 1994 of MTBE gasoline from the Heichel Gulf station, 82 South Main Street, Mansfield, PA (Tioga County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,000,000.00;

19)     Release detected on or about November 25, 1998 of MTBE gasoline from the Bowers Gulf station, 12 East Avenue, Wellsboro, PA (Tioga County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $876,300.72;

20)     Release detected on or about October 7, 1996 of MTBE gasoline from the Hess Service Center, Ltd., 801 Route 15 North, Dillsburg, PA (York County), resulting in

investigation and remediation costs paid to date by the Commonwealth in excess of $1,388,543.84;

21)    Release detected on or about May 1, 1999 of MTBE gasoline from the Hess Station #38411, Route 4037, Fleetwood, PA (Berks County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $766,776.49;

22)    Release detected on or about September 9, 1995 of MTBE gasoline from the Hilltop Sunoco, State Route 6 & I-84, Milford, PA (Pike County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,000.000;

23)    Release detected on or about May 30, 2002 of MTBE gasoline from the Flinn's Mobil station, 1910 Baltimore Pike, Gettysburg, PA (Adams County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,294,810.49;

24)    Release detected on or about February 3, 2005 of MTBE gasoline from the R.P. Hoffman Mobil station, Route 940 & Long Pond Road (adjacent to Interstate 380), Pocono Summit, PA (Monroe County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $2,677,054.16;

25)    Release detected on or about May 22, 1998 of MTBE gasoline from the Reese's Shell station, 10 North Railroad Street, Myerstown, PA (Lebanon County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $984,979.88;

26)    Release detected on or about March 13, 2001 of MTBE gasoline from the Holiday Shell station, 8030 Perry Highway, Erie, PA (Erie County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $750,706.03;

27)    Release detected on or about October 17, 2007 of MTBE gasoline from the Bath Shell Shi Nickel station, 7857 Bethlehem-Bath Pike, Bath, PA (Northampton County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $772,866.61;

28)    Release detected on or about April 27, 1994 of MTBE gasoline from the Campbell Sunoco Ultra Service Center, 1111 Clay Pike, North Huntington, PA (Westmoreland County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $2,000,000.00;

29)    Release detected on or about January 13, 1998 of MTBE gasoline from the former Sunrise Sunoco station, 1479 Old Brodhead Road, Monaca, PA (Beaver County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $956,233.68;

30)    Release detected on or about February 1, 1999 of MTBE gasoline from the Toto's Sunoco Food Market, 1138 E. Susquehanna Avenue, Philadelphia, PA (Philadelphia County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $933,411.92;

31)     Release detected on or about February 4, 1999 of MTBE gasoline from the Bill's Texaco Station, 5510 Allentown Boulevard, Harrisburg, PA (Dauphin County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,015,606.17;

32)     Release detected on or about August 19, 1999 of MTBE gasoline from the Dublin Texaco Exxon station, Dublin, PA (Bucks County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,000,000.00;

33)     Release detected on or about March 3, 2004 of MTBE gasoline from the Pipersville Texaco station, 6816 Easton Road, Pipersville, PA (Bucks County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,416,473.76;

34)     Release detected on or about October 14, 1999 of MTBE gasoline from the Starbrick BP station, 2609 Pennsylvania Avenue W., Warren, PA (Warren County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $445,625.88;

35)     Release detected on or about March 13, 1995 of MTBE gasoline from the Bruno & Sons Service Station, 500 East Lancaster Avenue, Downingtown, PA (Chester County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,482,649.41;

36)     Release detected on or about August 1, 1995 of MTBE gasoline from the Marshalls Creek Service Station, Business Route 209 & Route 402, Marshalls Creek, PA (Monroe County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,585,886.19;

37)     Release detected on or about February 27, 1996 of MTBE gasoline from the Automotion Service Center, 110 Revere Boulevard, Reading, PA (Berks County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $2,987,702.37;

38)     Release detected on or about February 26, 1996 of MTBE gasoline from the Nichols Plaza station, 1103 Pennsylvania Avenue West, Warren, PA (Warren County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $971,300.00;

39)     Release detected on or about December 6, 1995 of MTBE gasoline from the Lawrenceville Downtown Time Saver station, Route 49 & Route 15, Lawrenceville, PA (Tioga County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $904,321.55;

40)     Release detected on or about October 9, 1996 of MTBE gasoline from the Fisher's Service, Inc. station, 335 N. Main Street, Butler, PA (Butler County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $808,889.77.

41)     Release detected on or about February 25, 1997 of MTBE gasoline from the Dye's Service station, 2295 Mercer Road, Stoneboro, PA (Mercer County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $967,838.55.

42)     Release detected on or about February 20, 1997 of MTBE gasoline from the former Penns Pantry CE Schneck, 2965 Lebanon Road (Route 72), Manheim, PA (Lancaster County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $2,751,455.50.

43)     Release detected on or about July 20, 1998 of MTBE gasoline from the Matus Service station, 2453 Old Rt. 18, Wampum, PA (Lawrence County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,927,745.75.

44)     Release detected on or about February 22, 1999 of MTBE gasoline from the Bob Nolan's Auto Service station, 2464 Bristol Pike, Bensalem, PA (Bucks County), resulting in cleanup costs paid to date by the Commonwealth in excess of $1,873,475.17.

45)     Release detected on or about June 10, 1998 of MTBE gasoline from the Kicks Convenience Store, 220 Lake Street, South Fork, PA (Cambria County), resulting in cleanup costs paid to date by the Commonwealth in excess of $1,456,102.68.

46)     Release detected on or about October 18, 1996 of MTBE gasoline from the Country Fair Store #95 facility, 76 North Main Street, Union City, PA (Erie County) resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $223,495.69.

47)     Release detected on or about September 1, 1995 of MTBE gasoline from the Country Fair Store #44 facility, 1681 S. Center St. Ext., Grove City, PA (Mercer County) resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $423,654.13.

48)     Release detected on or about July 25, 2000 of MTBE gasoline from the Country Fair Store #93 facility, 228 West Main Street, Grove City, PA (Mercer County) resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $266,993.88.

49)     Release detected on or about February 19, 2004 of MTBE gasoline from the Country Fair Store #84 facility, 7400 Peach Street in Summit Township, PA (Erie County) resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $674,454.83.

233.     Other releases of MTBE gasoline have occurred from USTIF indemnified sites in

Pennsylvania owned or operated by independents not publicly affiliated with particular MTBE

Defendants.  In such instances, the MTBE gasoline that was released was often obtained on the spot market from jobbers.  Jobbers purchase gasoline from various MTBE Defendants which they would sometimes blend together before sale and delivery to independent stations.  These releases of MTBE gasoline include by example, but are in no way limited to:

1)      Release detected on or about October 12, 1994 of MTBE gasoline from the Brownies Service Station, 113 Main Street, Greenville, PA (Mercer County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,056,054.14;

2)      Release detected on or about December 16, 1994 of MTBE gasoline from the CR's Friendly Market No. 1, 1501 N. 9th Street, Reading, PA (Berks County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,596,573.36;

3)      Release detected on or about October 10, 1994 of MTBE gasoline from Cranberry Township Public Works Facility, 20727 US Route 19, Cranberry, PA (Butler County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $924,717.79;

4)      Release detected on or about March 22, 1995 of MTBE gasoline from Morgan's Service Station, 190 South Tremont Street, Tremont, PA (Schuylkill County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,593,015.78;

5)      Release detected on or about July 19, 1995 of MTBE gasoline from the former Sheetz #17, 130 Belmont Street, Johnstown, PA (Cambria County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,087,507.84;

6)      Release detected on or about September 14, 1995 of MTBE gasoline from the former Zippy Market, Old Route 15 (Lycoming Creek Road & Stone Drive), Hepburnville, PA (Lycoming County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $827,548.52;

7)      Release detected on or about February 23, 1996 of MTBE gasoline from the Kwik Fill Station No. S-010, 631 West New Castle Road, Zelienople, PA (Butler County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $870,608.45;

8)      Release detected on or about March 20, 1996 of MTBE gasoline from the Squirrel Hill Automotive, 2001 Murray Avenue, Pittsburgh, PA (Allegheny County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $912,494.10;

9)      Release detected on or about September 1996 of MTBE gasoline from the Landhope Farms #5, Route 10, Limestone Road, Oxford, PA (Chester County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $944,802.02;

10)      Release detected on or about November 1, 1996 of MTBE gasoline from the Bressler Service, Inc. station, Route 501 & Old US Route 22, Bethel, PA (Berks County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $863,783.38.

11)      Release detected on or about July 1996 of MTBE gasoline from Sheetz #149, 124 N. Brady Street, Dubois, PA (Clearfield County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $995,908.98.

12)      Release detected on or about March 1997 of MTBE gasoline from Sheehan Motors, Inc., 926 Second Street, Cresson, PA (Cambria County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $927,414.78.

13)      Release detected on or about June 24, 1997 of MTBE gasoline from Dennis Lumber Company, R.R. 1, Box 109, Markleysburg, PA (Fayette County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $798,542.96.

14)      Release detected on or about October 21, 1997 of MTBE gasoline from the Doms Service Station, 2400 Eighth Avenue, Altoona, PA (Blair County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,203,814.95.

15)      Release detected on or about April 21, 1998 of MTBE gasoline from Kauffman Mini Mart, I-78 Exit 8, Shartlesville, PA (Berks County), resulting in investigation and remediation costs paid to date by the Commonwealth in excess of $1,131,285.05.

16)      Release detected on or about December 20, 2005 of MTBE gasoline from Lens Hartsville Garage, 1075 W. Bristol Road, Warminster, PA (Bucks County), resulting in cleanup costs paid to date by the Commonwealth in excess of $1,196,770.60.

17)      Release detected on or about September 23, 1998 of MTBE gasoline from Snow Shoe Auto Truck Stop, Inc., R.R. 1 Box 143, Snow Shoe, PA (Centre County), resulting in cleanup costs paid to date by the Commonwealth in excess of $1,445,480.64.

