**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

In re: Methyl Tertiary Butyl Ether ("MTBE") Products
Liability Litigation

---

**This document relates to the following case**:
*Commonwealth of Pennsylvania v.*
*Exxon Mobil Corp. et al.*
Case No. 1:14-cv-06228

**MDL No. 1358**
**Master File C.A. No.**
**1:00-1898 (SAS)**

**MEMORANDUM IN SUPPORT OF DEFENDANT LUKOIL AMERICAS**
**CORPORATION'S MOTION TO DISMISS FOR**
**LACK OF PERSONAL JURISDICTION AND FAILURE TO STATE A CLAIM**

## TABLE OF CONTENTS

STATEMENT OF THE CASE....................................................................................... 1

      A.    GPMI............................................................................................. 1

      B.    LAC..............................................................................................2

      C.    LAC's Relationship to GPMI................................................... 3

      D.    GPMI's Financial Troubles. .................................................... 4

      E.    Post-MTBE Transactions ....................................................... 5

      F.    This Lawsuit............................................................................ 7

ARGUMENT ............................................................................................................. 8

   I.    LAC MAY NOT BE HALED INTO COURT BASED ON ITS
       CONTACTS WITH PENNSYLVANIA. ..............................................9

      A.    The Commonwealth Must Demonstrate That LAC Has Adequate
          Minimum Contacts with Pennsylvania to Support the Exercise of
          Personal Jurisdiction. ...............................................................9

      B.    The Commonwealth Has Failed to Demonstrate That LAC Has
          "Minimum Contacts" with Pennsylvania.....................................10

   II.    LAC MAY NOT BE HALED INTO COURT BASED ON THE
       CONTACTS OF GPMI....................................................................12

      A.    Piercing GPMI's Veil Would Not Enforce a Paramount Equity. ...............12

      B.    Piercing GPMI's Veil Would Not Prevent Fraud. ......................................17

   III.    ALTERNATIVELY, LAC REQUESTS AN EVIDENTIARY HEARING............21

   IV.    ALTERNATIVELY, THE COMPLAINT SHOULD BE DISMISSED FOR
       FAILURE TO STATE A CLAIM......................................................................22

CONCLUSION........................................................................................................ 24

i

# TABLE OF AUTHORITIES

**CASES**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)......................................................................................23

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*,
    902 F.2d 194 (2d Cir. 1990).....................................................................9, 22

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
    171 F.3d 779 (2d Cir. 1999)............................................................................9

*Bart Arconti & Sons, Inc. v. Ames-Ennis, Inc.*,
    275 Md. 295 (1975) .................................................................................14, 18

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...............................................................................16, 23

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985).......................................................................................10

*Colandrea v. Colandrea*,
    42 Md. App. 421 (1979) .........................................................................17, 18

*Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A.*,
    347 F.3d 448 (2d Cir. 2003)..........................................................................22

*Daimler AG v. Bauman*,
    134 S. Ct. 746 (2014).............................................................................10, 11

*Dixon v. Process Corp.*,
    38 Md. App. 644 (1978) .........................................................................12, 15

*Doe v. Delaware State Police*,
    939 F. Supp. 2d 313 (S.D.N.Y. 2013)...........................................................11

*Doron Precision Sys. v. FAAC, Inc.*,
    423 F. Supp. 2d 173 (S.D.N.Y. 2006).............................................................4

*Gen. Retail Servs., Inc. v. Wireless Toyz Franchise, LLC*,
    255 F. App'x 775 (5th Cir. 2007) .................................................................11

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
    131 S. Ct. 2846 (2011)..........................................................................10, 11

*Hanson v. Denckla*,
    357 U.S. 235 (1958).......................................................................................10

*Helicopteros Nacionales de Columbia, S.A. v. Hall*,
    466 U.S. 408 (1984)............................................................................................10

*Hildreth v. Tidewater Equip. Co.*,
    378 Md. 724 (2003) ....................................................................... *passim*

*In re Agent Orange Prod. Liab. Litig. MDL No. 381*,
    818 F.2d 145 (2d Cir. 1987)...........................................................................10

*In re Auto. Refinishing Paint Antitrust Litig.*,
    358 F.3d 288 (3d Cir. 2004)...........................................................................10

*Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*,
    326 U.S. 310 (1945)...................................................................................9, 10

*Jazini v. Nissan Motor Co., Ltd.*,
    148 F.3d 181 (2d Cir. 1998)............................................................................9

*Karabu Corp. v. Gitner*,
    16 F. Supp. 2d 319 (S.D.N.Y. 1998)..............................................................11

*Malin v. XL Capital Ltd.*,
    499 F. Supp. 2d 117 (D. Conn. 2007).............................................................3

*Mangiafico v. Blumenthal*,
    471 F.3d 391 (2d Cir. 2006)...........................................................................22

*Mellon Bank (E.) PSFS, Nat. Ass'n v. Farino*,
    960 F.2d 1217 (3d Cir. 1992)...........................................................................9

*Residential Warranty Corp. v. Bancroft Homes Greenspring Valley, Inc.*,
    126 Md. App. 294 (1999) .........................................................................13, 19

*Schlossberg v. Bell Builders Remodeling, Inc.*,
    441 Md. 671 (2015) ...................................................................................12, 13

*Serio v. Baystate Properties, LLC*,
    209 Md. App. 545 (2013) ...............................................................................13

*Sunward Elecs., Inc. v. McDonald*,
    362 F.3d 17 (2d Cir. 2004)..............................................................................15

*Time Share Vacation Club v. Atl. Resorts, Ltd.*,
    735 F.2d 61 (3d Cir. 1984)........................................................................9, 22

*Walden v. Fiore*,
    134 S. Ct. 1115 (2014)..............................................................................10, 21

**STATUTES**

Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 .......................................................4

**RULES**

FED. R. BANK. P. 9019(a) ...........................................................................................................19

FED. R. CIV. P. 12(b)(6) .............................................................................................................22

FED. R. CIV. P. 12(d) .................................................................................................................22

**OTHER AUTHORITIES**

Environmental Protection, *Commonwealth Sues Major Oil Companies for Environmental
        Damage Inflicted on Pa.'s Natural Resources* (Jun. 27, 2014) ...................................................4

G. Michael Epperson and Joan M. Canny, *The Capital Shareholder's Ultimate Clamity:
        Pierced Corporate Veils and Shareholder Liability in The District of Columbia,
        Maryland, and Virginia, 37* CATH U.L. REV. 605, 621 (1988).................................................13

## STATEMENT OF THE CASE

In June 2014, the Commonwealth of Pennsylvania sued LUKOIL Americas Corporation ("LAC") and numerous other defendants in the Court of Common Pleas of Philadelphia County. ECF No. 1 at 5.  The Commonwealth sought to hold LAC liable for its alleged use of MTBE gasoline, as well as for the alleged conduct of former LAC subsidiary Getty Petroleum Marketing Inc. ("GPMI").  The case was removed to federal court, ECF No. 1, and transferred to this multidistrict litigation, ECF No. 11, where the Commonwealth amended its complaint, ECF No. 36.

