**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re: Methyl Tertiary Butyl Ether ("MTBE") Products
Liability Litigation

**MDL No. 1358**
**Master File C.A. No.**
**1:00-1898 (SAS)**

**This document relates to the following case**:
*Commonwealth of Pennsylvania v.*
*Exxon Mobil Corp. et al.*
Case No. 1:14-cv-06228

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANT LUKOIL AMERICAS**
**CORPORATION'S MOTION TO DISMISS FOR**
**LACK OF PERSONAL JURISDICTION AND FAILURE TO STATE A CLAIM**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................1

ARGUMENT......................................................................................................................2

    I.     LAC IS NOT RESPONSIBLE FOR GPMI'S CONTACTS OR
          LIABILITY DURING THE PERIOD AFTER LAC ACQUIRED GPMI'S
          STOCK.................................................................................................................2

          A.    The Exercise of Personal Jurisdiction Would Be Improper. ........................2

          B.    The Commonwealth Has Not Stated a Claim. ...........................................8

    II.    LAC IS NOT RESPONSIBLE FOR GPMI'S CONTACTS OR
          LIABILITY DURING THE PERIOD BEFORE LAC ACQUIRED
          GPMI'S STOCK..................................................................................................9

    III.   THE INSURANCE CLAIMS MUST BE DISMISSED.....................................10

CONCLUSION.................................................................................................................10

i

## **TABLE OF AUTHORITIES**

**CASES**

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..........................................................................................................9

*Commonwealth ex rel. Pappert v. TAP Pharm. Products, Inc.*,
    868 A.2d 624 (Pa. Commw. Ct. 2005) ..............................................................................4

*Daimler AG v. Bauman*,
    134 S. Ct. 746 (2014) ........................................................................................................2

*Daval Steel Prod. v. M/V Fakredine*,
    951 F.2d. 1357 (2d Cir. 1991).............................................................................................7

*Dewhurst v. Telenor Invest AS*,
    83 F. Supp. 2d 577 (D. Md. 2000) ....................................................................................4

*Gao v. JPMorgan Chase & Co.*,
    No. 14 CIV. 4281, 2015 WL 3606308 (S.D.N.Y. June 9, 2015)......................................10

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
    131 S. Ct. 2846 (2011) .....................................................................................................2

*Harte-Hanks Direct Mktg./Baltimore, Inc. v. Varilease Tech. Fin. Grp., Inc.*,
    299 F. Supp. 2d 505 (D. Md. 2004) ..................................................................................3

*Hildreth v. Tidewater Equip. Co.*,
    378 Md. 724, 838 A.2d 1204 (2003)...............................................................................4, 8

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007) ..............................................................................................10

*In re MTBE Products Liab. Litig.*,
    No. 1:00-1898, 2008 WL 3163634 (S.D.N.Y. Aug. 6, 2008) .......................................9, 10

*In re MTBE Products Liab. Litig.*,
    959 F. Supp. 2d 476 (S.D.N.Y. July 16, 2013)..................................................................8

*In re Ski Train Fire in Kaprun, Austria on November 11, 2000*,
    342 F. Supp. 2d 207 (S.D.N.Y. Oct. 8, 2004)....................................................................6

*Kennedy v. Hankey Grp.*,
    No. CIV. WDQ-09-2890, 2010 WL 1664087 (D. Md. Apr. 22, 2010) ..................................4

*Mylan Labs., Inc. v. Azko, NV.*,
    2 F.3d. 56 (4th Cir. 1993) ..................................................................................................3

ii

*Rheumatology Nurses Soc'y, Inc. v. Phoenix Grp. Holdings, LLC,*
    No. CIV. CCB-08-1675, 2009 WL 249233 (D. Md. Jan. 8, 2009)..........................................3

*Vitro Elecs., Div. of Vitro Corp. of Am. v. Milgray Elecs., Inc.,*
    255 Md. 498 (1969)......................................................................................................3, 4

