**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE: METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION** | **Master File No. 1:00-1898 MDL 1358** |
| **This document relates to:** | Hon. Vernon S. Broderick |
| *Commonwealth of Pennsylvania, etc. v. Exxon Mobil Corporation, et al*, Case No. 1:14-cv-06228(VSB) | |

## MEMORANDUM OF LAW IN SUPPORT OF EXXON MOBIL CORPORATION'S MOTION FOR PARTIAL SUMMARY JUDGMENT BASED ON <u>SETTLEMENT AND RELEASE</u>

# TABLE OF CONTENTS

Page

SUMMARY OF ARGUMENT ...................................................................................................1

STATEMENT OF FACTS ........................................................................................................2

    I.     USTIF .........................................................................................................................2

    II.    The Commonwealth's Usurpation of USTIF's Subrogation Claims ............................3

    III.   The Commonwealth and USTIF's Settlement with ExxonMobil....................................4

LEGAL STANDARD ...............................................................................................................7

ARGUMENT ...........................................................................................................................7

    A.    UNDER PENNSYLVANIA LAW, A CLEAR AND UNAMBIGUOUS RELEASE
           MUST BE ENFORCED ACCORDING TO THE ORDINARY MEANING OF
           THE LANGUAGE USED BY THE SETTLING PARTIES AT THE TIME THE
           AGREEMENT WAS EXECUTED. ...........................................................................7

    B.    THE CLEAR, ORDINARY AND UNAMBIGUOUS LANGUAGE OF THE
           PARTIES' SETTLEMENT AGREEMENT PROVES THAT THE
           COMMONWEALTH INTENDED TO, AND DID, RELEASE EXXONMOBIL
           FROM ALL PAST AND FUTURE CLAIMS FOR REMEDIATING MTBE...........9

CONCLUSION .......................................................................................................................12

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brown v. Cooke*,
    707 A.2d 231 (Pa. Super. Ct. 1998)...........................................................................8

*Buttermore v. Aliquippa Hosp.*,
    561 A.2d 733 (Pa. 1989).................................................................................8, 9

*Dublin by Dublin v. Shuster*,
    598 A.2d 1296 (Pa. Super. Ct. 1991), *appeal denied*, 533 Pa. 600 (1992)...............8

*Flatley by Flatley v. Penman*,
    632 A.2d 1342 (Pa. Super. Ct. 1993)...................................................................8, 9, 12

*Harrity v Medical College of Pennsylvania Hosp.*,
    653 A.2d 5 (Pa. Super. Ct. 1994)...............................................................................8

*Jeffreys v. City of New York*,
    426 F.3d 549 (2d Cir. 2005)........................................................................................7

*Jordan v. SmithKline Beecham, Inc.*,
    958 F. Supp. 1012 (E.D. Pa. 1997)..........................................................................9, 12

*Marvel Characters, Inc. v. Kirby*,
    726 F.3d 119 (2d Cir. 2013).......................................................................................7

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
    No. 14-CIV-6228, 2015 WL 2354582 (S.D.N.Y. May 14, 2015)........................2, 3

*Robert F. Felte, Inc. v White*,
    302 A.2d 347 (Pa. 1973)..........................................................................................9, 10

*Steuart v McChesney*,
    444 A.2d 659 (Pa. 1982)...........................................................................................8

*Vaughn v. Didizian*,
    648 A.2d 38 (Pa. Super. Ct. 1994)...........................................................................8

**Statutes & Regulations**

35 P.S. § 6021.701 *et seq.*.................................................................................................2

35 P.S. § 6021.704..............................................................................................................2

35 P.S. § 6021.705............................................................................................................2, 3

25 Pa. Code § 977.33(a)(4) ............................................................................................2

25 Pa. Code. § 977.40 ................................................................................................3, 4

## SUMMARY OF ARGUMENT

The Commonwealth of Pennsylvania's ("Commonwealth") claims against ExxonMobil seek to recover past and future costs for remediating MTBE, including monies that the Pennsylvania Underground Storage Tank Indemnification Fund ("USTIF" or "the Fund") reimbursed to underground storage tank ("UST") owners and operators for conducting such remediation. But two years before it filed this lawsuit, the Commonwealth and USTIF settled these very same claims with ExxonMobil.[1] That settlement was negotiated with the assistance of counsel and memorialized in a fully integrated, written agreement that includes a comprehensive "Release and Covenant Not to Sue" releasing ExxonMobil from all past, present, and future claims

> of every kind and description, whether known or unknown, and regardless of the legal theory, related to or in any manner arising out of applications or claims for reimbursement filed with the Commonwealth [and] payments made from the USTIF as a result of those applications or claims[.]