18)      Release detected on or about September 2, 1998 of MTBE gasoline from Pickelner Lock Haven Bulk Plant facility (Lock Haven Division), 204 Second Avenue, Lock Haven, PA (Clinton County), resulting in cleanup costs paid to date by the Commonwealth in excess of $1,298,083.74.

19)      Release detected on or about March 16, 1999 of MTBE gasoline from the Top Star Middletown, 2826 E. Harrisburg Pike, Middletown, PA (Dauphin County), resulting in cleanup costs paid to date by the Commonwealth in excess of $2,503,601.60.

20)     Release detected on or about December 16, 1999 of MTBE gasoline from the former Mike's Fancy Service Center, 7947 Boyertown Pike, Boyertown, PA (Berks County), resulting in cleanup costs paid to date by the Commonwealth in excess of $1,989,151.51.

21)     Release detected on or about October 13, 2000 of MTBE gasoline from Sanatoga Oil Company Inc. facility, 2177 East High Street, Pottstown, PA (Montgomery County), resulting in cleanup costs paid to date by the Commonwealth in excess of $1,211,752.03.

22)     Release detected on or about March 24, 2004 of MTBE gasoline from the former Walt Whitman Truck Stop, 3540 South Lawrence Street, Philadelphia, PA (Philadelphia County), resulting in cleanup costs paid to date by the Commonwealth in excess of $1,749,835.55.

23)     Release detected on or about March 31, 2005 of MTBE gasoline from the former 307 Mini Mart, Route 307, Moscow, PA (Lackawanna County), resulting in cleanup costs paid to date by the Commonwealth in excess of $1,422,368.97.

24)     Release detected on or about May 26, 2005 of MTBE gasoline from Lockwoods Inc. station, Route 296 & Cortez Road, South Canaan, PA (Wayne County), resulting in cleanup costs paid to date by the Commonwealth in excess of $2,984,269.63.

234.    Other releases of MTBE gasoline have occurred in Pennsylvania from sites not indemnified by USTIF for which Commonwealth funds have been and will be expended in determining the extent of, monitoring, treating, remediating and otherwise addressing releases of MTBE in the groundwater.

235.    MTBE Defendants are responsible for MTBE and MTBE gasoline that was released, directly or indirectly, into the waters of the Commonwealth.

236.    As a direct and proximate result of MTBE Defendants' acts and omissions as alleged herein, the Commonwealth has incurred, and will continue to incur, significant costs and expenses in investigating, monitoring, treating, remediating and otherwise addressing releases of MTBE into the waters of the Commonwealth.

237.    Total expenditures by the Commonwealth to date to define the extent of, monitor, treat and remediate gasoline releases from USTIF indemnified sites, a substantial portion of

which have involved MTBE gasoline and resulting MTBE contamination of groundwater, exceed $738 million.

238.     Under Pennsylvania law, USTIF, after payment of any cost of corrective action, is "subrogated to all of the rights of recovery of an owner or operator against any person for the cost of remediation." 25 Pa. Code § 977.40(a).

239.     The Commonwealth, through USTIF, is subrogated to the rights of recovery of USTIF's indemnified owners and operators against MTBE Defendants for the cost of defining the extent of, monitoring, treatment, remediation and any other corrective action in addressing MTBE contamination.

240.     In addition to monies paid or incurred by the Commonwealth under the USTIF program, the Commonwealth through DEP and other agencies have expended funds and staff time in defining the extent of, monitoring, treatment and remediation of MTBE contamination from releases from both USTIF indemnified facilities and other sources.

241.     Defining the extent of, monitoring, treatment and remediation of MTBE contamination was a substantial factor in the costs incurred by the Commonwealth in each investigation and remediation of releases of MTBE gasoline.

242.     As a result of MTBE Defendants' acts and omissions as alleged herein, the Commonwealth is entitled to recover from the MTBE Defendants all of the monies and the value of the staff time expended by the Commonwealth to date and into the future in defining the extent, monitoring, treatment and remediation of MTBE gasoline and MTBE contaminated groundwater.

243.     In addition, because its natural resources are damaged by the continuing presence of MTBE in groundwater at detectable levels, the Commonwealth is entitled to recover from

MTBE Defendants the future costs to define the extent of, monitor, treat and remediate MTBE contaminated groundwater.

## COUNT I
### (Against All MTBE Defendants)
### (Strict Product Liability Based On Defective Design)

244.    The Commonwealth incorporates by reference the preceding paragraphs as though set forth at length herein.

245.    MTBE Defendants designed, manufactured, formulated, refined, set specifications for, exchanged, promoted, marketed and/or otherwise supplied (directly or indirectly) MTBE or MTBE gasoline that was delivered into Pennsylvania or into areas outside Pennsylvania affecting the waters of the Commonwealth.

246.    MTBE Defendants represented and claimed that MTBE gasoline could be handled and used in the same manner as gasoline not containing MTBE, and/or otherwise did not require any different or special handling or precautions.

247.    MTBE Defendants knew that MTBE and/or MTBE gasoline were going to be handled, purchased and used without inspection for defects and/or knew that downstream handlers and intended users and consumers did not have the wherewithal to inspect or test for defects.

248.    MTBE and/or MTBE gasoline are defective and unreasonably dangerous products because, among other things:

a.    MTBE is released more readily from gasoline transportation, storage and delivery systems or facilities than are the other constituents of gasoline and other available and viable alternative gasoline additives that can be substituted for MTBE;

b.    MTBE, when used in its intended manner, causes extensive groundwater

contamination that is difficult, time consuming and expensive to respond to and remediate;

     c.     even at extremely low concentrations, MTBE renders groundwater putrid, foul, and unfit for use by humans;

     d.     MTBE poses significant threats to the public health, comfort, safety and welfare and the environment;

     e.     upon information and belief, despite prior knowledge of potential carcinogenic or other health effects, MTBE Defendants failed to conduct reasonable, appropriate or adequate scientific studies to evaluate the potential human health effects of MTBE;

     f.     at all times relevant to this action, feasible alternatives to MTBE were available to the MTBE Defendants which could have achieved required efficiencies, octane levels and/or oxygenation and would have eliminated the unreasonable dangers and hazards posed by MTBE gasoline;

     g.     commercial grade MTBE is defectively manufactured when it contains and/or degrades into unnecessary but environmentally harmful impurities such as TBA; and

     h.     any utility allegedly provided by the use of MTBE as a gasoline additive is greatly outweighed by the risks and dangers associated with MTBE.

249.     MTBE is not safe for its intended use by the intended users or consumers of MTBE.

250.     MTBE is not safe for its intended use in light of the availability of reasonably safer and available alternatives.

251.     MTBE Defendants at all times knew of the defective and unreasonably dangerous nature of MTBE and MTBE gasoline, yet still manufactured, sold and/or distributed the products without any regard for their defective characteristics.

252.     At all times relevant to this action, MTBE and/or MTBE gasoline were unreasonably dangerous for sale to or use by the intended user or consumer, and/or the great risk of harm to public welfare and the environment posed by MTBE and/or MTBE gasoline outweighed the cost to MTBE Defendants of reducing or eliminating such risk.  MTBE Defendants were able to convert to a different safer formulation without MTBE, and still profit from their gasoline sales.

253.     At all times relevant to this action, the distribution, storage, and/or use of MTBE and/or MTBE gasoline and the risks and dangers associated therewith including the risk of harm to public health and welfare and the environment outweighed any limited utility provided by MTBE and/or MTBE gasoline.

254.     At all times relevant to this action, MTBE and MTBE gasoline were used by the intended users and/or consumers of MTBE and MTBE gasoline without substantial change in their condition, and as a proximate result of the defects previously described, MTBE and MTBE gasoline caused the injuries and damages set forth in this Complaint.

255.     As a direct and proximate result of MTBE Defendants' acts and omissions as alleged herein, the Commonwealth has incurred and suffered and will continue to incur and suffer substantial costs and damages as aforesaid for which MTBE Defendants are strictly, jointly and severally liable.

WHEREFORE, the Commonwealth respectfully requests that this Court:

a.     Enter judgment against MTBE Defendants, jointly and severally for all costs to define the extent of, remediate, remove, restore, treat, monitor and otherwise respond to MTBE in the waters of the Commonwealth so that such waters are restored to their original condition, and for all damages to compensate the Commonwealth for the lost interim value and benefits of

their water resources during all times of injury caused by MTBE, and for such orders as may be necessary to provide full relief to address risks to the Commonwealth, including the costs of:

       1)     past and future testing of all affected or potentially affected groundwater for the presence of MTBE, including in both public and private drinking water wells ; and

       2)     past and future treatment and remediation of all groundwater containing detectable levels of MTBE until restored to non-detectable levels, including in both public and private drinking water wells;

b.     Enter judgment against MTBE Defendants, jointly and severally, for all reasonable costs incurred related to the investigation, response, remediation, removal, restoration, treatment and monitoring, directly or indirectly resulting from the contamination of the waters of the Commonwealth with MTBE;

c.     Enter judgment against MTBE Defendants, jointly and severally, for all damages in an amount at least equal to the full cost of restoring the waters of the Commonwealth to their original condition prior to the contamination of such waters with MTBE;

d.     Enter judgment against MTBE Defendants, jointly and severally, for all compensatory damages for the lost interim or permanent value of the waters of the Commonwealth as a result of the contamination of such waters with MTBE;

e.     Enter judgment against MTBE Defendants, jointly and severally, for all other damages sustained by the Commonwealth as a direct and proximate result of MTBE Defendants' acts and omissions alleged herein, including remedial, administrative, oversight and legal expenses and compensation for damage to waters of the Commonwealth;

f.     Enter an order against MTBE Defendants for all appropriate injunctive relief to abate or mitigate the MTBE contamination of waters of the Commonwealth;

g.      Enter an order assessing MTBE Defendants for punitive damages in an amount to be determined by this Court;

h.      Award the Commonwealth costs incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i.      Award the Commonwealth such other relief as this Court deems appropriate.

## COUNT II
### (Against All MTBE Defendants)
### (Strict Liability for Failure to Warn)

256.    The Commonwealth incorporates by reference the preceding paragraphs as though set forth at length herein.

257.    MTBE and MTBE gasoline were designed, manufactured, formulated, marketed, promoted, supplied and/or sold in a defective condition that was unreasonably dangerous to intended users or consumers.