In December 2014, LAC moved to dismiss that amended complaint, citing a lack of personal jurisdiction.  *See* ECF No. 85.  LAC explained that it is merely a holding company, and that it has had nothing to do with the use of MTBE gasoline and no presence in Pennsylvania. ECF No. 86 at 2.  LAC further explained that GPMI was engaged in the petroleum marketing business for years before LAC acquired GPMI's publicly traded stock, *see* ECF No. 86 at 1, and that LAC had no influence on GPMI's decisions concerning when, if ever, to use MTBE gasoline, *see* ECF No. 86 at 1–2.

The Commonwealth never filed a response brief.  Instead, in November 2015, after months of jurisdictional discovery—during which LAC produced more than 10,000 pages of responsive documents—the Commonwealth again amended its complaint.  ECF No. 175 ("Compl.," "Complaint," or "Second Amended Complaint").  As before, it is clear that LAC **never** used MTBE gasoline and **never** even tried to affect whether or how GPMI did so.  The Second Amended Complaint must therefore be dismissed.

### A.    GPMI

GPMI began operations in 1997, after having been spun off from Getty Petroleum Corp. Before the spin-off, Getty Petroleum was engaged in the retail and wholesale petroleum

1

marketing and distribution business.  Decl. ¶¶ 9–10.[1]  As part of that business, Getty Petroleum owned much of the real estate underlying its retail service stations and other operating assets.  Decl. ¶ 9.  Eventually, Getty Petroleum decided to focus solely on real estate management.  Decl. ¶ 10.  It thus changed its name to Getty Realty Corp. and spun off its operating assets (but not the underlying real estate) into a separate publicly traded entity:  GPMI.  Decl. ¶ 10.

GPMI served retail and wholesale customers through a network that spanned various Northeastern and Mid-Atlantic states.  Decl. ¶¶ 11, 25.  Getty Realty owned the real estate on which GPMI's service stations and terminals were located.  Decl. ¶ 10.  Under the so-called Master Lease, Getty Realty leased the real estate to GPMI, and GPMI sub-leased the properties to third-party dealers, who operated the stations under franchise agreements.  Decl. ¶ 10.

GPMI never owned or operated a refinery; instead, it focused on "the marketing and distribution of petroleum products that it had purchased from refiners and other suppliers."  Decl. ¶ 11.  GPMI had its own policy concerning when, if ever, to market and distribute gasoline containing MTBE.  Decl. ¶ 26.  For as long as GPMI existed, its policy favored using, whenever possible, ethanol-blended gasoline rather than MTBE gasoline.  *See* Decl. ¶ 26.

**B.    LAC**

In October 2000, LAC was incorporated under the laws of the State of Delaware.  Decl. ¶ 15(a).  Unlike GPMI, LAC is and always has been a holding company.  Decl. ¶ 13.  Although LAC has officers and directors, it has never had a single non-officer employee, Decl. ¶ 13, and it has never conducted any physical operations, Decl. ¶ 19.  Accordingly, it has never tested,

---

[1] "Decl." citations refer to the Amended Declaration of Vincent De Laurentis, an officer and former director of LAC, which is being filed concurrently with this Memorandum.  This Court may consider supporting evidence when ruling on a 12(b)(2) motion to dismiss.  *See In re Methyl Tertiary butyl Ether (MTBE) Products Liability Litig.*, 14 CIV. 1014, 2014 WL 1778984, at *1 n.2 (S.D.N.Y. May 5, 2014) (Scheindlin, J.).

"designed, manufactured, formulated, refined, set specifications for, exchanged, promoted, stored, marketed and/or otherwise supplied (directly or indirectly)" any product to anyone in any place.  Compl. ¶ 14; *see* Decl. ¶¶ 19–23.  Nor has it ever "owned or operated" an underground storage tank or "associated dispensing equipment," Compl. ¶ 21; participated in Pennsylvania's Underground Storage Tank Indemnification Fund ("USTIF"), Compl. ¶ 22; or made any claim to or on that Fund, let alone a claim for which private insurance funds were also sought or recovered, Compl. ¶ 31; Decl. ¶ 24.  LAC conducts its limited activities—holding stock and facilitating financing for its subsidiaries—from its headquarters in New York.  Decl. ¶ 21.  LAC has never owned or leased property in Pennsylvania, or had a mailing address or a telephone listing there.  Decl. ¶ 20; *see also* Decl. ¶¶ 19–24 (detailing LAC's lack of operations and lack of contacts with Pennsylvania).

### C.  LAC's Relationship to GPMI

During the last month of 2000 and the first month of 2001, LAC acquired 100% of the stock of GPMI.  Decl. ¶ 15(a)–(f).[2]  Until LAC sold GPMI's stock in 2011 to an unrelated third party, LAC held GPMI as a direct or indirect wholly owned subsidiary.  Decl. ¶ 15(g).  Both companies observed all corporate formalities, Decl. ¶ 31, and LAC did not make or influence GPMI's day-to-day operating decisions, Decl. ¶ 29.  Indeed, after the acquisition, "virtually all of GPMI's existing management team and its key operating personnel remained in place," and they continued to run the company consistent with its historical policies and practices.  Decl. ¶ 29.  In particular, LAC did not affect (or even attempt to affect) GPMI's decisions concerning when, if

---

[2] Securities and Exchange Commission filings describing the transaction are available at https://perma.cc/VQF3-Q6BG and http://www.sec.gov/cgi-bin/browse-edgar?company=LUKOIL+Americas&owner=exclude&action=getcompany.  *See also Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 133 (D. Conn. 2007) *aff'd*, 312 F. App'x 400 (2d Cir. 2009) (discussing judicial notice).

ever, to use MTBE gasoline.  Decl. ¶ 30.  As noted, GPMI set its policy on the use of MTBE

gasoline before being acquired by LAC.  That policy remained in effect until the industry's use

of MTBE gasoline ended no later than 2006.  Decl. ¶ 26.[3]

### D.    GPMI's Financial Troubles

After its stock was acquired by LAC, GPMI continued to be a growing and generally

profitable company.  Decl. ¶ 35.  In 2004, for example, GPMI had positive net earnings and

acquired more than 700 service stations in New Jersey and Pennsylvania.  Decl. ¶ 35.  The

acquisition was a culmination of GPMI expansion efforts that dated back to at least 1997.  Decl.