*Wright v. Ernst & Young LLP,*
    152 F.3d 169 (2d Cir. 1998) ..............................................................................................8

STATUTES

Md. Code Ann., Corps. & Ass'ns
    § 2-408(c).........................................................................................................................6

RULES

FED. R. CIV. P.
    12(b)(6)...........................................................................................................................8
    36(b) ...............................................................................................................................5

OTHER AUTHORITIES

*Detergent Additive Certification Program Questions and Answers Document*, U.S. Envtl.
    Prot. Agency (April 28, 1997). ............................................................................................2

**INTRODUCTION**

The Commonwealth's opposition reflects a well-worn principle: when you're wrong on the law, argue facts; when you're wrong on the facts, argue law; and when you're wrong on both, obfuscate. But, try as it might, the Commonwealth cannot obscure the straightforward and dispositive reality that Getty Petroleum Marketing Inc. ("GPMI") was a bona fide company that itself made the operating decisions relevant to the claims in this litigation. Before LUKOIL Americas Corporation ("LAC") acquired its stock, GPMI was an independent, publicly traded company with hundreds of employees, operations in 13 states, and profits in the millions of dollars. *See* Amended Decl. of Vincent De Laurentis (Doc. 245) ("Decl.") ¶ 25. After LAC's acquisition, GPMI's existing management team remained in place and continued to make the day-to-day decisions required to run a large petroleum marketing and distribution business. *Id.* ¶¶ 29–30. To suggest that GPMI was nothing more than a sham corporation behind which LAC seeks to hide is implausible, to put it mildly.

The Commonwealth bases its counter-reality on supposed facts about managerial overlap, corporate governance, and branding that are consistent with ordinary parent-subsidiary relationships. To hold LAC responsible for GPMI's contacts and conduct based on those suppositions would conflict with established norms of corporate separateness.

Perhaps aware of that conflict, the Commonwealth also resorts to mischaracterization. Myriad claims in its brief are not even close to supported by the exhibits it cites. For example, the Commonwealth repeatedly latches onto the word "Lukoil" in various documents, ignoring the fact that "Lukoil" often does not refer to LAC. *See, e.g.*, Br. 10 (asserting that LAC controlled GPMI, based on a document that refers to "OAO Lukoil"). The Commonwealth also heralds (Br. 6) an agreement containing the phrase "LAC additive" as proof "that LAC was

1

involved in supply activities," without regard for the industry's abbreviation of the phrase "lowest additive concentration," *i.e.*, "LAC." *See Detergent Additive Certification Program, Questions and Answers Document*, U.S. Envtl. Prot. Agency (April 28, 1997) at 2 ("[C]an a detergent additive continue to be used at the lowest additive concentration (LAC) ***?").[1] Numerous other factual claims similarly fail when one compares them to the actual content of the documents or testimony cited in support. Mischaracterization may make for a startling opposition brief, but it cannot and should not delay LAC's dismissal from this case.

**ARGUMENT[2]**

I.   **LAC IS NOT RESPONSIBLE FOR GPMI'S CONTACTS OR LIABILITY DURING THE PERIOD AFTER LAC ACQUIRED GPMI'S STOCK.**

   A.   **The Exercise of Personal Jurisdiction Would Be Improper.**

   **1.**  The Commonwealth first suggests (Br. 10) that this Court may exercise *general* personal jurisdiction over LAC. But the Commonwealth's brief makes no effort to explain how LAC could be deemed "at home" in Pennsylvania. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011); *see also Daimler AG v. Bauman*, 134 S. Ct. 746, 761 & n.19 (2014). If the Commonwealth were correct, LAC could be sued in Pennsylvania for an out-of-state fender-bender involving one of its officers—a result that is counterintuitive, to say the least. Instead, this case is and always has been about specific personal jurisdiction (*vel non*).