Because that settlement and release bars the Commonwealth from suing ExxonMobil for all costs or damages "arising out of applications or…payments…from the USTIF," and "relat[ed]" costs or damages caused by gasoline contamination, including MTBE contamination, ExxonMobil is entitled to summary judgment on the monetary damage claims in this case.

ExxonMobil is, and all times relevant has been, in compliance with its regulatory duty to provide corrective action to remediate sites impacted by MTBE gasoline spills. This motion does not affect ExxonMobil's clean up duties.   This motion does not seek adjudication of the Commonwealth's claims for injunctive relief found in Claims I – V of their Second Amended Complaint.

---

[1] "ExxonMobil" refers to Defendants Exxon Mobil Corporation, ExxonMobil Oil Corporation and Exxon Company, U.S.A., and their related entities ExxonMobil Refining and Supply Company, Exxon Chemical U.S.A., ExxonMobil Chemical Corporation, ExxonMobil Chemical U.S.A., Exxon Corporation, and Mobil Corporation.  *See* Second Am. Compl. at ¶ 40.

## STATEMENT OF FACTS

I.      **USTIF**

USTIF is a privately financed insurance fund created by the Pennsylvania General Assembly to provide funding for the cleanup of gasoline and all of its components, including MTBE, that is spilled or leaked from a UST system.  *See* 56.1 Stmt. ¶ 1; *Decl. of Lisa Gerson* ("Gerson Decl."), Ex. 1 (*Rule 30(b)(6) Dep. on USTIF (R. Burgan) Tr.*), at 106:11-17; *see also* 35 P.S. § 6021.701 *et seq.* ("Storage Tank and Spill Prevention Act").  As an insurance fund, USTIF provides UST owners and operators with "primary coverage" for the costs of addressing gasoline releases, including contamination caused by MTBE.  *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, No. 14-CIV-6228, 2015 WL 2354582 at *1 (S.D.N.Y. May 14, 2015) (citing 25 Pa. Code § 977.38(a)).  Specifically, a UST owner or operator who has taken corrective action in response to a UST release, including the remediation of gasoline or MTBE, may submit a claim to USTIF for reimbursement of its costs.  35 P.S. § 6021.705(b); 25 Pa. Code § 977.33(a)(4).

Almost all of USTIF's funds for paying these reimbursement claims come from premiums (fees) paid by the UST owners and operators "for every gallon [of gasoline] that enters a UST."  *In re MTBE*, 2015 WL 2354582 at *4 (alteration in the original); *see also* 56.1 Stmt. ¶ 4; Gerson Decl. Ex. 1 at 85:23-88:12.  USTIF's remaining funds come from subrogation recoveries and investment income.  56.1 Stmt. ¶ 4; Gerson Decl. Ex. 1 at 88:13-18.  USTIF receives absolutely no funding from tax revenue collected by the Commonwealth.  56.1 Stmt. ¶ 4; Gerson Decl. Ex. 1 at 90:1-6,  177:17-23.  In fact, the statute creating USTIF explicitly bars it from pledging the full faith and credit of the Commonwealth in its operations, and exempts the Commonwealth from any liability for those operations.  35 P.S. § 6021.704(a)(3).  Accordingly, the Commonwealth does

not fund, indemnify or reimburse, in any way, the corrective action and other remediation efforts undertaken by UST owners and operators.

USTIF's operations are governed by an independent board of directors that has the authority to initiate, participate in, and defend litigation.  35 P.S. §§ 6021.703(a), 6021.705(f)(3). That authority includes the right of USTIF to seek recovery from others for the funds that it has paid out on reimbursement claims submitted by UST owners or operators.  Specifically, once a reimbursement claim is paid the Fund "steps into [the owner or operator's] shoes and inherits their legal rights."  *In re MTBE*, 2015 WL 2354582 at *1 (citing 25 Pa. Code.  § 977.40 (a)).  This assumption of the owner or operator's rights sounds in subrogation, and is the only mechanism by which USTIF can seek to recover some or all of the funds that it has paid out in reimbursement. 25 Pa. Code. § 977.40.