258.    Despite their knowledge that ground and surface water contamination with MTBE was the inevitable consequence of their conduct as alleged herein, MTBE Defendants failed to provide adequate warnings or instructions, or they provided inadequate warnings or instructions, on the proper and safe use of MTBE and MTBE gasoline.  Nor did MTBE Defendants take any other precautionary measures to prevent or mitigate such contamination of the waters of the Commonwealth.

259.    MTBE Defendants did not adequately warn or instruct intended users or consumers as to the dangers of MTBE.

260.    MTBE Defendants' failure to provide the required warnings or instructions, or their provision of inadequate warnings or instructions, on the use of or dangers presented by MTBE and/or MTBE gasoline rendered these products defective and unreasonably dangerous.

The absence of required warnings or instructions, or MTBE Defendants' provision of inadequate warnings or instructions, for the safe use of MTBE and/or MTBE gasoline were a direct and proximate cause of the injuries to the waters of the Commonwealth as alleged herein.

261. Had the downstream handlers and intended users and consumers of MTBE and/or MTBE gasoline received adequate warnings or instructions concerning the safe use of MTBE and/or MTBE gasoline, they would have, or are substantially likely to have, avoided the risks or dangers attendant to the use of MTBE or MTBE gasoline, including avoiding altogether MTBE or MTBE gasoline.

262. As a direct and proximate result of MTBE Defendants' acts and omissions as alleged herein, the Commonwealth has incurred and suffered and will continue to incur and suffer substantial costs and damages as aforesaid for which MTBE Defendants are strictly, jointly and severally liable.

WHEREFORE, the Commonwealth respectfully requests that this Court:

a. Enter judgment against MTBE Defendants, jointly and severally for all costs to define the extent of, remediate, restore, treat, monitor and otherwise respond to MTBE in the waters of the Commonwealth so that such waters are restored to their original condition, and for all damages to compensate the Commonwealth for the lost interim value and benefits of their water resources during all times of injury caused by MTBE, and for such orders as may be necessary to provide full relief to address risks to the Commonwealth, including the costs of:

1) past and future testing of all affected or potentially affected groundwater for the presence of MTBE, including in both public and private drinking water wells; and

2) past and future treatment and remediation of all groundwater containing detectable levels of MTBE until restored to non-detectable levels, including in both public and private drinking water wells;

b. Enter judgment against MTBE Defendants, jointly and severally, for all reasonable costs incurred related to the investigation, response, remediation, removal, restoration, treatment and monitoring, directly or indirectly resulting from the contamination of the waters of the Commonwealth with MTBE;

c. Enter judgment against MTBE Defendants, jointly and severally, for all damages in an amount at least equal to the full cost of restoring the waters of the Commonwealth to their original condition prior to the contamination of such waters with MTBE;

d. Enter judgment against MTBE Defendants, jointly and severally, for all compensatory damages for the lost interim or permanent value of the waters of the Commonwealth as a result of the contamination of such waters with MTBE;

e. Enter judgment against MTBE Defendants, jointly and severally, for all other damages sustained by the Commonwealth as a direct and proximate result of MTBE Defendants' acts and omissions alleged herein, including remedial, administrative, oversight and legal expenses and compensation for damage to waters of the Commonwealth;

f. Enter an order against MTBE Defendants for all appropriate injunctive relief to abate or mitigate the MTBE contamination of waters of the Commonwealth;

g. Enter judgment against MTBE Defendants for punitive damages in an amount to be determined by this Court;

h. Award the Commonwealth costs incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i.     Award the Commonwealth such other relief as this Court deems appropriate.

## COUNT III
### (Against All MTBE Defendants)
### (Public Nuisance)

263.    The Commonwealth incorporates by reference the preceding paragraphs as though set forth at length herein.

264.    MTBE Defendants' negligent, reckless and intentional activities which have resulted in the contamination of the waters of the Commonwealth, a public resource, as alleged herein, and created a significant and unreasonable interference with the general public's right to clean, unadulterated water constitute a public nuisance.

265.    MTBE Defendants' actions and omissions in causing MTBE to enter and pollute the waters of the Commonwealth violate, *inter alia*, the Pennsylvania Storage Tank and Spill Prevention Act and the Pennsylvania Clean Streams Law, 35 P.S. §§ 691.1 *et seq.*, and constitute a public nuisance *per se* under Pennsylvania law.

266.    The public nuisance caused by MTBE Defendants has substantially and unreasonably interfered with, obstructed and/or threatened, among other things, the Commonwealth's interests in the waters of the Commonwealth, as well as the Commonwealth's ability to protect, conserve and manage the waters of the Commonwealth, a public resource.

267.    The public nuisance caused by MTBE Defendants is of a continuing nature and has produced a long-lasting effect upon the waters of the Commonwealth, as MTBE Defendants knew or had reason to know at all times material hereto.

268.    MTBE Defendants intentionally and fraudulently promoted MTBE for use as an additive in gasoline despite knowing it had latent and far-reaching adverse environmental consequences, and MTBE Defendants refined, compounded, formulated, marketed, distributed

and/or otherwise supplied and controlled MTBE gasoline in Pennsylvania (and areas outside Pennsylvania affecting the waters of the Commonwealth) when, at all times material hereto, MTBE Defendants knew, or reasonably should have known, that (i) MTBE gasoline would be placed into leaking gasoline storage and delivery systems; and (ii) when released into the subsurface, MTBE would spread farther and faster than other components of gasoline, resist biodegradation, contaminate groundwater, including drinking water supplies, and, ultimately, be difficult and costly to remove from the water.

269.     Based on their conduct as aforesaid, MTBE Defendants have, at all times relevant to this action, caused, maintained, substantially participated in and/or assisted in the creation of such public nuisance and is a substantial contributor to such public nuisance.

270.     As a direct and proximate result of MTBE Defendants' acts and omissions as alleged herein, the Commonwealth has incurred and suffered and will continue to incur and suffer substantial costs and damages as aforesaid for which MTBE Defendants are jointly and severally liable.

WHEREFORE, the Commonwealth respectfully requests that this Court:

a.     Enter judgment against MTBE Defendants, jointly and severally for all costs to define the extent of, remediate, remove, restore, treat, monitor and otherwise respond to MTBE in the waters of the Commonwealth so that such waters are restored to their original condition, and for all damages to compensate the Commonwealth for the lost interim value and benefits of their water resources during all times of injury caused by MTBE, and for such orders as may be necessary to provide full relief to address risks to the Commonwealth, including the costs of:

1)     past and future testing of all affected or potentially affected groundwater for the presence of MTBE, including in both public and private drinking water wells; and

2)      past and future treatment and remediation of all groundwater containing detectable levels of MTBE until restored to non-detectable levels, including in both public and private drinking water wells;

b.      Enter judgment against MTBE Defendants, jointly and severally, for all reasonable costs incurred related to the investigation, response, remediation, removal, restoration, treatment and monitoring, directly or indirectly resulting from the contamination of the waters of the Commonwealth with MTBE;

c.      Enter judgment against MTBE Defendants, jointly and severally, for all damages in an amount at least equal to the full cost of restoring the waters of the Commonwealth to their original condition prior to the contamination of such waters with MTBE;

d.      Enter judgment against MTBE Defendants, jointly and severally, for all compensatory damages for the lost interim or permanent value of the waters of the Commonwealth as a result of the contamination of such waters with MTBE;

e.      Enter judgment against MTBE Defendants, jointly and severally, for all other damages sustained by the Commonwealth as a direct and proximate result of MTBE Defendants' acts and omissions alleged herein, including remedial, administrative, oversight and legal expenses and compensation for damage to waters of the Commonwealth;

f.      Enter an order against MTBE Defendants for all appropriate injunctive relief to abate or mitigate the MTBE contamination of waters of the Commonwealth;

g.      Enter an order assessing MTBE Defendants for punitive damages in an amount to be determined by this Court;

h.      Award the Commonwealth costs incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i.      Award the Commonwealth such other relief as this Court deems appropriate.

## COUNT IV
## (Against All MTBE Defendants)
## (Negligence)

271.    The Commonwealth incorporates by reference the preceding paragraphs as though set forth at length herein.

272.    MTBE Defendants owed a duty to the Commonwealth to exercise due care in the design, manufacture, formulation, handling, control, disposal, marketing, sale, testing, labeling, use, and instructions for use of MTBE and/or MTBE gasoline.

273.    MTBE Defendants so negligently, carelessly, and recklessly designed, manufactured, formulated, handled, labeled, instructed, controlled (or failed to control), tested (or failed to test), marketed, sold and otherwise distributed MTBE and MTBE gasoline that they breached their duties and directly and proximately caused MTBE to contaminate and threaten the waters of the Commonwealth, resulting in the damages alleged in this Complaint.

274.    MTBE Defendants failed to conduct reasonable, appropriate or adequate scientific studies to evaluate the environmental fate and transport characteristics of MTBE, and/or the likelihood that use of MTBE as a component of gasoline would pollute public water supplies, render drinking water unusable and unsafe, and threaten public health and welfare and the environment.

275.    MTBE Defendants which manufactured, promoted and/or otherwise supplied MTBE to the MTBE Defendants which refined gasoline knew or reasonably should have known that:

a.      MTBE Defendants which refined gasoline would in turn blend the MTBE into gasoline;

b.    such MTBE gasoline would then be placed into gasoline storage and delivery systems, including those in Pennsylvania, with a known propensity and/or potential to leak; and

c.    when released into the subsurface, MTBE would spread farther and faster than other components of gasoline, resist biodegradation, contaminate waters of the Commonwealth, including drinking water supplies, and, ultimately, be difficult and costly to find and remove from the water.