¶ 36.[4]

In 2005, however, GPMI's economic performance took a downward turn.  Decl. ¶ 37.  By

2006, various market forces combined to cause GPMI to experience losses that became

substantial and recurring.  Decl. ¶¶ 37–38.  Its financial stability was further eroded by the

automatic rent-escalation provisions of the Master Lease.  Decl. ¶ 38.  As a result of those

provisions, a "rent gap" developed between the rent GPMI owed to its landlord, Getty Properties

Corp. (a subsidiary of Getty Realty), and the rent GPMI collected from its sub-lessees.  Decl.

¶ 38.  Although the gap eventually exceeded $20 million annually, Getty Properties refused

GPMI's efforts to re-negotiate the lease.  *See, e.g.*, Decl. ¶ 38.

---

[3] The Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594, eliminated the "oxygen content requirement for reformulated gasoline," § 1504, effective no later than May 6, 2006, *see* § 1504(a)(2)(B).  In a press release concerning this lawsuit, Pennsylvania stated that MTBE "was phased out as a gasoline additive in Pennsylvania in 2005."  *See* Pennsylvania Department of Environmental Protection, *Commonwealth Sues Major Oil Companies for Environmental Damage Inflicted on Pa.'s Natural Resources* (Jun. 27, 2014), http://perma.cc/WRH7-2SMV?type=pdf at 2; *cf. Doron Precision Sys. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006) (discussing judicial notice).

[4] The stations were Mobil-branded when they were acquired.  Decl. ¶ 35.  Over time, GPMI re-branded the stations with the Lukoil mark, "thereby extinguishing a costly royalty obligation."  Decl. ¶ 35.

Also in 2006, GPMI contracted with Bionol Clearfield LLC to purchase substantial volumes of ethanol for a five-year term, which began to run in March 2010.  Decl. ¶ 44. Between the contract's execution (in 2006) and the commencement of performance (in 2010), the market for ethanol radically changed.  Decl. ¶ 44.  GPMI was thus "exposed to the possibility of having to pay substantially above-market prices for large volumes of ethanol under Bionol's interpretation of the contract's pricing provisions (an interpretation that GPMI ultimately disputed)."  Decl. ¶ 44.  GPMI's efforts to negotiate a compromise solution were unsuccessful. Decl. ¶ 45.  In June 2010, GPMI commenced an arbitration proceeding to challenge Bionol's interpretation of the contract's pricing provisions.  Decl. ¶ 44.  At that time, GPMI also started making payments based on what it believed to be the proper contract price rather than the amounts billed by Bionol.  Decl. ¶ 44.  When Bionol stopped making further deliveries of ethanol in November 2010, the difference between what Bionol had invoiced and what GPMI had paid was approximately $23 million.  Decl. ¶ 44.

### E.  Post-MTBE Transactions

Long after the industry stopped using MTBE gasoline in 2006, LAC was involved in two transactions involving GPMI.  While both transactions were made in an effort to restore GPMI's financial health, that goal was thwarted by a staggering damages award in the Bionol arbitration.

**1.**  After 2006, GPMI undertook a number of steps to reduce costs, raise capital, and pay off its debts.  Decl. ¶¶ 38–43.  Included among those efforts was an agreement to sell 162 of its non-Master Lease service stations to an independent third party for approximately $137.5 million.  Decl. ¶ 41.  The transaction, however, failed to close when (in summer 2008) the would-be purchaser could not secure needed financing.  Decl. ¶ 41.  Lehman Brothers filed for bankruptcy soon after, the economy crashed, and credit dried up.  Decl. ¶ 41.  As a result, significant asset sales to third parties became virtually impossible.  Decl. ¶ 41.

That timing was particularly unfortunate.  Principally because of its acquisition of service stations in 2004, GPMI faced the maturation of hundreds of millions of dollars in debt in late 2009 and early 2010.  *See* Decl. ¶¶ 35, 42.  Accordingly, between September and November 2009, GPMI: (i) sold its blending and supply business to an affiliate for $25.4 million; and (ii) sold its heating oil business and its non-Master Lease stations to affiliate LUKOIL North America LLC ("LNA") for about $120 million, plus the assumption of roughly $60 million in liabilities.  Decl. ¶ 42.  Investment banking firm Houlihan Lokey Howard & Zukin Financial Advisors contemporaneously analyzed the sale to LNA, and concluded that the purchase price "was financially fair to GPMI."  Decl. ¶ 42.  In addition to receiving the proceeds of the sale to LNA, GPMI separately received a $340 million capital contribution to pay off its debt obligations.  Decl. ¶ 42.

**2.**  Although the measures described above produced a debt-free GPMI, the Master Lease and the Bionol contract remained serious financial challenges for the company.  Decl. ¶ 45.  Continuing efforts to renegotiate both contracts were unsuccessful.  Decl. ¶¶ 38, 45.  Eventually, LAC determined that GPMI would be in a better position to negotiate effectively if it were under new ownership.  Decl. ¶ 45.  Thus, in late 2010, LAC began soliciting bidders for a potential sale of GPMI.  Decl. ¶ 45.  On February 28, 2011, LAC sold its entire interest in GPMI to an independent third party, Cambridge Petroleum Holdings LLC.  Decl. ¶ 47.

Several months after the sale, in July 2011, a divided arbitration panel issued a $230 million award to Bionol—ten times the $23 million differential between Bionol's disputed invoice price and the amount paid by GPMI.  Decl. ¶ 48.  "The award sounded GPMI's death knell," and in December of that year, Cambridge placed GPMI into bankruptcy.  Decl. ¶ 48.

6

3.   During the bankruptcy, the Trustee of the GPMI estate prosecuted an adversary proceeding against LAC, LNA, and their ultimate parent (then known as OAO Lukoil).  *See generally* Compl., *In re: Getty Petroleum Marketing Inc., et al.*, No. 11-02941 (S.D.N.Y., Dec. 29, 2011), ECF No. 1.  The Trustee alleged that the GPMI-LNA sale constituted a fraudulent conveyance and sought to set it aside.  After 17 days of trial proceedings, the case settled, and money was paid to GPMI's bankruptcy estate.  Although the Commonwealth had notice of and made filings in the bankruptcy, it chose not to file a proof of claim.  *See generally* Liquidating Trustee's Motion to Enforce the Bar Date and in Aid of Confirmation Concerning Liquidating Trust Distributions, *In re: Getty Petroleum Marketing Inc., et al.*, No. 11-15606 (S.D.N.Y., July 24, 2014), ECF No. 1226 [hereinafter "Motion to Enforce the Bar Date"].