   **2.**  In an effort to establish specific personal jurisdiction, the Commonwealth claims (Br. 18–19) that "the test for jurisdictional veil-piercing *** [is not based] on piercing the corporate veil," by which it appears to mean that an "agency" approach to piercing supplants the approach used at the liability stage. That claim marks a sharp reversal: part of the Commonwealth's

---

[1] *Available at* http://www3.epa.gov/otaq/regs/fuels/additive/detergnt/gdacq-a2.pdf.

[2] Neither parties' declarations and exhibits are relevant to the motion to dismiss for failure to state a claim, and LAC's 12(b)(6) argument does not rely on them.

2

argument for why it was entitled to so much jurisdictional discovery was that normal Maryland veil-piercing law applied.  *See, e.g.*, Letter from William Walsh to Court at 3–4, April 16, 2015.

Regardless, the Commonwealth's "agency" fixation is misplaced.  For whether phrased in terms of "agency" or something else, the jurisdictional inquiry remains focused on the veil-piercing concerns that apply at the liability stage.  *See, e.g.*, *Rheumatology Nurses Soc'y, Inc. v. Phoenix Grp. Holdings, LLC, No.* CIV. CCB-08-1675, 2009 WL 249233, at *3 (D. Md. Jan. 8, 2009) ("The plaintiffs further suggest that the court should pierce the corporate veil to establish jurisdiction ***.  Maryland generally is more restrictive than other jurisdictions in allowing a plaintiff to pierce the corporate veil, *** and courts do so only where necessary to prevent fraud or to enforce a paramount equity ***."); *Harte-Hanks Direct Mktg./Baltimore, Inc. v. Varilease Tech. Fin. Grp., Inc.*, 299 F. Supp. 2d 505, 514 (D. Md. 2004) ("Harte–Hanks Baltimore suggests that the court should pierce the corporate veil to establish personal jurisdiction ***. Under Maryland law, the court may pierce the corporate veil if the circumstances would allow piercing of the veil generally.  *** The Maryland courts will pierce the corporate veil only where necessary to prevent fraud or to enforce a paramount equity.").  Indeed, Maryland has rejected an inquiry that "would have the effect of breaking down observed distinctions between parents and subsidiary corporations, where fraud or deception is not present."  *Vitro Elecs., Div. of Vitro Corp. of Am. v. Milgray Elecs., Inc.*, 255 Md. 498, 504 (1969) (discussing jurisdiction).

The Commonwealth's contrary position depends on (Br. 11) a case in which the court *refused* to exercise jurisdiction.  *See Mylan Labs., Inc. v. Azko, NV.*, 2 F.3d. 56, 61 (4th Cir. 1993).  The court confirmed that jurisdictional veil-piercing is permissible "only if the parent exerts considerable control over the activities of the subsidiary," particularly whether "significant decisions of the subsidiary must be approved by the parent."  *Id.*  What qualifies as a "significant

decision[]" cannot simply mean a decision of great consequence for the subsidiary:  an inquiry of that nature would "break[] down observed distinctions between parents and subsidiary corporations," *Vitro*, 255 Md. at 504, because parents routinely oversee their subsidiaries' extraordinary decisions.  *See, e.g.*, *Dewhurst v. Telenor Invest AS*, 83 F. Supp. 2d 577, 588-89 (D. Md. 2000) ("[T]he fact that a parent requires its approval for certain extraordinary loans or ventures does not mean that the parent is controlling the subsidiary.").  Instead, the exercise of control must be significant in the context of the case—*i.e.*, it must concern the "policy and business practice" relevant "to the transaction" at issue.  *Hildreth v. Tidewater Equip. Co.*, 378 Md. 724, 735, 838 A.2d 1204, 1210 (2003) (discussing liability); *Kennedy v. Hankey Grp.*, No. CIV. WDQ-09-2890, 2010 WL 1664087, at *3 n.19 (D. Md. Apr. 22, 2010) (refusing to exercise jurisdiction because it was not "necessary to prevent fraud or to enforce a paramount equity").