## II.      The Commonwealth's Usurpation of USTIF's Subrogation Claims.

Applying Pennsylvania's long-settled anti-subrogation law, this Court already has held that a USTIF subrogation claim cannot be asserted against the owner or operator who was reimbursed by the Fund for actions taken at a particular gasoline release site.  *In re MTBE*, 2015 WL 2354582, at *3-*4.

Accordingly, in this case the Commonwealth purports to be asserting USTIF's subrogation claims against third-parties, including ExxonMobil, who allegedly are responsible for some part of the alleged costs or other damages that a UST owner or operator incurred to clean-up MTBE at a particular gasoline release site.  Specifically, the Commonwealth states that it seeks to recover from ExxonMobil "the costs paid or incurred to date and in the future, ***including by USTIF*** and DEP, to detect, define the extent of, monitor, treat, abate, remove and/or otherwise remediate MTBE contamination and threatened contamination of groundwater and both public and private

3

water wells (which are sourced from groundwater) throughout Pennsylvania….” 2d Am. Compl. ¶ 8 (emphasis added). Likewise, in paragraph 40 of its Second Amended Complaint, the Commonwealth states that it “sues [ExxonMobil] pursuant to its statutory right of subrogation under 25 Pa. Code § 977.40(a).” *Id.* ¶ 40.[2]

Putting aside the legal infirmities of the Commonwealth’s attempted usurpation of USTIF’s subrogation claims in this case,[3] the Commonwealth released ExxonMobil from those very claims years ago.

## III.     The Commonwealth and USTIF’s Settlement with ExxonMobil

Beginning in the 1990’s, both Exxon and Mobil submitted reimbursement claims to USTIF for costs they incurred to remediate UST gasoline releases at various sites across Pennsylvania. *See* 56.1 Stmt. ¶ 5; *Decl. of Theodore P. Ray* (“Ray Decl.”), Ex. 1 (Settlement Agreement (May 14, 2014)), at 1. USTIF approved those claims and reimbursed Exxon and Mobil for some or all of their remediation costs, including their costs to cleanup MTBE contamination. *See* 56.1 Stmt. ¶ 6; Ray Decl. Ex. 1 at 1.

Because Exxon and Mobil allegedly had also received coverage from their private insurers, the Commonwealth sought to recover some of the reimbursements that USTIF had paid. A private practitioner (Steven A. Corr) was retained as a Special Attorney General and, on November 21, 2011, he sent a demand letter to ExxonMobil on behalf of his clients (i) the Commonwealth, (ii) the Pennsylvania Department of Insurance, and (iii) USTIF. *See* 56.1 Stmt. ¶ 7; Ray Decl. Ex. 2 (*Ltr. from Steven A. Corr to David B. Mantor* (Nov. 21, 2011)). In that demand letter Mr. Corr

---

[2] In Counts I – V of their Second Amended Complaint the Commonwealth advances five alternative legal theories seeking to recover (1) identical monetary damages and (2) identical injunctive relief. This motion does not affect the injunctive relief claims, and the monetary relief claims are identical to the damages sought in paragraphs 8 & 40.

[3] Those legal infirmities are not relevant to this particular motion, which is based solely on the comprehensive release that the Commonwealth gave to ExxonMobil years ago. Those infirmities will be addressed in a different motion filed on behalf of the defendants in this case.

identified seven (7) claims that, in his view, entitled his clients to recover against ExxonMobil: (1) "statutory subrogation" under 25 Pa. Code 977.4; (2) "equitable subrogation"; (3) "unjust enrichment"; (4) "negligent misrepresentation"; (5) "fraud"; (6) "strict liability" for "environmental damage, contamination or pollution" under 25 Pa. Code 303; and (7) violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"). *See* 56.1 Stmt. ¶ 8; Ray Decl. Ex. 2.

After extensive negotiations, on May 4, 2012, the Commonwealth, the Department of Insurance and USTIF entered into a settlement agreement with ExxonMobil. *See* 56.1 Stmt. ¶ 9; Ray Decl. Ex. 1. ExxonMobil agreed to pay $8,500,000 and, in return, the Commonwealth, the Department of Insurance and USTIF gave ExxonMobil a broad and comprehensive "Release and Covenant Not to Sue" ("Release"). *See* 56.1 Stmt. ¶ 10; Ray Decl. Ex. 1 at 2 ¶¶ 1-2. Specifically, the Commonwealth, Department of Insurance and USTIF agreed to release, discharge and covenant not to sue ExxonMobil not just from the seven potential claims identified in Mr. Corr's demand letter, but also "from and concerning any and all past, present, and future liability, rights, claims, demands, damages, causes of action, or controversies of every kind and description, whether known or unknown, and regardless of the legal theory, related to or in any manner arising out of

- applications or claims for reimbursement filed with the Commonwealth; [and]

- payments made from the USTIF as a result of those applications or claims[.]"