276.    MTBE Defendants which refined, marketed and/or otherwise supplied MTBE gasoline that was delivered, stored and sold in Pennsylvania and/or in areas affecting waters of the Commonwealth knew, or reasonably should have known, that:

a.    such gasoline would be placed into gasoline storage and delivery systems with a known propensity and/or potential to leak;

b.    MTBE would be released even more readily than the constituents of gasoline not containing MTBE from gasoline storage and delivery systems; and

c.    when released into the subsurface, MTBE would spread farther and faster than other components of gasoline, resist biodegradation, contaminate waters of the Commonwealth, including drinking water supplies, and, ultimately, be difficult and costly to remove from the water.

277.    MTBE Defendants manufactured, refined, marketed, promoted and/or otherwise supplied MTBE and/or MTBE gasoline to downstream handlers and intended users and consumers when they knew, or reasonably should have known, that MTBE would be released into the environment from commercial and consumer uses and sources in Pennsylvania other than gasoline storage and delivery systems; and contaminate the waters of the Commonwealth.

278.     Despite their knowledge that water contamination with MTBE was a probable consequence of their conduct and omissions as alleged herein, MTBE Defendants failed to provide any warnings or special instructions, take any other precautionary measures to prevent or mitigate such contamination, or undertake and perform appropriate and necessary response or remediation activities.

279.     In light of the facts alleged herein, MTBE Defendants breached their duty to use due care in the design, manufacture, formulation, handling, control, marketing, sale, testing, labeling, use, and instructions for use of MTBE and/or MTBE gasoline.

280.     As a direct and proximate result of MTBE Defendants' acts and omissions as alleged herein, the Commonwealth has incurred and suffered and will continue to incur and suffer substantial costs and damages as aforesaid for which MTBE Defendants are jointly and severally liable.

WHEREFORE, the Commonwealth respectfully requests that this Court:

a.     Enter judgment against MTBE Defendants, jointly and severally for all costs to define the extent of, remediate, remove, restore, treat, monitor and otherwise respond to MTBE in the waters of the Commonwealth so that such waters are restored to their original condition, and for all damages to compensate the Commonwealth for the lost interim value and benefits of their water resources during all times of injury caused by MTBE, and for such orders as may be necessary to provide full relief to address risks to the Commonwealth, including the costs of:

1)     past and future testing of all affected or potentially affected groundwater for the presence of MTBE, including in both public and private drinking water wells; and

2)      past and future treatment and remediation of all groundwater containing detectable levels of MTBE until restored to non-detectable levels, including in both public and private drinking water wells;

b.      Enter judgment against MTBE Defendants, jointly and severally, for all reasonable costs incurred related to the investigation, response, remediation, removal, restoration, treatment and monitoring, directly or indirectly resulting from the contamination of the waters of the Commonwealth with MTBE;

c.      Enter judgment against MTBE Defendants, jointly and severally, for all damages in an amount at least equal to the full cost of restoring the waters of the Commonwealth to their original condition prior to the contamination of such waters with MTBE;

d.      Enter judgment against MTBE Defendants, jointly and severally, for all compensatory damages for the lost interim or permanent value of the waters of the Commonwealth as a result of the contamination of such waters with MTBE;

e.      Enter judgment against MTBE Defendants, jointly and severally, for all other damages sustained by the Commonwealth as a direct and proximate result of MTBE Defendants' acts and omissions alleged herein, including remedial, administrative, oversight and legal expenses and compensation for damage to waters of the Commonwealth;

f.      Enter an order against MTBE Defendants for all appropriate injunctive relief to abate or mitigate the MTBE contamination of waters of the Commonwealth;

g.      Enter an order assessing MTBE Defendants for punitive damages in an amount to be determined by this Court;

h.      Award the Commonwealth costs incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i.  Award the Commonwealth such other relief as this Court deems appropriate.

## COUNT V
### (Against All MTBE Defendants)
### (Trespass)

281.  The Commonwealth incorporates by reference the preceding paragraphs as though set forth at length herein.

282.  The Commonwealth is the possessor and owner of rights and interests in the waters of the Commonwealth, a public natural resource, which the Commonwealth also holds in trust for the benefit of its citizens.  These rights and interests include, but are not limited to, the Commonwealth's possession and control over waters of the Commonwealth and its legal responsibilities to protect the quality of such waters from contamination and pollution, its constitutional duties as trustee of public natural resources to conserve and maintain the waters for the benefit of all the people, and its *parens patriae* prerogatives, duties and rights to prosecute and recover for trespasses to waters of the Commonwealth

283.  By their tortious conduct as alleged herein, MTBE Defendants caused MTBE to enter, invade, intrude upon and injure the waters of the Commonwealth, trespassing upon the Commonwealth's interests and rights to such waters.

284.  Based on their knowledge of the properties and manner of distribution and storage of MTBE and MTBE gasoline as alleged herein, MTBE Defendants were or should have been aware that as a result of their conduct MTBE contamination of Pennsylvania's groundwater as alleged was inevitable or substantially certain to result.

285.  The trespass upon the waters of the Commonwealth is a continuing trespass.

286.  The Commonwealth has not consented to the trespass alleged herein.

287.    As a direct and proximate result of MTBE Defendants' acts and omissions as alleged herein, the Commonwealth has incurred and suffered and will continue to incur and suffer substantial costs and damages as aforesaid for which MTBE Defendants are jointly and severally liable.

WHEREFORE, the Commonwealth respectfully requests that this Court:

a.    Enter judgment against MTBE Defendants, jointly and severally for all costs to define the extent of, remediate, remove, restore, treat, monitor and otherwise respond to MTBE in the waters of the Commonwealth so that such waters are restored to their original condition, and for all damages to compensate the Commonwealth for the lost interim value and benefits of their water resources during all times of injury caused by MTBE, and for such orders as may be necessary to provide full relief to address risks to the Commonwealth, including the costs of:

1)    past and future testing of all affected or potentially affected groundwater for the presence of MTBE, including in both public and private drinking water wells; and

2)    past and future treatment and remediation of all groundwater containing detectable levels of MTBE until restored to non-detectable levels, including in both public and private drinking water wells;

b.    Enter judgment against MTBE Defendants, jointly and severally, for all reasonable costs incurred related to the investigation, response, remediation, removal, restoration, treatment and monitoring, directly or indirectly resulting from the contamination of the waters of the Commonwealth with MTBE;

c.    Enter judgment against MTBE Defendants, jointly and severally, for all damages in an amount at least equal to the full cost of restoring the waters of the Commonwealth to their original condition prior to the contamination of such waters with MTBE;

d.     Enter judgment against MTBE Defendants, jointly and severally, for all compensatory damages for the lost interim or permanent value of the waters of the Commonwealth as a result of the contamination of such waters with MTBE;

e.     Enter judgment against MTBE Defendants, jointly and severally, for all other damages sustained by the Commonwealth as a direct and proximate result of MTBE Defendants' acts and omissions alleged herein, including remedial, administrative, oversight and legal expenses and compensation for damage to waters of the Commonwealth;

f.     Enter an order against MTBE Defendants for all appropriate injunctive relief to abate or mitigate the MTBE contamination of waters of the Commonwealth;

g.     Enter an order assessing MTBE Defendants for punitive damages in an amount to be determined by this Court;

h.     Award the Commonwealth costs incurred in prosecuting this action, together with prejudgment interest, to the full extent permitted by law; and

i.     Award the Commonwealth such other relief as this Court deems appropriate.

**COUNT VI**
**(Against All MTBE Defendants)**
**(Violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law)**

288.     The Commonwealth incorporates by reference the preceding paragraphs as though set forth at length herein.

289.     At all relevant times, there was in effect the UTPCPL.

290.     Section 3 of the UTPCPL, 73 P. S. § 201-3, provides, in pertinent part:

Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce as defined by sub clauses (i) through (xxi) of clause (4) of section 2 of this act ... are hereby declared unlawful.

291.     Section 2 of the UTPCPL, 73 P. S. § 201-2, provides, in pertinent part:

"UNFAIR METHODS OF COMPETITION" and "UNFAIR OR DECEPTIVE ACTS OR PRACTICES" mean any one or more of the following:

* * *

(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that person has a sponsorship, approval, status, affiliation or connection that he does not have;

* * *

(vii) Representing that goods or services are of a particular standard, quality or grade or that goods are of a particular style or model, if they are of another;

* * *

(ix) Advertising goods or services with intent not to sell them as advertised;

* * *

(xxi) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

292. MTBE Defendants' unfair and deceptive actions and practices as aforesaid in connection with the marketing, sale and distribution of MTBE and MTBE gasoline violated and continue to violate the UTPCPL for one or more of the following reasons:

a. MTBE Defendants disseminated, marketed, advertised and otherwise distributed information to gasoline refiners, distributors, jobbers, retailers and consumers that MTBE was a safe, suitable and effective gasoline additive when in fact its environmental risks and hazards outweighed any benefits as a gasoline additive;

b. MTBE Defendants use of MTBE as a gasoline additive did not and does not have the characteristics, benefits or qualities it was represented to possess in that when released into the environment it caused far reaching damage to air, property, water supplies and other natural

resources of the Commonwealth that has necessitated and will necessitate longer, more difficult and more costly remedial actions;

293.     MTBE Defendants' omissions, misrepresentations, and improper practices relating to the marketing and promotion of MTBE as a gasoline additive had and continue to have the tendency, capacity and likelihood to deceive the public, including gasoline refiners, distributors, jobbers, retailers and consumers purchasing, storing and distributing same.

294.     MTBE Defendants' omissions, misrepresentations, and improper practices relating to the marketing and promotions of MTBE as a gasoline additive unfairly and improperly placed available alternative additives, such as ethanol, at a competitive disadvantage, thereby negatively impacting the public and commerce of Pennsylvania.

295.     The Pennsylvania Attorney General has reason to believe that MTBE Defendants omissions, misrepresentations, and practices relating to the marketing and promotion of MTBE as a gasoline additive violated and will continue to violate the UTPCPL.

296.     Unless restrained, MTBE Defendants will or may continue to engage in methods, acts or practices that violate the UTPCPL and are contrary to the public's interest, thereby necessitating a permanent injunction to prevent and restrain such misconduct by MTBE Defendants.

297.     Pursuant to § 4 of the UTPCPL, 73 P.S. § 201-4, the Attorney General believes it to be in the public interest to bring this action against MTBE Defendants to restrain the continued violation of the UTPCPL.