### F.   This Lawsuit

The Commonwealth's original complaint named GPMI as a defendant.  *See* ECF No. 1 Ex. 1 at 38 ¶ 53.  When confronted with its failure to file a proof of claim, however, the Commonwealth voluntarily dismissed GPMI from the case, ECF No. 15, and did not name GPMI in the First Amended Complaint, *see generally* ECF No. 36.  GPMI has returned as a named defendant in the Second Amended Complaint, but the "claim against GPMI is [now] limited to recoverable insurance proceeds."  Compl. ¶ 74.

The Second Amended Complaint also names LAC as a defendant, generally alleging: (1) that LAC is part of a group of "MTBE Defendants" (Compl. ¶ 122) and "Insurance Defendants" (Compl. ¶ 123), and that unspecified members of the group acted tortiously; and (2) that LAC should be held liable for GPMI's use of MTBE gasoline because of (i) the relationship between LAC and GPMI, *see, e.g.*, Compl. ¶¶ 299, 308, and (ii) the allegedly fraudulent nature of the 2009 GPMI-LNA transaction, *see, e.g.*, Compl. ¶¶ 317-324.  Those and more specific allegations are discussed as pertinent below.

**ARGUMENT**

This case presents the question whether a shareholder (LAC) may be haled into court to answer for the use of MTBE gasoline by a separate corporation (GPMI) whose stock it once held. The question, in other words, is whether the veil of GPMI may be pierced, and its conduct attributed to LAC, such that GPMI's contacts with the relevant forum state (Pennsylvania) count against LAC as well. Such piercing is improper here. GPMI was an operating publicly traded company before LAC acquired its stock—and GPMI's existing policy concerning the use of MTBE gasoline was unaffected by the acquisition. Those facts alone establish that GPMI had a separate corporate existence that may not be ignored.

The inquiry should end there. For completeness, however, this brief proceeds in four parts. The first sketches relevant background principles of personal jurisdiction and discusses why (putting GPMI to the side) LAC's non-existent contacts with Pennsylvania cannot support the exercise of personal jurisdiction over LAC. The second explains why attributing GPMI's conduct to LAC, under the circumstances presented here, would be a radical departure from governing law. It also discusses why, at minimum, nothing suggests that LAC may be made to answer for the use of MTBE gasoline occurring before LAC acquired GPMI's stock.

The second part, like the first, assumes the truth of the Complaint's factual allegations. The third part briefly notes that, even if those allegations had been sufficient to justify the exercise of personal jurisdiction, LAC would remain entitled to (and, if necessary, requests) an evidentiary hearing to confirm that the Commonwealth's allegations lack a factual basis. Because the Complaint is insufficient even if taken as true, however, dismissal is proper now without the need for an evidentiary hearing. The fourth and final part argues that the Commonwealth's inadequate allegations also fail to state a claim against LAC.

I.   **LAC MAY NOT BE HALED INTO COURT BASED ON ITS CONTACTS WITH PENNSYLVANIA.**

   A.   **The Commonwealth Must Demonstrate That LAC Has Adequate Minimum Contacts with Pennsylvania to Support the Exercise of Personal Jurisdiction.**

   The Commonwealth bears the burden of establishing that the exercise of personal jurisdiction is proper.  *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999); *Mellon Bank (E.) PSFS, Nat. Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992).  Where, as here, jurisdictional discovery has occurred, the plaintiff must *at least* make "an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant."  *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 196-98 (2d Cir. 1990); *see also Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61, 66 (3d Cir. 1984) (requiring "sworn affidavits or other competent evidence," rather than allowing "a plaintiff [to] rely on the bare pleadings alone in order to withstand a defendant's 12(b)(2) motion to dismiss").  In considering a plaintiff's efforts, "the Court 'will not draw argumentative inferences in the plaintiff's favor, nor must [the Court] accept as true a legal conclusion couched as a factual allegation."  Opinion at 12, No. 1:00-cv-01898 (Dec. 7, 2015) (Scheindlin, J.), ECF 4312 (citation omitted); *see also Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185 (2d Cir. 1998) (citation omitted); *Mellon Bank*, 960 F.2d at 1223; *Time Share*, 735 F.2d at 65 (rejecting "allegation" as "no more than a conclusory statement").

   Whether this Court may exercise personal jurisdiction over LAC depends on the sufficiency of LAC's contacts with Pennsylvania.  As relevant here, "due process requires that in order to subject a defendant to a judgment in personam, *** [the defendant] have certain minimum contacts with" "the forum" "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310 (1945).  Because this case was transferred

9

to this multi-district litigation from a federal district court sitting in Pennsylvania, Pennsylvania is the relevant forum state. *See In re Agent Orange Prod. Liab. Litig. MDL No. 381*, 818 F.2d 145, 163 (2d Cir. 1987); *In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 297 n.11 (3d Cir. 2004). Thus, the Commonwealth must identify facts demonstrating that LAC had adequate contacts with Pennsylvania.

### B. The Commonwealth Has Failed to Demonstrate That LAC Has "Minimum Contacts" with Pennsylvania.

**1.** Adequate "minimum contacts" come in two forms. *First*, a defendant's contacts with a forum may be so "systematic and continuous," *Int'l Shoe*, 326 U.S. at 320, "as to render [the defendant] essentially at home in the forum \*\*\*." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011). If so, adequate contacts exist to support the exercise of "general or all-purpose jurisdiction," *Daimler AG v. Bauman*, 134 S. Ct. 746, 751 (2014), and the court may "hear any and all claims against" the defendant, *Goodyear*, 131 S. Ct. at 2851.

*Second*, a defendant may "purposefully avail[] itself of the privilege of conducting activities within the forum State." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958) (emphasis added); *see also Walden v. Fiore*, 134 S. Ct. 1115, 1122 (2014) ("purposefully"). If the defendant does so, adequate contacts exist to support the exercise of "specific or case-linked jurisdiction." *Goodyear*, 131 S. Ct. at 285. Specific jurisdiction extends only to "litigation [that] results from alleged injuries that 'arise out of or relate to'" the activities at issue, *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)); unlike general jurisdiction, specific jurisdiction does not authorize a court to "hear any and all claims against" the defendant, *Goodyear*, 131 S. Ct. at 2851.

It is beyond dispute that LAC, "a Delaware corporation with its principal place of business" in New York, Compl. ¶ 83, is not "at home" in Pennsylvania, and is thus not subject to general personal jurisdiction in that forum, *see Goodyear*, 131 S. Ct. at 2851-54; *Daimler*, 134 S. Ct. at 761 & n. 19.  The Commonwealth must therefore demonstrate that the exercise of specific personal jurisdiction would be proper.