The Commonwealth does not seriously dispute that even its "agency" inquiry is, at bottom, a question of jurisdictional veil piercing (and thus governed, per this Court's order, by Maryland law).  *See* Br. 18–19 ("[T]he test for jurisdictional veil-piercing *** is based on agency.").  In any event, the only Pennsylvania case it cites involved a refusal to exercise jurisdiction, and focused on one corporation's lack of control over another.  *See Commonwealth ex rel. Pappert v. TAP Pharm. Products, Inc.*, 868 A.2d 624, 632 (Pa. Commw. Ct. 2005).

**3.**  With that backdrop in mind, the Commonwealth's newfound allegations are not significant for the jurisdictional inquiry.  And they are, in many instances, not even colorably supported by the exhibits on which the Commonwealth relies.  A few striking examples illustrate the point.  *First,* LAC is not the same as all "Lukoil" entities, such as the ultimate parent formerly known as OAO Lukoil.  *Compare* Br. 4 ("LAC began direct negotiations") (citing Exhibit 5-a at 967–68) *with* Exhibit 5-a at 968 ("And that was a negotiated provision between

4

Getty Realty and GPMI and OAO Lukoil?  A[.] Yes."); *see also, e.g.*, Br. 8–10.  *Second*, a

barebones 2008 consolidated internal report, associating LAC with 1500 stations (Br. 2), is

entirely consistent with LAC's owning *subsidiaries* that own 1500 stations.  *Third*, Vadim

Gluzman's testimony is not "[c]ontrary" to the statement that "GPMI continued to be run as

before" after LAC acquired its stock.  Br. 15 (citing Ex. 5-a at 956–57).  Indeed, he emphasized

that "[t]he only person [who] didn't stay with [GPMI] was an attorney who was very old, and he

pretty much retired, and we hired outside [counsel] working for Getty.  And that was pretty much

it.  So, we didn't really touch anyone."  Ex. 5-a at 956–57.[3]

    The Commonwealth further suggests (Br. 1) that LAC's Master Answer concedes that

LAC purchased and distributed gasoline.  As an initial matter, that answer was superseded more

than a year ago, a fact the Commonwealth does not disclose to the Court.  *See* Third Amended

Master Answer, No. 1:08-cv-00312, ECF 420 (Dec. 23, 2014).  Regardless, the statement is far

from a statement that LAC controlled GPMI or anything of the sort.  Indeed, as the

Commonwealth well knows—and was reminded by LAC's pre-motion letter—Rule 30(b)(6)

testimony elicited in the New Jersey case (in 2012) made clear that LAC is a holding company

and was not involved with GPMI's operating decisions.[4]  In any event, the Commonwealth

makes no effort to explain how the answer could be significant in this case (which has not

reached the answer stage), while even formal admissions made pursuant to Federal Rule of Civil

Procedure 36 "cannot be used against the party in any other proceeding."  FED. R. CIV. P. 36(b).

Accordingly, this claim, too, is of no import.

    **4.**  Armed with its contrivances, Pennsylvania launches into an extended discussion (Br.

---

[3] Likewise, whatever "Lukoil" represented to lenders (Br. 1, 6), about what might happen in the future, has little bearing on whether LAC actually exercised relevant control over GPMI, especially since the individuals discussed in the document at issue also wore GPMI hats.

[4] LAC would be pleased to submit this testimony to the Court.

14–18) of several factors concerning the relationship between LAC and GPMI.  While those factors may be informative in some cases, they shed little light on whether LAC exercised pertinent control—particularly because the Commonwealth's discussion of those factors is based on a misleading recitation of supposed facts.  To repeat:  LAC is not all "Lukoil" entities.  *See* Br. 15 (reports to Moscow), 17 (branding).  And, to provide just one more example, whether or not GPMI was insolvent *in 2009* has nothing to do with the relationship between GPMI and LAC *while MTBE was in use*.  *See* Br. 17–18; *see also* Br. 16 (discussing Houlihan Lokey advice).[5]