56.1 Stmt. ¶ 11; Ray Decl. Ex. 1 ¶ 2. These releases were not, by their express terms, limited to the specific sites for which Exxon, Mobil or ExxonMobil had received reimbursements from

USTIF.  As for those specific Exxon and Mobil sites, the Commonwealth, Department of Insurance

and USTIF agreed to release, discharge and covenant not to sue ExxonMobil for

> • "any claim by the Commonwealth that ExxonMobil received
> or was eligible to receive payments or other recovery from
> any other source including insurance coverage (including
> through NACC and MIRC) for the cost of environmental
> remediation of any property located within the
> Commonwealth of Pennsylvania for which ExxonMobil
> filed or files an application for reimbursement; and
>
> • any claims for 'indirect claims' and payments from the
> USTIF to third parties or subsequent owners of any Exxon,
> Mobil or ExxonMobil sites."

*Id.*

The settling parties expressly contemplated that different or additional facts, even if only

later discovered, would not alter or abrogate their agreement, including the Release:

> Each Settling Party acknowledges that it may hereafter discover
> facts different from, or in addition to, those which it now knows to
> be or believes to be true with respect to the matters covered by this
> Settlement Agreement, and agrees that this Settlement Agreement
> and the obligations imposed and the release contained in it shall
> remain in effect in all respects, notwithstanding such different or
> additional facts or the subsequent discovery thereof.

*Id.*

Michael Consedine, the Commissioner of the Department of Insurance at that time, signed

the Settlement Agreement on behalf of both the Commonwealth and USTIF.  56.1 Stmt. ¶ 13; Ray

Decl. Ex. 1 at 5.  Christine Lynn, then the Comptroller of the Governor's Office, also signed on

behalf of the Commonwealth.  The form and legality of the settlement agreement was reviewed

and approved by both the Pennsylvania Office of the Attorney General and the Department of

Insurance's Office of the Chief Counsel.  *Id.*  Representatives of both of those legal offices also

executed the Settlement Agreement.  *Id.*

6

By its terms, the Settlement Agreement is a fully integrated agreement that "sets forth the entire agreement and understanding of the Settling Parties concerning the subject matter of this Settlement Agreement."  56.1 Stmt. ¶ 12; Ray Decl. Ex. 1 ¶ 13.  The settling parties waived any dispute over ambiguities in the Agreement (Ray Decl. Ex. 1 ¶ 7), and provided that it would be interpreted in accordance with Pennsylvania law.  *Id.* ¶ 12.

## LEGAL STANDARD

A court should grant summary judgment "if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135 (2d Cir. 2013).  "A fact is 'material' for these purposes when it might affect the outcome of the suit under the governing law.  An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).  "In determining whether there is a genuine dispute as to a material fact, [the court] must resolve all ambiguities and draw all inferences against the moving party."  *Marvel Characters*, 726 F.3d at 135 (internal quotation marks and citations omitted).

Because there can be no genuine dispute about the relevant, materials facts of the parties' prior Settlement and Release, as a matter of law ExxonMobil is entitled to summary judgment on the claims made in Paragraphs 8 and 40 of the Second Amended Complaint as well as all monetary claims made in Counts I – VII of the Second Amended Complaint.

## ARGUMENT

### A. UNDER PENNSYLVANIA LAW, A CLEAR AND UNAMBIGUOUS RELEASE MUST BE ENFORCED ACCORDING TO THE ORDINARY MEANING OF THE LANGUAGE USED BY THE SETTLING PARTIES AT THE TIME THE AGREEMENT WAS EXECUTED.

The parties' Settlement Agreement states that it must be "interpreted, construed, and enforced in accordance with the laws of the Commonwealth of Pennsylvania,"  Ray Decl. Ex. 1

¶ 12.  Those laws, and the decisions interpreting them, are as clear and unambiguous as the parties' Release in this case.

Pennsylvania law holds that a settlement and release is interpreted according to contract principles.  *Harrity v Medical College of Pennsylvania Hosp.*, 653 A.2d 5, 10 (Pa. Super. Ct. 1994). Two of those principles are dispositive here.