298.     Pursuant to § 4.1 of the UTPCPL, 73 P.S. § 201-4.1,  and  due to their respective violations of the UTPCPL, MTBE Defendants should be furthered ordered and directed by the

Court to restore to the Commonwealth and other persons in interest any moneys or property, real or personal, lost as a result of MTBE Defendants' violations of the UTPCPL.

299.    MTBE Defendants willfully used and will continue to use methods, acts and practices relating to MTBE and MTBE gasoline that violate the UTPCPL and accordingly under § 8 of the UTPCPL, 73 P.S. § 2-201-8, assessment and recovery of civil penalties on behalf of the Commonwealth is warranted and should be ordered against each defendant in a sum not exceeding one thousand dollars ($1000.00) per violation, which civil penalty is in addition to any other relief awarded the Commonwealth.

WHEREFORE, the Commonwealth respectfully requests that this Court:

a.    Enter declaratory judgment against MTBE Defendants determining and declaring that each defendant's methods, acts and practices relating to the sale, marketing and distribution of MTBE or MTBE gasoline violated the UTPCPL, 73 P.S. § 201-1 *et seq*.;

b.    Enter a permanent injunction order restraining MTBE Defendants from further violating the UTPCPL, 73 P.S. § 201-1 *et seq*.;

c.    Enter an order under § 4.1 of the UTPCPL, 73 P.S. § 201-4.1, requiring MTBE Defendants to restore to the Commonwealth and other persons in interest any moneys or property, real or personal, MTBE Defendants acquired as a result of MTBE Defendants' violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law;

d.    Enter an order awarding to the Commonwealth a civil penalty under § 8 of the UTPCPL, 73 P.S. § 201-8, against each defendant in a sum not exceeding one thousand dollars ($1000.00) per violation;

e.     Award the Commonwealth costs and reasonable attorneys' fees incurred in

prosecuting this action, together with prejudgment interest, to the full extent permitted by law;

and

f.     Award the Commonwealth such other relief as this Court deems appropriate.

## COUNT VII
## (Against All Insurance Defendants)
## (Subrogation)

300.    The Commonwealth incorporates by reference the preceding paragraphs as

though set forth at length herein.

**Allegations Specific to the BP Insurance Defendants**

301.    For purposes of the Insurance Claims herein, Defendants BP p.l.c., BP Holdings

North America Limited, BP America Inc., BP Products North America Inc., BP West Coast

Products LLC, and their predecessor companies and subsidiaries are referred to herein

collectively as "BP Insurance Defendants."

302.    Over several decades, hundreds of insurance companies issued thousands

of insurance policies to the BP Insurance Defendants through a complex, multi-layer insurance

program.

303.    The insurance policies issued to the BP Insurance Defendants over the years

included primary, umbrella, and excess commercial general liability ("CGL") policies, pollution

liability policies, all risk policies, garage liability policies, and others.

304.    In addition to obtaining the policies identified above, the BP Insurance

Defendants also owned captive insurers including Jupiter Insurance Ltd., Cairngorm Insurance

Limited, Greater Pacific Limited, Jupiter Assurance Ltd., Northern Resources Insurance

Company Ltd., and Northern Resources Assurance Inc.  All of these captive insurers were

amalgamated into Jupiter Insurance Ltd. between 2000 and 2012. On March 25, 2011, the BP Insurance Defendants incorporated a new captive insurer, Saturn Insurance Inc. in Vermont. These captive insurers received credit ratings from ratings agencies, and the BP Insurance Defendants treated captive insurance as third-party insurance in IRS filings by, for example, deducting premiums.

305. Until 2004, the BP Insurance Defendants were also partial owners in, and insured by, a mutual liability insurer known as Oil Insurance Limited, and its related excess carrier, Oil Casualty Insurance Limited.

306. Plaintiff believes, and therefore avers, that the BP Insurance Defendants, at all times relevant hereto, were named insureds on their dealers' and jobbers' insurance policies which provided coverage for, among other things, the investigation and remediation of releases from USTs in Pennsylvania.

307. Upon information and belief, the commercial, captive, mutual and dealer/jobber insurance policies described above provided coverage to the BP Insurance Defendants for releases from USTs in Pennsylvania. Those covered UST releases were the subject of claims made by the BP Insurance Defendants to, and paid by, USTIF.

308. In 1992, the BP Insurance Defendants made claims and initiated settlement negotiations with many of its insurers to resolve various coverage issues, including coverage for leaking USTs that were also the subject of claims made to USTIF.

309. The BP Insurance Defendants also initiated legal proceedings to enforce their rights under many of the aforementioned insurance policies for reimbursement of, in relevant part, costs related to leaking USTs in Pennsylvania. Specifically, the BP Insurance Defendants filed insurance coverage litigation including, but not limited to, the following:

a.     *ARCO, et al. v. Aetna Casualty & Surety, et al.*, Superior Court of California, County of Los Angeles, No. BC015575; and

b.     *Amoco Oil Co., et al. v. Accident Casualty Insurance, et al.*, Circuit Court of Cook County, Illinois – Law Division, No. 1993-L-008484.

310.    Upon information and belief, the BP Insurance Defendants settled their claims with all of the insurers, including their coverage litigation, for millions of dollars.

311.    In exchange for payment of millions of dollars in settlement funds, the BP Insurance Defendants released their insurers from all past and future claims for, among other things, remediation costs related to leaking USTs in Pennsylvania which were the subject of claims made by the BP Insurance Defendants to, and paid by, USTIF without notifying Plaintiff of such payments.

**Allegations Specific to the Sunoco Insurance Defendants**

312.    For purposes of the Insurance Claims herein, Defendants Energy Transfer Partners, L.P., ETP Holdco Corporation, Sunoco, Inc., and their predecessor companies and subsidiaries are referred to herein collectively as "Sunoco Insurance Defendants."

313.     Over several decades, hundreds of insurance carriers issued thousands of insurance policies to the Sunoco Insurance Defendants through a complex, multi-layer insurance program.

314.    The insurance policies issued to the Sunoco Insurance Defendants over the years included primary, umbrella, and excess CGL policies, pollution liability policies, all risk policies, garage liability policies, and others.

315.    In addition to obtaining the policies identified above, the Sunoco Insurance Defendants also owned captive insurers including Helios Assurance Company Limited.  Upon

information and belief, this captive insurer received credit ratings from ratings agencies and the Sunoco Insurance Defendants treated captive insurance as third-party insurance in IRS filings by, for example, deducting premiums.

316.    At all times relevant hereto, the Sunoco Insurance Defendants were owners and insureds of the mutual liability insurer Oil Insurance Limited and its related excess carrier, Oil Casualty Insurance Limited.

317.    Consistent with the practice of other major oil companies, Plaintiff believes, and therefore avers, that the Sunoco Insurance Defendants, at all times relevant hereto, were named insureds on their dealers' and jobbers' insurance policies which provided coverage for, among other things, the investigation and remediation of releases from USTs in Pennsylvania.

318.    Upon information and belief, the commercial, captive, mutual and dealer/jobber insurance policies described above provided coverage to the Sunoco Insurance Defendants for releases from USTs in Pennsylvania.  Those covered UST releases were the subject of claims made by the Sunoco Insurance Defendants to, and paid by, USTIF.

319.    On or before October 4, 1996, the Sunoco Insurance Defendants began making claims and initiated settlement negotiations with many of their insurers to resolve various coverage issues, including coverage for leaking USTs in Pennsylvania that were also the subject of claims made to USTIF.

320.    The Sunoco Insurance Defendants initiated litigation against many of their insurers to enforce their rights under many of the aforementioned insurance policies for reimbursement or, in relevant part, costs related to leaking USTs in Pennsylvania.  Specifically, the Sunoco Insurance Defendants filed insurance coverage litigation including, but not limited to,

*Jalisco Corporation Inc., et al. v. Argonaut Insurance Company, et al.*, Superior Court of California, Los Angeles County, No. BC158441.

321.     Upon information and belief, the Sunoco Insurance Defendants settled their claims with all of their insurers, including their coverage litigation, for millions of dollars without notifying Plaintiff.

322.     In exchange for millions of dollars in settlement funds, the Sunoco Insurance Defendants released their insurers from all past and future claims for, among other things, remediation costs related to leaking USTs in Pennsylvania which were the subject of claims made by the Sunoco Insurance Defendants to, and paid by, USTIF without notifying Plaintiff of such releases.

### Allegations Specific to the Chevron Insurance Defendants

323.     For purposes of the Insurance Claims herein, Defendants Chevron Corporation, Chevron U.S.A. Inc., and their predecessor companies and subsidiaries are referred to herein collectively as "Chevron Insurance Defendants."

324.     Over several decades, hundreds of insurance companies issued thousands of insurance policies to the Chevron Insurance Defendants through a complex, multi-layer insurance program.

325.     The insurance policies issued to the Chevron Insurance Defendants over the years included primary, umbrella, and excess CGL policies, pollution liability policies, all risk policies, garage liability policies, and others.

326.     In addition to obtaining the insurance policies described above, the Chevron Insurance Defendants also owned captive insurers including, but not limited to, Insco, Ltd., Bermaco Insurance Company Limited, Iron Horse Insurance Company, Heddington Insurance

Ltd., and Puritan Assurance Ltd. These captive insurers received credit ratings from ratings agencies, and the Chevron Insurance Defendants treated captive insurance as third-party insurance in IRS filings by, for example, deducting premiums.

327. At all times relevant hereto, the Chevron Insurance Defendants were the owners and insureds of the mutual liability Oil Insurance Limited and its related excess carrier, Oil Casualty Insurance Limited.

328. Consistent with the practice of other major oil companies, Plaintiff believes, and therefore avers, that the Chevron Insurance Defendants, at all times relevant hereto, were named insureds on their dealers' and jobbers' insurance policies which provided coverage for, among other things, the investigation and remediation of releases from USTs in Pennsylvania.