**2.**  The Commonwealth's half-hearted efforts to do so fall far short.  The general strategy of the Complaint is apparent:  lump Defendants into a group and allege that the group did something supposedly objectionable.  So, for example, the Complaint defines "MTBE Defendants" to refer to an enormous group of Defendants that includes LAC.  Compl. ¶ 122. "MTBE Defendants," the Commonwealth further complains, "designed, manufactured, formulated, refined, set specifications for, exchanged, promoted, stored, marketed and/or otherwise supplied (directly or indirectly) MTBE and MTBE gasoline that was delivered, stored, and sold in Pennsylvania (or to areas outside Pennsylvania affecting the waters of the Commonwealth) resulting in contamination of the waters of the Commonwealth."  Compl. ¶ 14. That broad group pleading cannot support an exercise of personal jurisdiction over LAC.  *See, e.g., Gen. Retail Servs., Inc. v. Wireless Toyz Franchise, LLC*, 255 F. App'x 775, 793 (5th Cir. 2007); *Doe v. Delaware State Police*, 939 F. Supp. 2d 313, 332 (S.D.N.Y. 2013); *Karabu Corp. v. Gitner*, 16 F. Supp. 2d 319, 325 (S.D.N.Y. 1998) (Sotomayor, J.).  Indeed, glaringly absent from the Complaint are allegations *that LAC* "designed" MTBE gasoline—or stored it, or sold it, etc. Accordingly, this Court may not exercise personal jurisdiction over LAC for claims arising out of involvement with or the use of MTBE gasoline.[5]

---

[5] The Commonwealth's suggestion that LAC may be haled into court based on the use of MTBE gasoline by GPMI is discussed in the next section.  *See* Part II, *infra*.

The Commonwealth's insurance claims fare no better. The phrase "Insurance Defendants" is defined to refer to numerous Defendants, including LAC. Compl. ¶ 123. Here, too, allegations of tortious conduct *by LAC* are absent. *See* Compl. ¶¶ 411-531; *see also* Decl. ¶ 24 (LAC never submitted claims to Pennsylvania's indemnification fund). As there is not even a suggestion that GPMI committed some insurance-related wrong for which LAC could be held to account (*see, e.g.*, Compl. ¶ 123), the insurance claims must be dismissed.

## II.    LAC MAY NOT BE HALED INTO COURT BASED ON THE CONTACTS OF GPMI.

The Commonwealth's main effort to establish personal jurisdiction over LAC is its attempt to hold LAC responsible for GPMI's alleged use of MTBE gasoline. The Commonwealth alleges, for example, that LAC "failed to observe GPMI's separate corporate entity," Compl. ¶ 343; and that LAC fraudulently removed assets from GPMI in 2009, *see* Compl. ¶¶ 317–331. This Court has already determined that whether GPMI's contacts may be imputed to LAC depends on the veil-piercing law of Maryland, the state of GPMI's incorporation. *See* ECF No. 140 at 11. Under that law, a corporate entity will be disregarded— and a shareholder held responsible for the corporation's acts—only when necessary to "enforce a paramount equity" or to "prevent fraud." *Hildreth v. Tidewater Equip. Co.*, 378 Md. 724, 733 (2003) (citation omitted); *accord Schlossberg v. Bell Builders Remodeling, Inc.*, 441 Md. 671, 672 (2015); *see also Dixon v. Process Corp.*, 38 Md. App. 644, 656 (1978) ("[T]he rule of law in this State is that no matter how flimsily woven is the corporate curtain, it may not be flung aside except to prevent fraud or enforce a paramount equity."). Neither circumstance is present here.

### A.    Piercing GPMI's Veil Would Not Enforce a Paramount Equity.

**1.** The "paramount equity" standard "has been so narrowly construed that neither" Maryland's highest court nor its intermediate appellate court "has ultimately 'found an equitable

12

interest more important than the state's interest in limited shareholder liability.'"  *Serio v. Baystate Properties, LLC*, 209 Md. App. 545, 559-60 (2013) (quoting G. Michael Epperson and Joan M. Canny, *The Capital Shareholder's Ultimate Calamity: Pierced Corporate Veils and Shareholder Liability in The District of Columbia, Maryland, and Virginia*, 37 CATH U.L. REV. 605, 621 (1988)); *see also Residential Warranty Corp. v. Bancroft Homes Greenspring Valley, Inc.*, 126 Md. App. 294, 307 (1999).  Indeed, "neither an utter disregard for corporate formalities nor the use of the corporate form by an individual as a shield from liability" is sufficient to justify "piercing the corporate veil."  Epperson, *supra*, at 621.  Accordingly, for this Court to hold that the Commonwealth has satisfied the "paramount equity" standard would be extraordinary.

**2.**  Unsurprisingly, then, there is no legitimate basis for this Court to do so here.  The leading formulation of the "paramount equity" inquiry is set out in *Hildreth*.  *See* 378 Md. at 727-739; *see also Schlossberg*, 441 Md. at 672 ("The analysis of the common factors considered by our courts when addressing whether a complaint or set of facts are sufficient to pierce the veil of a single corporation are delineated in *Hildreth* ***.").  The *Hildredth* court identified the core of that inquiry as the so-called "'alter ego' doctrine."  378 Md. at 735.  Under Maryland law, the doctrine permits piercing **only** in "exceptional circumstances," and **only** when a plaintiff demonstrates:

> (1) *Complete domination*, not only of the finances, but *of policy and business practice in respect to the transaction so that the corporate entity as to this transaction had at the time no separate mind, will, or existence of its own*[;] (2) that such control [was] used by the defendant to commit fraud or wrong, to perpetrate the violation of the statutory or other positive legal duty, or dishonest and unjust act in contravention of the plaintiff's legal rights[;] and (3) *that such control and breach of duty proximately caused the injury or unjust loss*.

*Hildreth*, 378 Md. at 735 (citation omitted, emphasis added, second alteration in original).

Familiar veil-piercing factors guide the inquiry, *see id.* at 735-736 (discussing inadequate

capitalization, comingling of shareholder and corporate assets, etc.), but of course do not

determine whether the *exercise* of control has *proximately caused* the injury alleged.  And to be

clear, a sole shareholder's "personal[] involve[ment]" in a transaction does not justify piercing.

*Hildredth*, 378 Md. at 733; *cf. Bart Arconti & Sons, Inc. v. Ames-Ennis, Inc.*, 275 Md. 295, 304-

305 (1975) (no piercing where two brothers owned 100% of corporation's stock, made debtor

corporation "dormant," shifted business to two other corporations operating "at the same place of

business," and did so for the purpose of evading legal obligations).[6]

The relationship between LAC and GPMI is discussed at length in the Amended

Declaration of Vincent De Laurentis.  *See, e.g.*, Decl. ¶¶ 19–34.  As explained, GPMI was an

independent publicly traded company before its stock was acquired by LAC, *see* Decl. ¶¶ 9–11,

and GPMI remained an independent operating company after the acquisition, *see* Decl.¶¶ 25-34.