Tellingly, the Commonwealth cites no authority to support its suggestion (Br. 14) that corporate formalities are disregarded when companies choose to act by unanimous consent rather than board meetings.  *See, e.g.*, Md. Code Ann., Corps. & Ass'ns § 2-408(c) (authorizing decisions by unanimous consent in lieu of board meetings).  And, as this Court has acknowledged, an overlap in directors is hardly unusual.  *See, e.g.*, *In re Ski Train Fire in Kaprun, Austria on November 11, 2000*, 342 F. Supp. 2d 207, 216 (S.D.N.Y. Oct. 8, 2004) (Scheindlin, J.) (explaining that "sole ownership, overlapping directors, consolidated financial statements, and reference to [a] subsidiary as a department [have been held] insufficient to establish the type of day-to-day control necessary to disregard corporate separateness").

**5.**  Perhaps the Commonwealth's most extraordinary move is its treatment of the 2009 transaction.  The Commonwealth finally acknowledges (Br. 13) that the transaction is not an independent ground for veil piercing.  The Commonwealth's position is now that the transaction (Br. 21) "show[s] the extent to which LAC dominated and controlled GPMI."   The obvious and fatal rejoinder is that a *2009* transaction is beside the point:  whether LAC *could* control its

---

[5] The legal significance of the relationship between GPMI and LAC in 2009 is discussed at greater length below.  Here, suffice it to say that, if the Commonwealth means to suggest that the "facts" discussed applied throughout the *entire* duration of the GPMI-LAC relationship, that suggestion is unambiguously false.

wholly owned subsidiary's bulk disposition of assets is not in dispute, and whether LAC *did* control that bulk disposition (in 2009) is not evidence that LAC (i) controlled GPMI's operating decisions (ii) during the time MTBE was in use.

To meet this point, the Commonwealth egregiously mis-quotes *Daval Steel Prod. v. M/V Fakredine*, 951 F.2d. 1357 (2d Cir. 1991).  According to the Commonwealth (Br. 13-14, 21-22), *Daval Steel* said that "transactions and movements of corporate assets subsequent to the transaction [at issue] ***was evidence admissible*** on the issue of alter ego liability."  That's false: the *Daval Steel* court was "persuaded that information concerning financial transactions and movements of corporate assets subsequent to the transaction giving rise to this litigation was ***'reasonably calculated to lead to the discovery' of*** <u>evidence admissible</u> on the issue of alter ego liability," because it was "reasonable to conclude, as the district court did, that information from subsequent years could help piece together the earlier picture."  *Daval Steel*, 951 F.2d at 1368 (emphasis added).  There is no excuse for omitting the "reasonably calculated" phrase.  And the omission radically changes the meaning of the quotation:  the point is not that evidence of subsequent transactions *is* relevant, it is that the evidence *could lead to* admissible evidence—a statement that makes no sense if evidence of the later transactions was itself "admissible."[6]

**6.**  Finally, the Commonwealth contends (Br. 13) that, even putting GPMI to the side,

---

[6] In addition to being irrelevant, the Commonwealth's suggestion (Br. 20–21) that LAC planned to and did drive GPMI into bankruptcy ignores, among other things: (i) the February 2008 third-party sale agreement, which failed only for lack of financing, Decl. ¶ 41; (ii) the August 2009 contribution of $340 million to GPMI—*before* GPMI sold its assets, *id.* ¶ 42; and (iii) the consideration that GPMI received, *id.* (~$180 million).  All of which is in addition to the staggering $230 million Bionol award—the event that actually precipitated the December 2011 bankruptcy.  *Id.* ¶ 48.  Further, the claim (Br. 7) that "DeLaurentis fails to mention that *** LAC arranged for OAO Lukoil to provide $25 million in funding to Cambridge to keep GPMI afloat" is misleading.  The Declaration mentions the $25 million, albeit with an obvious typo, *see* Decl. ¶ 46 ("LAC agreed to infuse $25 million into LAC").  And the funds were not paid *to Cambridge*, but instead were contributed to GPMI or toward its obligations—as the document on which the Commonwealth relies makes clear.  *See* Ex. 9-a (sealed) (Section 1.2(b)).