The **first** principle is that "the effect of a release must be determined from the ordinary meaning of its language." *Buttermore v. Aliquippa Hosp.*, 561 A.2d 733, 735 (Pa. 1989) (citing *Estate of Bodnar,* 372 A.2d 746 (1977)).  In assessing that "ordinary meaning," Courts should construe a release so that it covers those "matters as can fairly be said to have been within the contemplation of the parties when the release was given." *Dublin by Dublin v. Shuster*, 598 A.2d 1296, 1298–99 (Pa. Super. Ct. 1991), *appeal denied*, 533 Pa. 600 (1992).  And what was "within the contemplation of the parties" may, in turn, require the court to determine if the claim(s) released were, or could have been, contemplated by the parties at the time the settlement and release were executed.  *See Vaughn v. Didizian*, 648 A.2d 38, 40 (Pa. Super. Ct. 1994).  In short:  the court must "try to give effect to the intentions of the parties." *Brown v. Cooke,* 707 A.2d 231, 233 (Pa. Super. Ct. 1998).

Which brings us to the **second** principle that is dispositive:  the "primary source of the court's understanding of the parties' intent must be the document itself." *Flatley by Flatley v. Penman*, 632 A.2d 1342, 1344 (Pa. Super. Ct. 1993) (citing *Vogel v. Berkley*, 511 A.2d 878 (Pa. Super. Ct. 1986)); *see also Steuart v McChesney*, 444 A.2d 659, 661 (Pa. 1982) ("It is well established that the intent of the parties to a written contract is to be regarded as being in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the

8

express language of the agreement."); *Robert F. Felte, Inc. v White*, 302 A.2d 347, 351 (Pa. 1973)

(best evidence of "the intent of the parties is the writing itself").

      The Pennsylvania Supreme Court has long embraced these two principles and emphasized

that settling parties are free to craft broad releases which, if they are clear and unambiguous, <u>must</u>

be enforced even if one side later regrets the release as improvident:

> Parties with possible claims may settle their differences upon such
> terms as are suitable to them.  They may include or exclude terms,
> conditions and parties as they can agree.  In doing so, they may
> yield, insist or reserve such right as they choose.  If one insists that
> to settle, the matter must end then and forever, as between them,
> they are at liberty to do so.  They may agree for reasons of their own
> that they will not sue each other or any one for the event in question.
> However **improvident their agreement may be or subsequently
> prove for either party, their agreement, absent fraud, accident
> or mutual mistake, is the law of their case.**

*Buttermore*, 561 A.2d at 735 (emphasis added).  Federal courts applying Pennsylvania contract

law have reached the same conclusion:  "Thus, what a party now claims to have intended is not as

important as the intent that [the court] glean[s] from a reading of the document itself.  The parties'

intent at the time of signing as embodied in the ordinary meaning of the words of the document is

[the court's] primary concern."  *Penman*, 632 A.2d 1344; *see also Jordan v. SmithKline Beecham,

Inc.,* 958 F. Supp. 1012, 1019-20 (E.D. Pa. 1997) ("[A] party cannot evade the clear language of

the release by contending that he did not subjectively intend to release the claim in question.")

**B.**      **THE CLEAR, ORDINARY AND UNAMBIGUOUS LANGUAGE OF THE
PARTIES' SETTLEMENT AGREEMENT PROVES THAT THE
COMMONWEALTH INTENDED TO, AND DID, RELEASE EXXONMOBIL
FROM ALL PAST AND FUTURE CLAIMS FOR REMEDIATING MTBE.**

      Acting as Special Attorney General for the Commonwealth, Steven Corr's November 21,

2011 demand letter was comprehensive – articulating not one or two, but <u>seven</u> different claims

by which the Commonwealth, Department of Insurance and USTIF believed they were entitled to

recover USTIF reimbursements from ExxonMobil.  After several months of negotiations, each of

the parties – represented by their own very capable counsel – elected not only to settle those seven claims, but to intentionally resolve <u>all</u> past, present, and future claims for gasoline remediation (including MTBE remediation) that had or might be brought against ExxonMobil.