329. Upon information and belief, the commercial, captive, mutual and dealer/jobber insurance policies described above provided coverage to the Chevron Insurance Defendants for releases from USTs in Pennsylvania. Those covered UST releases were the subject of claims made by the Chevron Insurance Defendants to, and paid by, USTIF.

330. Beginning in or about 1996, the Chevron Insurance Defendants made claims and initiated settlement negotiations with many of their insurers to resolve various coverage issues, including coverage for leaking USTs in Pennsylvania that were also the subject of claims made to USTIF.

331. The Chevron Insurance Defendants initiated litigation against many of their insurers to enforce their rights under many of the aforementioned insurance policies for reimbursement for, in relevant part, costs related to leaking USTs in Pennsylvania. Specifically, the Chevron Insurance Defendants filed insurance coverage litigation including, but not limited to, the following:

a.    *Four Star Oil & Gas Company, et al. v. Allianz Underwriters Insurance Co.*, *et al.*, Superior Court of California, Los Angeles County, No. BC036944;

b.    *Texaco Refining & Marketing, et al., v. Fireman's Fund, et al*., Superior Court of California, Los Angeles County, No. BC084238; and

c.    *Union Oil Consolidated Coverage Actions*, Superior Court of California, Los Angeles County, Nos. BC271474, BC287966, and BC278535.

332.    Upon information and belief, the Chevron Insurance Defendants settled their claims with all of their insurers, including their coverage litigation, for millions of dollars without notifying Plaintiff.

333.    In exchange for millions of dollars in settlement funds, the Chevron Insurance Defendants released their insurers from all past and future claims for, among other things, remediation costs related to leaking USTs in Pennsylvania which were the subject of claims made by the Chevron Insurance Defendants to, and paid by, USTIF without notifying Plaintiff of such releases.

**Allegations Specific to the ConocoPhillips Insurance Defendants**

334.    For purposes of the Insurance Claims herein, Defendants ConocoPhillips, ConocoPhillips Company, Phillips 66, Phillips 66 Company, and their predecessor companies and subsidiaries are referred to herein collectively as "ConocoPhillips Insurance Defendants."

335.    Over several decades, hundreds of insurance companies issued thousands of insurance policies to the ConocoPhillips Insurance Defendants through a complex, multi-layer insurance program.

336.     The insurance policies issued to the ConocoPhillips Insurance Defendants over the years included primary, umbrella, and excess CGL policies, pollution liability policies, all risk policies, garage liability policies, and others.

337.     In addition to obtaining the insurance policies described above, the ConocoPhillips Insurance Defendants also owned captive insurers including, but not limited to, Walton Insurance Ltd., Danube Insurance Ltd., Sooner Insurance Company, International Energy Insurance Limited, Wabash Insurance Ltd., The Loil Group Limited and Peerless Insurance Company Limited.  These captive insurers received credit ratings from ratings agencies, and the ConocoPhillips Insurance Defendants treated captive insurance as third-party insurance in IRS filings by, for example, deducting premiums.

338.     At all times relevant hereto, the ConocoPhillips Insurance Defendants were the owners and insureds of the mutual liability Oil Insurance Limited and its related excess carrier, Oil Casualty Insurance Limited.

339.     Consistent with the practice of other major oil companies, Plaintiff believes, and therefore avers, that the ConocoPhillips Insurance Defendants, at all times relevant hereto, were named insureds on their dealers' and jobbers' insurance policies which provided coverage for, among other things, the investigation and remediation of releases from USTs in Pennsylvania.

340.     Upon information and belief, the commercial, captive, mutual and dealer/jobber insurance policies described above provided coverage to the ConocoPhillips Insurance Defendants for releases from USTs in Pennsylvania.  Those covered UST releases were the subject of claims made by the ConocoPhillips Insurance Defendants to, and paid by, USTIF.

341.     Beginning in or about the early 1990s, the ConocoPhillips Insurance Defendants made claims and initiated settlement negotiations with many of their insurers to resolve various

coverage issues, including coverage for leaking USTs in Pennsylvania that were also the subject of claims made to USTIF.

342.    The ConocoPhillips Insurance Defendants initiated litigation against many of their insurers to enforce their rights under many of the aforementioned insurance policies for reimbursement for, in relevant part, costs related to leaking USTs in Pennsylvania.  Specifically, the ConocoPhillips Insurance Defendants filed insurance coverage litigation including, but not limited to, the following:

a.      *Douglas Oil Company, et al. v. Allianz Underwriters Insurance Co, et al*., Superior Court of California, Los Angeles County, No. BC064046; and

b.      *Tosco Corporation v. Hartford Accident and Indemnity Company, et al*., Superior Court of California, San Francisco County, No. CGC-93-952681.

343.    Upon information and belief, the ConocoPhillips Insurance Defendants settled their claims with all of their insurers, including their coverage litigation, for millions of dollars without notifying Plaintiff.

344.    In exchange for millions of dollars in settlement funds, the ConocoPhillips Insurance Defendants released their insurers from all past and future claims for, among other things, remediation costs related to leaking USTs in Pennsylvania which were the subject of claims made by the ConocoPhillips Insurance Defendants to, and paid by, USTIF without notifying Plaintiff of such releases.

**Allegations Specific to the Hess Insurance Defendants**

345.    For purposes of the Insurance Claims herein, Defendants Hess Corporation, WilcoHess LLC, and their predecessor companies and subsidiaries are referred to herein collectively as "Hess Insurance Defendants."

346.     Over several decades, hundreds of insurance companies issued thousands of insurance policies to the Hess Insurance Defendants through a complex, multi-layer insurance program.

347.     The insurance policies issued to the Hess Insurance Defendants over the years included primary, umbrella, and excess CGL policies, pollution liability policies, all risk policies, garage liability policies, and others.

348.     In addition to obtaining the insurance policies described above, the Hess Insurance Defendants also owned certain captive insurers which will be further identified through discovery.

349.     At all times relevant hereto, the Hess Insurance Defendants were the owners and insureds of the mutual liability Oil Insurance Limited and its related excess carrier, Oil Casualty Insurance Limited.

350.     Consistent with the practice of other major oil companies, Plaintiff believes, and therefore avers, that the Hess Insurance Defendants, at all times relevant hereto, were named insureds on their dealers' and jobbers' insurance policies which provided coverage for, among other things, the investigation and remediation of releases from USTs in Pennsylvania.

351.     Upon information and belief, the commercial, captive, mutual and dealer/jobber insurance policies described above provided coverage to the Hess Insurance Defendants for releases from USTs in Pennsylvania, which releases were the subject of claims made by the Hess Insurance Defendants to, and paid by, USTIF.

352.     Beginning in or about the early 1990s, the Hess Insurance Defendants made claims and initiated settlement negotiations with many of their insurers to resolve various

coverage issues, including coverage for leaking USTs in Pennsylvania that were also the subject of claims made to USTIF.

353.    The Hess Insurance Defendants initiated litigation against many of their insurers to enforce their rights under many of the aforementioned insurance policies for reimbursement for, in relevant part, costs related to leaking USTs in Pennsylvania.  Specifically, the Hess Insurance Defendants filed insurance coverage litigation including, but not limited to, the following:

a.    *Amerada Hess Corporation v. Travelers Indemnity Company, et al.,* U.S.D.C., N.J., No. 95-2472 (MTB);

b.    *Meadville Corporation, et al. v. Aetna Casualty and Surety Company, et al.*, Superior Court of New Jersey, Law Division, Essex County, No. L-1180-98; and

c.    *Amerada Hess Corporation and Hess Oil Virgin Islands Corp. v. Certain Underwriters at Lloyds, et al.*, U.S.D.C., V.I., No. 2003-0168.

354.    Upon information and belief, the Hess Insurance Defendants settled their claims with all of their insurers, including their coverage litigation, for millions of dollars without notifying Plaintiff.

355.    In exchange for millions of dollars in settlement funds, the Hess Insurance Defendants released their insurers from all past and future claims for, among other things, remediation costs related to leaking USTs in Pennsylvania which were the subject of claims made by the Hess Insurance Defendants to, and paid by, USTIF without notifying Plaintiff of such releases.

**Allegations Specific to the Valero Insurance Defendants**

356.     For purposes of the Insurance Claims herein, Defendants Valero Energy Corporation, Valero Marketing and Supply Company, The Premcor Refining Group Inc., and their predecessor companies and subsidiaries are referred to herein collectively as "Valero Insurance Defendants."

357.     Over several decades, hundreds of insurance companies issued thousands of insurance policies to the Valero Insurance Defendants through a complex, multi-layer insurance program.

358.     The insurance policies issued to the Valero Insurance Defendants over the years included primary, umbrella, and excess CGL policies, pollution liability policies, all risk policies, garage liability policies, and others.

359.     In addition to obtaining the insurance policies described above, the Valero Insurance Defendants also owned certain captive insurers including, but not limited to, Colonnade Assurance Limited, Colonnade Vermont Insurance Company, Omnium Insurance & Reinsurance Company Ltd., and Opus Energy Risk Limited.  These captive insurers received credit ratings from ratings agencies, and the Valero Insurance Defendants treated captive insurance as third-party insurance in IRS filings by, for example, deducting premiums.

360.     At all times relevant hereto, the Valero Insurance Defendants were the owners and insureds of the mutual liability Oil Insurance Limited and its related excess carrier, Oil Casualty Insurance Limited.

361.     Consistent with the practice of other major oil companies, Plaintiff believes, and therefore avers, that the Valero Insurance Defendants, at all times relevant hereto, were named

insureds on their dealers' and jobbers' insurance policies which provided coverage for, among other things, the investigation and remediation of releases from USTs in Pennsylvania.

362.    Upon information and belief, the commercial, captive, mutual and dealer/jobber insurance policies described above provided coverage to the Valero Insurance Defendants for releases from USTs in Pennsylvania.  Those covered UST releases were the subject of claims made by the Valero Insurance Defendants to, and paid by, USTIF.

363.    Beginning in or about the early 1990s, the Valero Insurance Defendants made claims and initiated settlement negotiations with many of their insurers to resolve various coverage issues, including coverage for leaking USTs in Pennsylvania that were also the subject of claims made to USTIF.