Indeed, even if LAC *had* dominated GPMI (which it did not do), LAC certainly did not use any

"domination" to compel GPMI's use of MTBE gasoline:  after the acquisition, GPMI's

pre-existing management team continued to run the company; GPMI had the same employees;

and GPMI's operating decisions concerning the use of MTBE gasoline reflected longstanding

policy that was entirely unaffected by LAC's acquisition of the company.  *See* Decl. ¶¶ 29–30.

It is thus impossible to say that, "in respect to the transaction [at issue, *i.e.*, the use of

MTBE, GPMI] *** had at the time no separate mind, will, or existence of its own."  *Hildreth*,

378 Md. at 735 (citation omitted).  GPMI was, in short, "a valid, subsisting corporation which,

---

[6] The Complaint suggests that a refusal to pierce would allow "eva[sion] [of] legal obligations to the Commonwealth."  Compl. ¶ 343.  That is not true and has not been adequately pleaded.  *See, e.g., infra* Part II.B.  In any event, that would not be "a separate basis for piercing a corporate veil."  *Hildreth*, 378 Md. at 739.  "With its very limited scope, yet to actually be found in any Maryland case, [that supposed basis for piercing] is, at best, subsumed, along with the 'alter ego' doctrine, in the notion of paramount equity ***."  *Id.*; *see also id.* at 738 (discussing *Bart Arconti*, in which conduct "clearly designed to cause the corporation to evade a legal obligation[] did not suffice to justify disregarding the corporate entity").

until it suffered a reversal of fortunes, had substantial assets and business prospects." *Id.* at 737. Piercing its corporate veil and treating its actions as those of LAC would be an affront to Maryland law. *Cf. Dixon*, 382 A.2d at 895 (refusing to pierce veil of subsidiary where parent "conducted the management affairs of all its subsidiaries, owned the equipment they used, hired their employees, paid their office rents, and operated the payrolls and unemployment matters," even though "[t]he directors were the same for all corporations, and at board meetings, any matters of the various corporations were discussed").

To be clear, the significance of an alleged fraudulent conveyance in 2009 is a separate issue. *See* Part II.B, *infra*. What matters here is that the Commonwealth's claim that it was injured *by the use of MTBE gasoline* is an injury allegedly suffered *because of GPMI*. Indeed, at the very least, it could not be plainer that LAC did not cause GPMI to use MTBE gasoline before LAC acquired GPMI's stock. At minimum, then, all claims against LAC must be dismissed to the extent they concern pre-acquisition use of MTBE gasoline. *See Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004) ("A plaintiff must establish the court's jurisdiction with respect to *each* claim asserted.").

**3.** The allegations of the Complaint are not to the contrary. *First*, much of the Complaint sets out bare legal conclusions. *See, e.g.*, Compl. ¶ 301 ("GPMI acted as agent for *** LAC"), 320 ("LAC [is a] *** successor[] in liability"), 339 ("acted as alter-egos and/or as if GPMI was a department"), 345 ("directly, indirectly, and through agents and/or officers, or alter-egos, successors in liability"). Those non-factual allegations are entitled to no weight whatsoever.

*Second*, the Complaint often asserts that LAC dominated "the finances" of GPMI, *Hildreth*, 378 Md. at 735, as though it were improper for a shareholder to be concerned about the financial health of the corporation whose stock it holds. *See, e.g.*, Compl. ¶ 342 ("OAO

15

Lukoil and LAC required GPMI to submit financial reports to OAO Lukoil.").  In any event, control over the way in which GPMI *financed* its operations is a far cry from control over the operating decisions themselves—let alone the decision whether to use MTBE gasoline.  The lack of operational control is what matters.  *See Hildredth*, 378 Md. at 735 (requiring "[c]omplete domination, not only of the finances, but of policy and business practice in respect to the transaction" (citation omitted)).

   *Third*, the Complaint claims that LAC directed GPMI's acquisition or retention of service stations.  *See* Compl. ¶ 301 ("GPMI, at the direction of LAC and OAO Lukoil, entered into an Amended Master Lease  ***"); *id.* ¶ 305 ("In 2004, with the approval and at the direction of OAO Lukoil and LAC GPMI obtained a loan and line of credit," which was to be used "to finance the acquisition of service stations in New Jersey and Pennsylvania and to provide working capital associated with the acquisition.").  If the phrase "at the direction of LAC" is supposed to have legal significance, it is not entitled to any weight.  Regardless, it can hardly be described as a "factual" allegation.  *Cf. Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007) ("Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.").  The "at the direction" conclusion is, in any event, not true.  *See* Decl. ¶ 36.  Indeed, the allegation that GPMI acquired service stations "with the approval" of LAC is telling:  for GPMI to do something "with the approval" of LAC implies, correctly, that GPMI had its own separate mind.  Regardless, the Complaint nowhere alleges that LAC directed GPMI *to use MTBE gasoline* at those or other stations.[7]

---

   [7] Likewise, the Complaint does not allege that any involvement by LAC resulted in the use of MTBE gasoline at those stations, let alone use that would not have otherwise occurred.

*Fourth*, the Complaint alleges that "LAC directed gasoline blending operations in which GPMI *** blended MTBE gasoline for sale in Pennsylvania and elsewhere."  Compl. ¶ 326.  To be clear, if this allegation were meant to suggest that LAC had somehow specifically instructed GPMI to blend MTBE gasoline, the allegation would be false.  *See* Decl. ¶ 28.  Based on the parties' exchange of pre-motion letters, however, LAC understands this allegation to mean that GPMI and LAC were supposedly not separate corporations, and that LAC is thus responsible for alleged MTBE blending by GPMI.  Because the Commonwealth has not pleaded facts establishing that GPMI and LAC had no separate existence, this allegation is thus of no import.

Regardless, even if the allegation somehow pleaded facts establishing that LAC specifically instructed GPMI to blend MTBE gasoline, the allegation would still fail to demonstrate that any affected gasoline was ever sold in or delivered to Pennsylvania, or that the gasoline otherwise had any effect on the groundwater in the Commonwealth.  Accordingly, for that separate reason, the allegation cannot give rise to specific jurisdiction over LAC.

### B.   Piercing GPMI's Veil Would Not Prevent Fraud.

**1.** The Commonwealth also cannot take advantage of Maryland's narrow fraud-based ground for veil piercing.  To pierce the veil on that basis, a person must show, among other things: (i) "a material representation *** made with the purpose to defraud"; (ii) that "the person justifiably relied on the misrepresentation"; and (iii) that "the person suffered damage directly resulting from the misrepresentation."  *Colandrea v. Colandrea*, 42 Md. App. 421, 428 (1979); *see also id.* at 426 (requiring "clear and convincing" evidence).