LAC is liable based on "direct control over service stations" in Pennsylvania.  If this is meant to be a new (and, incidentally, false) allegation that LAC exercised control over the operation of PA service stations, it bears mention that "a party is not entitled to amend its complaint through statements made in motion papers."  *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998).  It appears instead to be a reference to the Complaint's allegations that LAC was involved in the acquisition or retention of a large block of stations.  Compl. ¶¶ 301, 305 (discussing a lease entered *by GPMI*, and a loan obtained *by GPMI*).  The Commonwealth does not bother to respond to LAC's explanation of why those allegations are inadequate.  *See* Opening Br. 16.  And certainly, the fact that LAC acquired a stake in GPMI, a company known to be operating in Pennsylvania, cannot give rise to piercing:  that position would impermissibly "subject a foreign holding company to personal jurisdiction wherever it acquired new investments."  *In re MTBE Products Liab. Litig.*, 959 F. Supp. 2d 476, 495 (S.D.N.Y. July 16, 2013)  (Scheindlin, J.).

**B.     The Commonwealth Has Not Stated a Claim.**

Finally, the Commonwealth's complaint cannot survive LAC's motion to dismiss under Rule 12(b)(6).  The Commonwealth does not dispute that LAC can be held *liable* for GPMI's conduct only if LAC so completely dominated GPMI that, with respect to MTBE use, GPMI "had at the time no separate mind, will, or existence of its own," *Hildreth*, 378 Md. at 735—and that such an exercise of control proximately caused the Commonwealth's injuries.

The Complaint comes nowhere close.  The allegations concerning GPMI's acquisition of stations (Br. 23) are discussed above.  The Commonwealth recites its allegation concerning blending (Br. 23), without even attempting to dispute LAC's response.  *See* Opening Br. 17.  The remaining paragraphs cited add nothing.  In short:  GPMI was involved with MTBE before LAC acquired GPMI, *see, e.g.*, Compl. ¶¶ 74, 345; and nothing suggests that LAC dominated (or even

tried to influence) any GPMI decision to use MTBE after the acquisition.

## II.   LAC IS NOT RESPONSIBLE FOR GPMI'S CONTACTS OR LIABILITY DURING THE PERIOD BEFORE LAC ACQUIRED GPMI'S STOCK.

LAC's opening brief stressed that the Commonwealth has no basis on which to hold LAC responsible for conduct that occurred before LAC acquired GPMI's (publicly traded) stock. *See* Opening Br. 8, 15, 23.   The Commonwealth's initial reply (Br. 24) is that responsibility for that conduct "is a separate and distinct issue from the issues in this motion to dismiss."   But wishing doesn't make it so.   Instead, LAC squarely raised the point that, after three complaints and thousands of pages of discovery, the Commonwealth is still unable to muster any factual basis for successor liability.   True, the Complaint does state (Br. 24) that "LAC *** [is a] successor[] in liability for MTBE contamination *** prior to January 25, 2001."   Compl. ¶ 345.   But it is hard to imagine a more conclusory assertion, and mere "labels and conclusions *** will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Perhaps for that reason, the Commonwealth argues that successor "liability must be determined on a site-by-site basis."   Br. 24.   The Commonwealth's only support for that claim is an opinion in which this Court determined that "*[a]s between Getty Properties and GPMI*, liability must be determined on a site-by-site basis ***."   *In re MTBE Products Liab. Litig.*, No. 1:00-1898, 2008 WL 3163634, at *3 (S.D.N.Y. Aug. 6, 2008) (emphasis added).   But whether *Getty Properties* is liable for contamination "that occurred at Getty stations or other Getty properties prior to the spinoff [of GPMI] in 1997," *id.*, is not even close to the same question as whether LAC, for no conceivable reason, assumed GPMI's liability when it acquired GPMI stock on the open market.   Indeed, the "two major hurdles" to Getty Properties' no-liability argument are irrelevant to LAC:   (i) LAC is *not* "the direct continuation of the corporate entity formerly called Getty Petroleum Corp. that is alleged to have caused plaintiffs' injuries"; and