How do we know that this is what the parties contemplated and intended when they executed their settlement agreement and release on May 4, 2012?  Because it is precisely what the plain language of that Settlement Agreement and Release says.  In return for ExxonMobil's payment of $8.5 million dollars, the Commonwealth, Department of Insurance and USTIF (hereinafter collectively "the Commonwealth") agreed to release ExxonMobil "from and concerning any and all past, present, and future liability, rights, claims, demands, damages, causes of action, or controversies of every kind and description, whether known or unknown, and regardless of the legal theory, related to or in any manner arising out of applications or claims for reimbursement filed with the Commonwealth; [and] payments made from the USTIF as a result of those applications or claims[.]"  56.1 Stmt. ¶ 11; Ray Decl. Ex. 1 ¶ 2.  These are not complicated or ambiguous words – this is simple, ordinary, plain English and there is absolutely nothing unclear or complex about it.  The Pennsylvania Supreme Court has said, time and again, that "the intent of the parties is the writing itself." *Robert F. Felte, Inc.*, 302 A.2d at 351.  And here the parties' writing is clear: the Commonwealth released ExxonMobil from all past, present, and future claims relating in any way to claims made or paid by USTIF, including the subrogation claims that the Commonwealth has asserted in this case. Moreover, the fact that this part of the Release does, and was intended to, apply to USTIF claims by or paid to <u>anyone</u> is evident from the rest of the Release, which explicitly addresses claims and payments specific to "Exxon," "Mobil" and "ExxonMobil" for their respective sites.  Simply put:  the parties and their respective, capable counsel knew how to limit their agreement and release to ExxonMobil sites, and when they wanted to do so they did

10

it explicitly with clear and unambiguous language.  Again, "the intent of the parties is in the writing itself" and that intent is clear here.

That the parties understood and intended their written settlement and release to mean exactly what the plain language says also is self-evident from how the Commonwealth negotiated, reviewed and executed the document.  This was not a run-of-the-mill vendor contract or standardized agreement to toll a statute of limitations; it was an agreement to settle and release claims against one of the world's largest integrated petroleum companies in return for millions of dollars.  The Commonwealth retained experienced counsel (Steven Corr), and deputized him as a Special Attorney General, specifically to pursue the claims and negotiations with ExxonMobil. 56.1 Stmt. ¶ 7.  The final negotiated agreement was reviewed for form and legality not only by the Department of Insurance's Office of Legal Counsel, but also by the Office of the Attorney General – both of which approved and executed the settlement and release.  On top of that, the written agreement was reviewed, approved and executed by two of the Commonwealth's most senior government officials:  Michael Consedine, then Commissioner of the Department of Insurance (the highest position in that Department), and Christine Lynn, Comptroller of the Governor's Office.  *Id.* ¶ 13.  Putting aside the plain language of the settlement and release, it would defy common-sense to suggest that all (or any) of these very-experienced Commonwealth officials and counsel somehow misunderstood or did not intend exactly what that plain language says and means.

Finally, it does not matter if the Commonwealth now believes – for whatever reason – that the release it negotiated and gave to ExxonMobil in 2012 was too broad or improvident.  "[W]hat a party now claims to have intended is not as important as the intent that [the court] glean[s] from a reading of the document itself.  The parties' intent at the time of signing as embodied in the

11

ordinary meaning of the words of the document is [the court's] primary concern." *Penman*, 632 A.2d 1344; *see also Jordan v. SmithKline Beecham, Inc.,* 958 F. Supp. 1012, 1020 (E.D. Pa. 1997).[4]  Again, that intent was clear then, and it is clear today:  the Commonwealth released ExxonMobil from all past, present, or future claims for the costs of remediating MTBE.

## CONCLUSION

The Commonwealth's claims against ExxonMobil seek to recover past and future costs for remediating MTBE, including monies that USTIF reimbursed or will reimburse to UST owners and operators for conducting such remediation.  Because the Commonwealth settled and released ExxonMobil from all such past, present, and future claims and causes of action for those damages, ExxonMobil is entitled to summary judgment on the claims made in Paragraphs 8 and 40 of the Second Amended Complaint as well as all monetary claims made in Counts I – VII of the Second Amended Complaint.

Dated: November 2, 2020                          Respectfully submitted,


By:    /s/ James A. Pardo
        James A. Pardo
        Lisa A. Gerson
        McDermott Will & Emery LLP
        340 Madison Avenue
        New York, New York 10173
        T: (212) 547-5400
        F: (212) 547-5444

        *Counsel for the Exxon Mobil*
        *Corporation Defendants*

---

[4] The Commonwealth cannot be heard to suggest that it was not aware of the claims in this case at the time it entered into the Settlement Agreement in 2012.  Just two years earlier, in 2010, the Commonwealth had retained outside counsel to bring this MTBE lawsuit and had sent ExxonMobil its Notice of Intent to Sue.