364.    The Valero Insurance Defendants initiated litigation against many of their insurers to enforce their rights under many of the aforementioned insurance policies for reimbursement for, in relevant part, costs related to leaking USTs in Pennsylvania.  Specifically, the Valero Insurance Defendants filed insurance coverage litigation including, but not limited to, the following:

a.    *Valero Energy Corporation, et al. v. National Union Insurance Company, et al.*, Hidalgo County Texas, No. C-1530-03-1; and

b.    *Valero Energy Corporation, et al. v. Steadfast Insurance Company, et al.*, 73rd District Court, Bexar County Texas, No. CI 02590.

365.    Upon information and belief, the Valero Insurance Defendants settled their claims with all of their insurers, including their coverage litigation, for millions of dollars without notifying Plaintiff.

366. In exchange for millions of dollars in settlement funds, the Valero Insurance Defendants released their insurers from all past and future claims for, among other things, remediation costs related to leaking USTs in Pennsylvania which were the subject of claims made by the Valero Insurance Defendants to, and paid by, USTIF without notifying Plaintiff of such releases.

**Allegations Specific to the Kinder Morgan Insurance Defendants**

367. For purposes of the Insurance Claims herein, Defendant Kinder Morgan, Inc. and its predecessor companies and subsidiaries are referred to herein collectively as "Kinder Morgan Insurance Defendants."

368. Over several decades, hundreds of insurance companies issued thousands of insurance policies to the Kinder Morgan Insurance Defendants through a complex, multi-layer insurance program.

369. The insurance policies issued to the Kinder Morgan Insurance Defendants over the years included primary, umbrella, and excess CGL policies, pollution liability policies, all risk policies, garage liability policies, and others.

370. In addition to obtaining the insurance policies described above, the Kinder Morgan Insurance Defendants also owned certain captive insurers including, but not limited to, Coastal Offshore Insurance Ltd., Colburn Insurance Company Limited. These captive insurers received credit ratings from ratings agencies, and the Kinder Morgan Insurance Defendants treated captive insurance as third-party insurance in IRS filings by, for example, deducting premiums.

371. At all times relevant hereto, the Kinder Morgan Insurance Defendants were the owners and insureds of the mutual liability Oil Insurance Limited and its related excess carrier, Oil Casualty Insurance Limited.

372. Consistent with the practice of other major oil companies, Plaintiff believes, and therefore avers, that the Kinder Morgan Insurance Defendants, at all times relevant hereto, were named insureds on their dealers' and jobbers' insurance policies which provided coverage for, among other things, the investigation and remediation of releases from USTs in Pennsylvania.

373. Upon information and belief, the commercial, captive, mutual and dealer/jobber insurance policies described above provided coverage to the Kinder Morgan Insurance Defendants for releases from USTs in Pennsylvania. Those covered UST releases were the subject of claims made by the Kinder Morgan Insurance Defendants to, and paid by, USTIF.

374. Beginning in or about the early 1990s, the Kinder Morgan Insurance Defendants made claims and initiated settlement negotiations with many of their insurers to resolve various coverage issues, including coverage for leaking USTs in Pennsylvania that were also the subject of claims made to USTIF.

375. The Kinder Morgan Insurance Defendants initiated litigation against many of their insurers to enforce their rights under many of the aforementioned insurance policies for reimbursement for, in relevant part, costs related to leaking USTs in Pennsylvania. Specifically, the Kinder Morgan Insurance Defendants filed insurance coverage litigation including, but not limited to, the following:

a. *The Coastal Corporation, et al. v. The Aetna Casualty & Surety Company, et al.*, Superior Court of California, Los Angeles County, No. C154142; and

b.       *Kern County Land Company, et al. v. California Union Insurance Company, et al.*, Superior Court of California, San Francisco County, No. 991097.

376.       Upon information and belief, the Kinder Morgan Insurance Defendants settled their claims with all of their insurers, including their coverage litigation, for millions of dollars without notifying Plaintiff.

377.       In exchange for millions of dollars in settlement funds, the Kinder Morgan Insurance Defendants released their insurers from all past and future claims for, among other things, remediation costs related to leaking USTs in Pennsylvania which were the subject of claims made by the Kinder Morgan Insurance Defendants to, and paid by, USTIF without notifying Plaintiff of such releases.

**Allegations Specific to the Marathon Insurance Defendants**

378.       For purposes of the Insurance Claims herein, Defendants Marathon Oil Corporation, Marathon Petroleum Corporation, Marathon Petroleum Company LP, and their predecessor companies and subsidiaries are referred to herein collectively as "Marathon Insurance Defendants."

379.       Over several decades, hundreds of insurance companies issued thousands of insurance policies to the Marathon Insurance Defendants through a complex, multi-layer insurance program.

380.       The insurance policies issued to the Marathon Insurance Defendants over the years included primary, umbrella, and excess CGL policies, pollution liability policies, all risk policies, garage liability policies, and others.

381.       In addition to obtaining the insurance policies described above, the Marathon Insurance Defendants also owned certain captive insurers including, but not limited to, Old Main

Assurance Ltd., and Yorktown Assurance Corporation. These captive insurers received credit ratings from ratings agencies, and the Marathon Insurance Defendants treated captive insurance as third-party insurance in IRS filings by, for example, deducting premiums.

382. At all times relevant hereto, the Marathon Insurance Defendants were the owners and insureds of the mutual liability Oil Insurance Limited and its related excess carrier, Oil Casualty Insurance Limited.

383. Consistent with the practice of other major oil companies, Plaintiff believes, and therefore avers, that the Marathon Insurance Defendants, at all times relevant hereto, were named insureds on their dealers' and jobbers' insurance policies which provided coverage for, among other things, the investigation and remediation of releases from USTs in Pennsylvania.

384. Upon information and belief, the commercial, captive, mutual and dealer/jobber insurance policies described above provided coverage to the Marathon Insurance Defendants for releases from USTs in Pennsylvania. Those covered UST releases were the subject of claims made by the Marathon Insurance Defendants to, and paid by, USTIF.

385. Beginning in or about the early 1990s, the Marathon Insurance Defendants made claims and initiated settlement negotiations with many of their insurers to resolve various coverage issues, including coverage for leaking USTs in Pennsylvania that were also the subject of claims made to USTIF.

386. The Marathon Insurance Defendants initiated litigation against many of their insurers to enforce their rights under many of the aforementioned insurance policies for reimbursement for, in relevant part, costs related to leaking USTs in Pennsylvania. Specifically, the Marathon Insurance Defendants filed insurance coverage litigation including, but not limited to, the following:

a.  *Marathon Oil, et al. v. Hartford, et al., District Court, Oklahoma County*, Oklahoma, No. CJ-93-5570; and

b.  *Marathon Oil Company, et al. v. Hartford Accident and Indemnity Company, et al.*, District Court of Galveston County, Texas, 122nd Judicial District, No. 96CV0631.

387.  Upon information and belief, the Marathon Insurance Defendants settled their claims with all of their insurers, including their coverage litigation, for millions of dollars without notifying Plaintiff.

388.  In exchange for millions of dollars in settlement funds, the Marathon Insurance Defendants released their insurers from all past and future claims for, among other things, remediation costs related to leaking USTs in Pennsylvania which were the subject of claims made by the Marathon Insurance Defendants to, and paid by, USTIF without notifying Plaintiff of such releases.

## Allegations Specific to the Shell Insurance Defendants

389.  For purposes of the Insurance Claims herein, Defendants Shell Oil Company, Shell Oil Products Company LLC, Motiva Enterprises LLC, and their predecessor companies and subsidiaries are referred to herein collectively as "Shell Insurance Defendants."

390.  Over several decades, hundreds of insurance companies issued thousands of insurance policies to the Shell Insurance Defendants through a complex, multi-layer insurance program.

391.  The insurance policies issued to the Shell Insurance Defendants over the years included primary, umbrella, and excess CGL policies, pollution liability policies, all risk policies, garage liability policies, and others.

392.    In addition to obtaining the insurance policies described above, the Shell Insurance Defendants also owned certain captive insurers including, but not limited to, Noble Insurance Ltd., PICO Ltd., and Noble Assurance Company.  These captive insurers received credit ratings from ratings agencies, and the Shell Insurance Defendants treated captive insurance as third-party insurance in IRS filings by, for example, deducting premiums.

393.    At all times relevant hereto, the Shell Insurance Defendants were the owners and insureds of the mutual liability Oil Insurance Limited and its related excess carrier, Oil Casualty Insurance Limited.

394.    Consistent with the practice of other major oil companies, Plaintiff believes, and therefore avers, that the Shell Insurance Defendants, at all times relevant hereto, were named insureds on their dealers' and jobbers' insurance policies which provided coverage for, among other things, the investigation and remediation of releases from USTs in Pennsylvania.

395.    Upon information and belief, the commercial, captive, mutual and dealer/jobber insurance policies described above provided coverage to the Shell Insurance Defendants for releases from USTs in Pennsylvania.  Those covered UST releases were the subject of claims made by the Shell Insurance Defendants to, and paid by, USTIF.

396.    Beginning in or about the early 1990s, the Shell Insurance Defendants made claims and initiated settlement negotiations with many of their insurers to resolve various coverage issues, including coverage for leaking USTs in Pennsylvania that were also the subject of claims made to USTIF.

397.    The Shell Insurance Defendants initiated litigation against many of their insurers to enforce their rights under many of the aforementioned insurance policies for reimbursement for, in relevant part, costs related to leaking USTs in Pennsylvania.  Specifically, the Shell

Insurance Defendants filed insurance coverage litigation including, but not limited to, *Shell Oil Company v. Certain Underwriters at Lloyd's*, Superior Court of California, San Francisco County, No. 954709.

398.    Upon information and belief, the Shell Insurance Defendants settled their claims with all of their insurers, including their coverage litigation, for millions of dollars without notifying Plaintiff.

399.    In exchange for millions of dollars in settlement funds, the Shell Insurance Defendants released their insurers from all past and future claims for, among other things, remediation costs related to leaking USTs in Pennsylvania which were the subject of claims made by the Shell Insurance Defendants to, and paid by, USTIF without notifying Plaintiff of such releases.