The oft-cited (and oft-distinguished) case on this point is *Colandrea v. Colandrea*.  There a married couple, Dominic and Carmen Colandrea, jointly owned a real estate corporation.  42 Md. App. at 422.  During divorce proceedings, Carmen misrepresented to Dominic that, in exchange for Dominic's stock, the corporation would issue and make payments on several

promissory notes.  *Id.* at 422–23.  Once Carmen had control of the corporation, she diverted its income elsewhere—to the detriment of her note-holding ex-spouse.  *Id.* at 423–24.  The court found clear and convincing evidence of fraud *during the property settlement negotiations*, and allowed Dominic to sue Carmen for the money he was promised.  *Id.* at 428–33.  The fraud at issue, in other words, was a shareholder *lying about whether a corporation would pay*—and inducing justifiable, detrimental reliance on that lie.  The supposed misrepresentation thus proximately caused the loss allegedly suffered.

**2.**  This case is different.  Unlike the plaintiff in *Colandrea*, the Commonwealth has not even alleged, much less demonstrated, that it (i) relied on (ii) a misrepresentation about the 2009 transaction and (iii) was damaged as a result.

**i-ii.**  The Commonwealth claims that several defendants, including LAC, "coordinated a stripping of the only profitable assets of GPMI to evade GPMI's obligations to creditors, including the Commonwealth of Pennsylvania."  Compl. ¶ 304; *see also, e.g.*, ¶ 319.  Once again, the Commonwealth's allegations are false.  *See* Decl. ¶¶ 35-47.  But even if true, those allegations would be immaterial:  unlike the property settlement at issue in *Colandrea*, the Commonwealth's alleged MTBE injuries did not result from *reliance* on a *misrepresentation* concerning a sale of assets in 2009, several years after MTBE gasoline was no longer in use.  Obviously, the Complaint does not claim otherwise.  The allegedly fraudulent conveyance the Commonwealth complains of thus cannot support veil piercing.  *Cf. Bart Arconti*, 275 Md. at 313 (distinguishing fraudulent conveyance actions from veil piercing); *Residential Warranty*, 126 Md. App. at 311 (same).[8]

---

[8] Note also that a fraudulent conveyance inquiry would demand proof that LAC intended to defraud the Commonwealth.  *See Residential Warranty*, 126 Md. App. at 314.  The

**iii.** Even if the lack of reliance on a misrepresentation were not an obstacle, however, the Commonwealth's allegations would still fall short. The Commonwealth's theory must be, contrary to *Colandrea*, that *any* harm caused by the GPMI-LNA sale justifies disregard of the corporate form—not just harm resulting from reliance on a misrepresentation. But no such harm has been pleaded, for at least two separate reasons: there is no allegation that the settlement resolving the fraudulent transfer allegations in the GPMI bankruptcy was inadequate, and the Commonwealth could not have recovered from GPMI regardless.

*First*, the Complaint asserts that GPMI's estate received a payment of over $90 million to settle the fraudulent conveyance allegations in the bankruptcy litigation. Compl. ¶ 331. The Complaint nowhere alleges that the amount GPMI received in the 2009 transaction, *combined with the settlement payment*, was inadequate consideration. Accordingly, there is no allegation that the total consideration paid to GPMI was insufficient—and thus no allegation that GPMI (let alone the Commonwealth) was harmed by the transaction by the time this suit began. Indeed, this was no ordinary settlement between private parties. Here, the bankruptcy court—after notice, briefing, and a hearing—expressly found that the parties' agreement was "fair and equitable and in the best interests of the Debtors, their estates, their creditors and all other parties in interest." Order Approving Settlement of Claims, *In re: Getty Petroleum Marketing Inc., et al.*, No. 11-02942 (S.D.N.Y., July 29, 2013), ECF No. 51 (resolving several claims); *see also* FED. R. BANK. P. 9019(a) ("On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors *** and to any other entity as the court may direct.") This suit was not filed until nearly a year after that finding was made. *See* ECF No. 1 at 5 ¶ 1 (suit filed June 19, 2014).

---

Commonwealth alleges that LAC intended to defraud *creditors* in general, but does not claim that LAC intended to defraud the Commonwealth in particular. *See* Compl. ¶ 304.

*Second*, even if GPMI had received additional consideration in the November 2009 transaction, the Commonwealth would be entitled to recover the same amount from GPMI's bankruptcy estate regardless:  $0.  As the Commonwealth has acknowledged by dismissing GPMI from this suit, and then adding GPMI back to seek only insurance proceeds, the Commonwealth's ability to recover assets from GPMI is foreclosed by its failure to file a proof of claim in the GPMI bankruptcy.  *See generally* Motion to Enforce the Bar Date (and authorities and filings cited therein).  Thus, even if GPMI had retained the assets at issue in the 2009 transaction, the Commonwealth would not have been able to recover against them.  Put somewhat differently, by the time this suit began, GPMI's assets were already spoken for by creditors who filed proofs of claim.  Whether or not *those* creditors would have recovered more money, but for the 2009 GPMI-LNA sale, has no bearing on the Commonwealth's MTBE claims.  Accordingly, even if the Commonwealth's piercing theory were supported by Maryland law, it would not be supported by the facts pleaded in the Complaint (or existing in the real world).

**3.**  Finally, even if fraud-based piercing were somehow available here, there is no indication that it would support the Commonwealth's desired relief.

The Commonwealth's fraudulent conveyance theory could take either of two forms.  The Commonwealth could mean that LAC may be held responsible for GPMI's use of MTBE gasoline up to the value of the assets supposedly wrongfully removed (and not returned).  The Commonwealth, in other words, could be bringing a fraudulent conveyance claim:  asking that the transaction be unwound to the extent it was wrongful, and that the Commonwealth be able to recover from the pool of assets returned to GPMI.  But the Commonwealth has already made clear that it "will not be pursuing fraudulent conveyance claims," so this cannot be the theory of the Complaint.  *See* Letter to Court, July 1, 2015; *see also* Rough Tr. of June 18, 2015 Hearing at

12 (THE COURT: "I think the fraudulent conveyance action is out because it was done by the liquidating trustee in the GPM bankruptcy."); *id.* at 25-28 (discussing possible letter).  Instead, the Commonwealth must mean that it (and, by implication, every other GPMI creditor) is allowed to access **all** of the assets of LAC, and allowed to hale LAC into court for **all** claims against GPMI.  LAC is not aware of any Maryland case that would allow the Commonwealth to do so.