9

(ii) LAC did *not* "expressly assume[], and agree[] to indemnify GPMI against, certain of Getty Petroleum's environmental liabilities." *Id.*   Finally, the Commonwealth's argument on this point is, once again, marked by obfuscation.   LAC is not asking this Court to determine (Br. 24) whether "Getty Properties" is liable.   Nor does it seek a determination (Br. 24) whether "GPMI *** has or had any liability for MTBE contamination that occurred prior to 2000."   The question raised by this motion is, instead, whether *LAC* is responsible.   Because the answer is "no," the MTBE claims should be dismissed to the extent that they concern conduct predating LAC's acquisition of GPMI's stock—and certainly conduct predating LAC's existence.

## III.   THE INSURANCE CLAIMS MUST BE DISMISSED.

The Commonwealth asserts in passing that more than 100 paragraphs of the Complaint "alleg[e]" that "LAC wrongfully collected USTIF money."   Br. 23 (citing Compl. ¶¶ 123, 411-531).   That is not true.   The vast majority of those paragraphs name other Defendants.   *See* Compl. ¶¶ 412-510.   The remainder make no effort to "specif[y] *** any particular activities by any particular defendant"—let alone LAC—and thus cannot prevent dismissal.   *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50–51 (2d Cir. 2007) (dismissing complaint under Rule 8).[7]   In any event, the absence of *proof* that "LAC wrongfully collected USTIF money" requires dismissal of the insurance claims for lack of personal jurisdiction, or at least an evidentiary hearing.   *See, e.g.*, Decl. ¶ 24 ("LAC has never *** sought compensation from [USTIF].").   The Commonwealth's failure of proof in this respect is particularly telling:   the Commonwealth runs USTIF, and would have been able to supply proof of LAC's involvement with USTIF if any existed.

## CONCLUSION

The motion to dismiss should be granted, with prejudice.   *See* Opening Br. 24.

---

[7] *Compare* Compl. ¶ 123 (lumping 40 defendants together) *with Gao v. JPMorgan Chase & Co.*, No. 14 CIV. 4281 PAC, 2015 WL 3606308, at *6 (S.D.N.Y. June 9, 2015) (2 defendants).

Respectfully submitted,

/s/ James P. Tuite

Katherine M. Katchen
AKIN GUMP STRAUSS
    HAUER & FELD LLP
2001 Market Street
Suite 4100
Philadelphia, PA 19103
Phone: 215-965-1239
Fax: 215-965-1210
kkatchen@akingump.com

James P. Tuite
AKIN GUMP STRAUSS
    HAUER & FELD LLP
1333 New Hampshire Ave., NW
Washington, D.C. 20036
Phone:  202-887-4406
Fax:  202-887-4288
jtuite@akingump.com

Matthew A. Scarola
AKIN GUMP STRAUSS
    HAUER & FELD LLP
580 California Street
Suite 1500
San Francisco, C.A. 94104
Phone:  415-765-9507
Fax:  202-887-4288
mscarola@akingump.com

*Attorneys for LUKOIL Americas Corporation*

Date:  February 19, 2016

**CERTIFICATE OF SERVICE**

I hereby certify that on February 19, 2016, a true and correct copy of this Reply Memorandum in Support of Defendant LUKOIL Americas Corporation's Motion to Dismiss for Lack of Personal Jurisdiction and Failure to State a Claim was electronically served on counsel of record via LexisNexis File & Serve.  A hard copy of this Reply Memorandum will be sent to opposing counsel by overnight delivery.

/s/ James P. Tuite

Date: February 19, 2016