## Allegations Applicable to All Insurance Defendants

400.    25 Pa. Code § 977.40 states, in pertinent part: "(a) The Fund, after any payment, shall be subrogated to all of the rights of recovery of an owner or operator against any person for the costs of remediation."

401.    In addition to statutory subrogation, Pennsylvania also recognizes the common law right of subrogation.  *See e.g.*, *Thompson v. Workers' Compensation Appeal Board*, 781 A.2d 1146 (Pa. 2001).

402.    As Fund participants, Insurance Defendants submitted claims to USTIF either before, concurrently or after asserting their rights to have these same claims paid by private insurance carriers.  Insurance Defendants similarly asserted their rights against their insurance carriers by initiating litigation or through informal claim proceedings without disclosing this information to the Commonwealth.

403.     Insurance Defendants' claims against their insurers have been paid by many of their insurers through settlements and insurance reimbursements.

404.     At the same time, Insurance Defendants' applications for corrective action payments with USTIF have either: (a) been paid; or (b) are currently awaiting payment.

405.     At no time have Insurance Defendants reimbursed USTIF any of the amounts they have received from their insurance carriers.

406.     At no time did Insurance Defendants disclose to the Commonwealth that they had insurance coverage for the same claims for which they sought payment from USTIF.  Likewise, Insurance Defendants never disclosed to the Commonwealth that they were pursuing, and settling, coverage claims with their insurers.

407.     Insurance Defendants failed to abide by the subrogation requirements of the regulations underlying the Act (25 Pa. Code § 977.40) by:

a.     Failing to disclose to the Commonwealth that they had insurance policies which provided, or could have provided, insurance coverage for corrective actions paid by USTIF;

b.     Failing to disclose to the Commonwealth that they were settling with their insurers and releasing all insurance policies which provided, or could have provided, coverage for corrective action costs paid by USTIF;

c.     Failing to protect the subrogation rights of the Commonwealth;

d.     Failing to comply with 25 Pa. Code § 977.32 relating to participant cooperation.

408.     As a result of Insurance Defendants' failure to abide by the subrogation requirements of the regulations underlying the Act (25 Pa. Code § 977.40), the Commonwealth has suffered damages in that the Insurance Defendants prevented the Commonwealth from

asserting its rights to recover corrective action costs paid by USTIF against Defendants' commercial, captive, mutual, and dealer/jobber insurers.

409. Because Insurance Defendants settled with their insurers and released all insurance policies which provided, or could have provided, coverage for corrective action costs paid to the Insurance Defendants by USTIF, the Commonwealth is entitled to reimbursement of all corrective action costs paid to Defendants by USTIF.

WHEREFORE, the Commonwealth respectfully requests that this Court enter judgment in its favor against the Insurance Defendants for its damages, including prejudgment interest, and all other relief, at law or equity, as the Court deems just and proper.

**COUNT VIII**
**(Against All Insurance Defendants)**
**(Unjust Enrichment)**

410. The Commonwealth incorporates by reference the preceding paragraphs as though set forth at length herein.

411. Under Pennsylvania law, it is well established that a person who has been unjustly enriched at the expense of another must make restitution to the other. *Binns v. First National Bank of California, Pennsylvania,* 80 A.2d 768 (Pa. 1951); *DeGasperi v. Valicenti*, 181 A.2d 862 (Pa. Super. 1962).

412. Where unjust enrichment is found, the law implies a contract, which requires the defendant to pay to the plaintiff the value of the benefit conferred. *Schenck v. K.E. David, Ltd.*, 666 A.2d 327 (Pa. Super. 1995).

413. At all times relevant hereto, the Insurance Defendants received benefits from the Commonwealth in the form of payments from USTIF to cover corrective action costs.

414. Insurance Defendants had knowledge of the benefit being conferred upon them by the Commonwealth.

415.    At the same time Insurance Defendants were accepting benefits from the Commonwealth in the form of payments from USTIF, Insurance Defendants were also pursuing claims against their various insurers to recover the very same corrective action costs for which they received payment from USTIF.

416.    At various times relevant hereto, Insurance Defendants entered into settlement agreements with their insurers and accepted payments which were, at least in part, payments for the very same corrective action costs covered by USTIF payments.

417.    Insurance Defendants have been unjustly enriched by their acceptance of benefits from the Commonwealth in the form of payments from USTIF to cover corrective action costs and also receiving settlement payments from their insurers for those same corrective action costs.

418.    Insurance Defendants have been unjustly enriched by their acceptance of benefits from the Commonwealth in the form of payments from USTIF to cover corrective action costs related to pre-February 1, 1994 leaks from UST systems.

419.    As a result of the unjust enrichment, Insurance Defendants must repay the Commonwealth the full value of the benefit conferred to them as USTIF participants in the form of payments from USTIF for corrective action.

WHEREFORE, the Commonwealth respectfully requests that this Court enter judgment in its favor against the Insurance Claim Defendants for its damages, including prejudgment interest, where appropriate and all other relief, at law or equity, as the Court deems just and proper.

**COUNT IX**
**(Against All Insurance Defendants)**
**(Violation of the Pennsylvania Storage Tank and Spill Prevention Act)**

420.    The Commonwealth incorporates by reference the preceding paragraphs as though set forth at length herein.

421. At all times relevant hereto, Insurance Defendants were required to abide by the STSPA as well as all regulations promulgated pursuant to the STSPA. *See e.g.*, 25 Pa. Code §§ 245.1 *et seq*. and 25 Pa. Code §§ 977.1 *et seq*.

422. 25 Pa. Code § 977.31 sets forth requirements participants must meet to be eligible for Fund coverage.

423. 25 Pa. Code § 977.32 sets forth minimum requirements for participant cooperation in the claim process to be eligible for Fund coverage.

424. At various times relevant hereto, Insurance Defendants failed to meet the eligibility and cooperation requirements for Fund coverage by:

a. Submitting claims for releases that occurred before February 1, 1994 in violation of 25 Pa. Code § 977.31 and § 977.33(b)(3);

b. Failing to disclose inventory records, maintenance records, company leak reports and UST equipment repair and replacement records which would have established dates of releases; and

c. Failure to protect the Commonwealth's subrogation rights by entering into settlement agreements and releasing insurance policies that provided coverage for the investigation and remediation of environmental contamination caused by leaking UST systems.

425. As a result of Insurance Defendants' failure to meet the eligibility requirements of the Fund, the Commonwealth is entitled to recover all payments made to Defendants by the Fund and to cease payment of further payments on any claim filed by Defendants.

WHEREFORE, the Commonwealth respectfully requests that this Court enter judgment in its favor against the Insurance Claim Defendants for its damages, including prejudgment

interest, where appropriate and all other relief, at law or equity, as the Court deems just and proper.

| | |
|---|---|
| **PENNSYLVANIA OFFICE OF ATTORNEY GENERAL** | **PENNSYLVANIA GOVERNOR'S OFFICE OF GENERAL COUNSEL** |
| By: /s/ James A. Donahue, III<br>    James A Donahue, III, Esquire<br>     Executive Deputy Attorney General<br>Strawberry Square, 14th Floor<br>Harrisburg, Pennsylvania 17120<br>(717) 705-0418<br>Email: jdonahue@attorneygeneral.gov | By: /s/ Linda C. Barrett<br>    Linda C. Barrett, Esquire<br>    Deputy General Counsel<br>333 Market Street, 17th Floor<br>Harrisburg, Pennsylvania 17101<br>(717) 787-9347<br>Email: lbarrett@pa.gov |

**With respect to MTBE Claims:**

| | |
|---|---|
| **BERGER & MONTAGUE, P.C.** | **COHEN, PLACITELLA & ROTH, P.C.** |
| By: /s/ Tyler E. Wren<br>    Daniel Berger, Esquire<br>    Tyler E. Wren, Esquire<br>Special Counsel to the<br>Commonwealth of Pennsylvania<br>1622 Locust Street<br>Philadelphia, Pennsylvania 19103<br>(215) 875-3000<br>Email: twren@bm.net<br>        danberger@bm.net | By: /s/ Stewart L. Cohen<br>    Stewart L. Cohen, Esquire<br>    Robert L. Pratter, Esquire<br>    Michael Coren, Esquire<br>Special Counsel to the<br>Commonwealth of Pennsylvania<br>Two Commerce Square<br>Suite 2900, 2001 Market St.<br>Philadelphia, Pennsylvania 19103<br>(215) 567-3500<br>Email: scohen@cprlaw.com<br>        RPratter@cprlaw.com<br>        MCoren@cprlaw.com |

**MILLER & AXLINE, P.C.**

By: /s/ Duane Miller
    Duane Miller, Esquire
    Michael Axline, Esquire
Special Counsel to the
Commonwealth of Pennsylvania
1050 Fulton Avenue, Suite 100
Sacramento, California  95825-4225
(916) 488-6688
Email: dmiller@toxictorts.org
        maxline@toxictorts.org

**With respect to Insurance Claims:**


**STARK & STARK, P.C.**

By: /s/  Stephen A. Corr_____
    Stephen A. Corr, Esquire
Special Counsel to the
Commonwealth of Pennsylvania
777 Township Line Road, Suite 120
Yardley, Pennsylvania  19067
(267) 907-9600
Email: scorr@stark-stark.com


Admission *pro hac vice* to be requested

**WIGGINS CHILDS QUINN & PANTAZIS**

By: /s/ Dennis G. Pantazis _____
    Dennis G. Pantazis, Esquire
Special Counsel to the
Commonwealth of Pennsylvania
The Kress Building
301 19th Street North
Birmingham, Alabama  35203
(205) 314-0500
Email: dgp@wigginschilds.com


Admission *pro hac vice* to be requested

**CERTIFICATE OF SERVICE**

I, Tyler Wren, Esquire, attorney for Plaintiff, hereby certifies that on October 30, 2014, a true and correct copy of the foregoing Amended Complaint was served via electronic filing if counsel has entered an appearance and is registered with the Court's ECF system, via LexisNexis File & Serve, and on all unrepresented parties pursuant to Rule 4.

/s/ Tyler E. Wren