Regardless, federal constitutional law would not.  As noted, this is a case about specific personal jurisdiction.  Specific personal jurisdiction for the use of MTBE gasoline, which ended by 2006, could not be based on conduct occurring years later.  *Cf. Walden*, 134 S. Ct. at 1122 ("[T]he relationship must arise out of contacts that the 'defendant himself' creates with the forum state." (emphasis removed)).  Indeed, it would be groundbreaking to hold that by fraudulently transferring any amount of money from a corporation, the transferor could be haled into court **anywhere** the transferee could have been haled into court—for any tort the subsidiary was accused of committing.  Thus, for that separate reason, even if Maryland law authorized the imputation of GPMI's conduct to LAC (which it does not), federal constitutional law would still forbid the exercise of personal jurisdiction over LAC.  For that reason or any of the others, LAC's 12(b)(2) motion to dismiss should be granted.

## III.    ALTERNATIVELY, LAC REQUESTS AN EVIDENTIARY HEARING.

As explained, even taking the (often false) factual allegations of the Complaint as true, the exercise of personal jurisdiction over LAC would be improper.  But LAC is entitled to even closer scrutiny of the Complaint.  In the Third Circuit, from which this case was transferred, and to which it will return if not dismissed, factual allegations are *never* enough:  "at no point may a plaintiff rely on the bare pleadings alone in order to withstand a defendant's 12(b)(2) motion to dismiss ***.  Once the motion is made, plaintiff must respond with actual proofs, not mere

allegations." *Time Share*, 735 F.2d at 66. And this Circuit has recognized that "[i]f the defendant contests the plaintiff's factual allegations, then a hearing is required, at which the plaintiff must prove the existence of jurisdiction by a preponderance of the evidence." *Ball*, 902 F.2d at 196–98 (2d Cir. 1990); *see also Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 469-70 (2d Cir. 2003) ("A defendant *must be given* an opportunity to contest plaintiff's factual allegations, in which case a hearing is required at which plaintiff must prove jurisdiction by a preponderance of the evidence." (emphasis added)). Accordingly, even if dismissal were not proper on the facts as pleaded, LAC would at least be entitled to (and, if necessary, hereby requests) an evidentiary hearing. Because the Complaint is inadequate on its face, however, and separately, because the Commonwealth has failed to produce "actual proofs," no hearing is required. *Time Share*, 735 F.2d at 66.[9]

## IV.   ALTERNATIVELY, THE COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM.[10]

If this Court may somehow exercise personal jurisdiction over LAC, it should dismiss the Second Amended Complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). LAC's understanding is that on January 8, 2016, a group of defendants

---

[9] This Circuit may not require "actual proofs," *see Ball*, 902 F.2d at 197; if it does not, then there is a cleanly presented circuit split between the transferor circuit and the transferee circuit on this important question. Holding an evidentiary hearing would avoid any circuit conflict: this Circuit's law clearly allows the hearing, and in the hearing, the Commonwealth would be required to produce "actual proofs."

[10] This argument does *not* rely on any declaration; it relies on the insufficiency of the Complaint. LAC, in other words, in no way intends to "present[]" "matters outside the pleadings" to the extent that its 12(b)(6) motion is concerned, and if this Court believes LAC has done so, it should "exclude[]" those matters from its consideration of the 12(b)(6) motion. FED. R. CIV. P. 12(d). While the declaration provides context for the 12(b)(2) motion, and establishes that at least an evidentiary hearing is required, the declaration is *not* necessary (and, in the 12(b)(6) context, is not relied upon) to demonstrate the aforementioned shortcomings of the Complaint. Likewise, any other cited materials are relied upon only to the extent that they may be properly considered on a 12(b)(6) motion to dismiss. *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (discussing what may be considered).

named in this action will file a Rule 12(b)(6) motion to dismiss, noting that LAC will join in their arguments by separate motion.  LAC joins those arguments (to the extent they concern Counts brought against LAC) and adopts by reference any briefing and oral argument supporting the motion.

LAC also separately moves to dismiss for failure to state a claim.  Simply put, for the reasons explained above, the Second Amended Complaint fails to allege facts sufficient to state a claim against LAC.  The Second Amended Complaint does not allege facts demonstrating that LAC itself used or had any involvement with MTBE gasoline, let alone did so in a way harmful to the Commonwealth; that LAC wrongfully collected USTIF money; or that LAC is responsible for MTBE use by any other entity.  Any conclusory allegations to the contrary cannot prevent 12(b)(6) dismissal  *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 679–80 (2009); *Twombly*, 550 U.S. at 556–57.  Nor can group pleading.  *See* Opinion and Order (July 2, 2015) (Scheindlin, J.) [ECF 152 at 18] ("The remaining allegations accusing defendants – as a group – of engaging in deceptive conduct or otherwise violating the UTPCPL are simply too vague as to each defendant under *Twombly* and its progeny to state a claim.").  And, as in the personal jurisdiction context, GPMI's veil cannot be pierced.  All claims against LAC should therefore be dismissed.

Alternatively, even if LAC could somehow be held liable for GPMI's use of MTBE gasoline while LAC held GPMI's stock, nothing suggests that LAC can be held liable for (i) the use of MTBE gasoline occurring before LAC owned GPMI's stock, let alone (ii) the use of MTBE gasoline occurring before GPMI even existed.  Accordingly, at minimum, the Second Amended Complaint should be dismissed to the extent it concerns liability for MTBE use occurring (i) before LAC acquired GPMI's stock, and especially (ii) before GPMI was spun-off from Getty Realty.

**CONCLUSION**

For the foregoing reasons, LAC's motion to dismiss should be granted. If the motion to dismiss for want of personal jurisdiction is granted, the Second Amended Complaint should be dismissed with prejudice to re-litigating the personal jurisdiction issue. The Commonwealth has already tried three times to plead facts adequate to justify haling LAC into court, and this time, it has done so with the benefit of thousands of pages of jurisdictional discovery. If the Complaint is instead dismissed for failure to state a claim, it should be dismissed with prejudice to the merits of the underlying claims. Three bites at the apple is enough—especially where, as here, there is no indication that *another* amended complaint would cure longstanding defects in the Commonwealth's pleadings.

Respectfully submitted,

|  | /s/ James P. Tuite |
|---|---|

Katherine M. Katchen
AKIN GUMP STRAUSS
    HAUER & FELD LLP
2001 Market Street
Suite 4100
Philadelphia, PA 19103
Phone: 215-965-1239
Fax: 215-965-1210
kkatchen@akingump.com

James P. Tuite
AKIN GUMP STRAUSS
    HAUER & FELD LLP
1333 New Hampshire Ave., NW
Washington, D.C. 20036
Phone:  202-887-4406
Fax:  202-887-4288
jtuite@akingump.com

Matthew A. Scarola
AKIN GUMP STRAUSS
    HAUER & FELD LLP
580 California Street
Suite 1500
San Francisco, C.A. 94104
Phone:  415-765-9507
Fax:  202-887-4288
mscarola@akingump.com

*Attorneys for LUKOIL Americas Corporation*

Date:  January 8, 2016