UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------- X

| | | |
|---|---|---|
| IN RE: Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation | : | Master File No. 1:00-1898 MDL 1358 |
| This Document Relates To: Commonwealth of Pennsylvania v. Exxon Mobil Corporation, et al., Case No. 1:14-cv-6228 | : | 14cv6228 (DLC) |
| | : | OPINION AND ORDER |

---------------------------------------- X

APPEARANCES:

For plaintiff Commonwealth of Pennsylvania:
Neil F. Mara
Pennsylvania Office of Attorney General
14th Fl. Strawberry Square
Harrisburg, PA 17120

Yechiel Michael Twersky
Daniel Berger
Tyler E. Wren
Berger & Montague, PC
1818 Market St Suite 3600
Philadelphia, PA 19103

Stewart L. Cohen
Eric S. Pasternack
Robert L. Pratter
Michael Coren
Cohen, Placitella & Roth
2001 Market Street, Suite 2900
Philadelphia, PA 19103

Duane Miller
Tracey L. O'Reilly
Molly McGinley Han
Miller, Axline & Sawyer
1050 Fulton Avenue, Suite 100
Sacramento, CA 95825

For defendants Exxon Mobil Corporation, et al., and on behalf of all moving defendants:

James A. Pardo
Lisa A. Gerson
Krista A. Reed
McDermott Will & Schulte LLP
One Vanderbilt Avenue
New York, New York 10017

DENISE COTE, District Judge:

This case is part of a consolidated multi-district litigation ("MDL") relating to the contamination of groundwater caused by releases of gasoline containing methyl tertiary butyl ether ("MTBE"). In this action, the Commonwealth of Pennsylvania ("Commonwealth") alleges that the defendants, which include dozens of gasoline manufacturers, distributors, and sellers, are liable for MTBE contamination of Pennsylvania's drinking water.

MDL proceedings in Phase I of this litigation concluded last year, and the 16 Focus Sites that survived summary judgment have been remanded to the Honorable Harvey Bartle III in the Eastern District of Pennsylvania for trial. Fact discovery in Phase II, which includes thousands of remaining Sites, has been ongoing since 2025 and is set to close on December 1, 2026. Arguing that rulings made on Phase I summary judgment motions can narrow the claims in Phase II, the defendants have filed a motion for summary judgment on the Commonwealth's request for

future remediation and restoration damages (hereinafter "restoration" damages) at 1,490 Sites. For the following reasons, the motion is granted in part.

**Background**

The following facts are taken from the documents submitted in connection with this motion. They are taken in the light most favorable to the plaintiff, as the non-moving party, unless otherwise noted.

MTBE was blended into gasoline from the 1980s to 2000s, at least in part to increase gas's octane, which was meant to reduce tailpipe emissions of carbon monoxide. Gasoline containing MBTE was widely distributed in Pennsylvania for use in motor vehicles. MTBE can and did enter the environment through spills, leaks, and other releases of gasoline from various storage and delivery systems, such as underground storage tanks ("UST") at gas stations. Compared to other ingredients of gasoline, MTBE does not easily adhere to soil and is highly soluble in water. Once in water, MTBE dissolves easily and moves through the ground quickly. As a result, it penetrates deeply into underground aquifers; this contamination can spread underground over great distances. Once contamination occurs, MTBE is difficult to remove and can make drinking water unfit for consumption, due to its foul taste and odor and

potential adverse health effects. MTBE was phased out as a gasoline additive at the federal level in 2006.

## I. The Commonwealth's Response to MTBE

### A. The Tank Act and Act 2

Agencies of the Commonwealth knew about and analyzed the possible impacts of releases from USTs as early as the mid-1980s. Since 1996, Pennsylvania has required testing for MTBE at gasoline release sites, and it adopted a statewide health standard for the concentration of MTBE in groundwater in 1997.

Pennsylvania enacted the Storage Tank and Spill Prevention Act ("Tank Act") in 1989 to address chemical releases from storage tanks. 35 Pa. Cons. Stat. § 6021.102. Under that law, the Pennsylvania Department of Environmental Protection ("DEP") may order "corrective action" to address a release or possible release. Id. § 6021.1302(a). "Corrective actions" may include measures to assess, mitigate, or remedy releases and their effects on public health and the environment. Id. § 6021.103.

DEP regulations set forth a "Corrective Action Process" for owners and operators of storage tanks, and other "responsible" parties, to follow. 25 Pa. Code. § 245.301 - 245.314. That process includes investigating and reporting suspected releases, taking interim remedial actions, replacing affected water supplies, determining and reporting the need for further

remediation, and submitting a "remedial action plan." Id. § 245.304-311. Depending on the extent of a release, the responsible party "shall" use soil survey techniques to determine the "horizontal and vertical extent" of soil and groundwater contamination. Id. § 245.309(c)(9)-(10). Also as part of this process, the responsible party selects a remediation standard that will be used as a benchmark for corrective action. Id. §§ 245.310(a)(26); 245.311(a). Available standards are found in the Land Recycling and Environmental Remediation Standards Act ("Act 2"). Id. § 245.1; see 35 Pa. Cons. Stat. § 6026.301(a) (listing remediation standards).

Once the DEP reviews and approves the remedial action plan, 25 Pa. Code. § 245.311(c), the responsible party implements it, and, upon completion, submits a remedial action completion report ("RACR") to the DEP. Id. § 245.312-245.313. The RACR must demonstrate that the remedial actions have achieved the selected remediation standard. Id. § 245.313(b). The DEP then reviews the RACR and approves or disapproves it. Id. § 245.313(c). At the end of this process, the Commonwealth expects the responsible party to abandon groundwater monitoring

wells by filling them with a sealant such as cement or grout.[1] For the purposes of this litigation, a Site for which this process has not ended is considered "Open".

II. This Lawsuit

The Commonwealth initiated this case in Pennsylvania state court on June 19, 2014. It was removed to the United States District Court for the Eastern District of Pennsylvania on July 17. On July 30, the United States Judicial Panel on Multidistrict Litigation ("Panel") transferred the case to this District for pretrial proceedings pursuant to 28 U.S.C. § 1407. On November 6, 2015, the Commonwealth filed its second amended complaint ("SAC"). The Commonwealth's remaining claim is for negligence.

The Commonwealth seeks essentially two types of damages. It seeks to recover USTIF costs,[2] which are easily quantifiable. The SAC also seeks to recover the costs of future testing of

---

[1] One DEP manual explains that "Unsealed or improperly sealed wells may threaten public health and safety, and the quality of the groundwater resources. Therefore, the proper abandonment (decommissioning) of a well is a critical final step in its service life."

[2] An Underground Storage Tank Indemnification Fund ("USTIF") helps Site owners cover the costs of cleaning up contaminated soil and groundwater. See In re Methyl Tertiary Butyl Ether, No. 14CV6228 (DLC), 2025 WL 1658427, at *2 (S.D.N.Y. June 11, 2025).

"potentially affected groundwater for the presence of MTBE" as well as future "treatment and remediation of all groundwater containing detectable levels of MTBE until restored to non-detectable levels." It seeks damages that reflect the "full cost of restoring the waters of the Commonwealth to their original condition prior to the contamination of such waters with MTBE."

III. Recent Proceedings

A. Phase I

Pursuant to a protocol overseen by the MDL Court, the parties identified 75 Focus Sites out of more than 5,000 Sites for discovery and the first trial in the litigation ("Phase I"). A series of summary judgment decisions issued last year addressed factual and legal disputes concerning many of the Phase I Sites.

Of particular importance to the pending motion, one of the Phase I summary judgment opinions granted summary judgment for the defendants on the plaintiff's claim for future investigation costs. The Commonwealth explained that those investigations were needed to determine whether additional remediation work is required at 42 Phase I Focus Sites. Summary judgment was granted on the ground that the claim for damages was speculative. In re Methyl Tertiary Butyl Ether ("MTBE") Prods.

Liab. Litig., No. 14CV6228 (DLC), 2025 WL 1270541 (S.D.N.Y. Apr. 30, 2025) ("April 30 Opinion").[3]

As described in the April 30 Opinion, the Commonwealth's expert Anthony Brown opined that additional remediation work was not required, or possibly required, or that he did not know if it would need to be done. Id. at *3. For the eight of those Sites at which DEP continues its work ("Open Sites"), Brown did not know what, let alone if any, future restoration work was needed in addition to the DEP's remediation efforts that were underway. Id. The April 30 Opinion is incorporated by reference and familiarity with it is assumed.[4]

The Commonwealth intends to rely on Brown as its expert in Phase II of this litigation and both parties have referred to his prior testimony in connection with the pending motion. Accordingly, the following excerpts from his testimony, taken in Phase I depositions, remain relevant. In his deposition on April 28, 2022, Brown was asked about what he meant by his statement that "MTBE contamination of groundwater should be

[3] Reconsideration of the April 30 Opinion was denied. In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig., No. 14CV6228 (DLC), 2025 WL 1675489 (S.D.N.Y. June 13, 2025).

[4] An Opinion of November 6, 2025, denied defendants' motion to apply the April 30 Opinion to Sites where Brown had opined that future remediation work was necessary. In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., No. 14CV6228 (DLC), 2025 WL 3101104 (S.D.N.Y. Nov. 6, 2025).

remediated to a concentration at or below the statewide health standard of [20 parts per billion ("ppb")]." Brown responded, "[U]ltimately, to achieve restoration, the groundwater would need to be remediated to that standard, 20 [ppb], after which, my opinion is that monitored natural attenuation could address the residual concentrations." When asked, "[I]s there magic to 20 [ppb] or is it just because that's what the State says so?", Brown responded,

> [A]fter you've achieved that goal, then the rest of the contamination is the residual concentrations, clearly nature will be enough to take care of those.
>
> And I've actually even gone beyond that and said, well, the conditions are very similar to New Jersey, therefore, if you do active remediation, you really only need to go to 70 [ppb], because basically even after that, I think it would be reasonable to conclude that monitored natural attenuation could address those residual concentrations in a reasonable period of time.

(Emphasis supplied.)

On June 15, 2022, Brown was asked, "So is your opinion in this case, in Pennsylvania, that [at] detections [of] 70 [ppb] and below, monitored natural attenuation is a possible remedial method in order to achieve restoration?" He answered,

> I would say my opinion is at 20 [ppb] and below, it is achievable to -- that is, you should achieve restoration using just natural attenuation.
>
> Between 20 [ppb] and 70 [ppb], I believe at most sites you should be able to achieve restoration in a reasonable time period using natural attenuation

> between those two concentrations. But, obviously, there may be site-specific conditions that would suggest that that is not possible, such that we may see that at a particular location, the natural attenuation may stall; that is, for an extended period of time, we just have consistent concentrations higher than 20 [ppb] but lower than 70 [ppb], but they do not appear to be attenuating.
>
> So there may be some circumstances where the concentrations are below 70 [ppb] but attenuation does not appear to be effective and some other remediation should be implemented.

(Emphasis supplied.)

With respect to eight Focus Sites that were still Open, Brown recommended further investigation and/or remedial action. For one of these Sites, Focus Site 10, Brown was asked at his May 16, 2022 deposition, "[T]o the extent work is ongoing through the regulatory process, there may be a need for you to change your opinions, to update -- to account for the ongoing work; is that fair to say?" Brown responded, "Possibly. I don't know what that work is and what the data shows until I've actually reviewed it. So I can't say whether it would affect my opinions or not."

Brown was asked on June 22, 2022, about another Site, Focus Site 57, "To the extent additional work is done at this site that might be consistent with or conflict with your report, your report doesn't take that into account going forward; correct?" Brown responded, "It does not because we don't know what

additional actions may be taken. Clearly if there are additional actions and this litigation continues, then there would likely be a need to update the report given the additional actions that have been taken at the site and the additional passage of time."

The plaintiff also relied during Phase I on its non-site specific expert Graham E. Fogg. Fogg submitted a 200+ page expert report on March 8, 2021, about, among other things, the characteristics of MTBE in groundwater, biodegradation, and the history of MTBE contamination in Pennsylvania. Looking at data collected from sampling wells in Luzerne County, Pennsylvania, Fogg observed that because MTBE plumes often occur in fractured bedrock, there were wells where MTBE was not detected (or detected at low levels) "in close proximity" to wells with high concentrations. He also looked at MTBE concentrations in private wells in Montgomery County and presented data demonstrating that MTBE levels at concentrations below 1000 ppb remained in the wells from 1991 to 2016.

At his deposition on December 7, 2021, Fogg stated the following about MTBE contamination:

> [A] well will typically get contaminated, concentrations will go up, and given enough time they'll eventually go down as the plume moves on to other parts of ths system and other wells.

> So the spread of the problem is not necessarily just increasing concentrations in individual wells, but it's the movement of the contaminants from one part of the aquifer to the others. . . .
>
> So if you just look at individual wells and you say, concentrations are going down, therefore the problem is going away, that's an incomplete analysis because it neglects to look at, well, where is the contamination going? And data like this show, well the contamination's going -- it's contaminating wells and it's also hitting additional wells.

B. Phase II Discovery

While Phase I summary judgment motions were being adjudicated, fact discovery on the remainder of the Sites began ("Phase II"). In response to the parties' initial proposals for Phase II discovery, which were submitted on September 5, 2025, the plaintiff was ordered on September 19, to "work diligently" to identify the name, regulatory status, and the maximum concentration of MTBE in groundwater during the most recent sampling of MTBE at each Phase II Site ("MRM"). That data was necessary in order for the plaintiff to decide whether to pursue USTIF and/or restoration damages for the over 5,000 Phase II Sites.

Ultimately, the Commonwealth, working with the defendants, prepared a spreadsheet with the MRM and other data for the Phase II Sites on which the Commonwealth wishes to pursue a recovery.

That spreadsheet was finalized on April 14, 2026[5] and contains data regarding 3,221 Sites. The Commonwealth continues to evaluate, however, whether the number of Sites for which it will seek a recovery from the defendants should be further reduced. Of the 3,221 Sites on the April 14 spreadsheet, the Commonwealth seeks USTIF damages for 2,385 Sites and restoration damages for 1,643.

At a conference on April 2, the Court set a deadline of December 1, 2026 for the close of fact discovery.[6] Expert discovery will proceed in tranches and will close on October 27, 2027.

In addition, at that same conference, the defendants suggested that early summary judgment practice regarding the Commonwealth's claim for restoration damages could reduce the burden of discovery on all parties. The Commonwealth agreed.[7]

[5] No Focus Site may be added to the April 14 spreadsheet without good cause shown.

[6] The Commonwealth's production of DEP files is staggered. Production must be made by July 31, 2026 for Sites for which the plaintiff is not seeking USTIF damages; by mid-August 2026 for Sites for which the plaintiff is seeking USTIF damages and the Site files are digitized; and by September 15, 2026 for Sites for which the plaintiff is seeking USTIF damages and the Site files are in the process of digitization. The parties already have the relevant USTIF files. The defendants' files for the Sites are to be produced by July 31, 2026.

[7] Counsel for the plaintiff indicated that this early summary judgment practice was "a fantastic idea."

The Court invited the plaintiff and the defendants to submit exemplars for each category of Sites addressed in the motion. The Commonwealth also represented that it would not pursue restoration damages at Sites with an MRM below 20 ppb so long as there had never been a detection of groundwater or soil contamination that exceeded 2,000 ppb.[8]

On May 29, the defendants moved for summary judgment on the Commonwealth's claim for restoration damages for three categories of Phase II Sites: (1) 632 Sites where the MRM was less than 20 ppb but the historical groundwater MTBE contamination was greater than 2,000 ppb; (2) 642 Sites where the MRM was greater than or equal to 20 ppb but less than 70 ppb; and (3) 532 Open Sites[9], that is, Sites where the DEP has not completed supervision of restoration work. The motion relies on Brown's testimony during Phase I discovery and an application of the April 30 Opinion. Consistent with the Court's direction at the April 2 conference, the defendants selected one Focus Site for each category to serve as an exemplar. The motion became fully submitted on July 20.

---

[8] The Commonwealth has since altered that position. It now applies the historic 2,000 ppb exception to groundwater contamination only.

[9] 203 of the Open Sites overlap with Category 1 and 104 of the Open Sites overlap with Category 2.

**Discussion**

The defendants seek summary judgment on future restoration damages that the Commonwealth pursues for three categories of Sites. Each category is discussed in turn below.

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." Choi v. Tower Rsch. Cap., LLC, 2 F.4th 10, 16 (2d Cir. 2021) (citation omitted). "[S]ummary judgment must be rejected if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Indemn. Ins. Co. of N. Am. v. Unitrans Int'l Corp., 98 F.4th 73, 77 (2d Cir. 2024) (citation omitted). "The court's role with respect to such a motion is not to resolve disputed questions of fact but solely to determine whether, as to any material fact, there is a genuine issue to be tried." Moll v. Telesector Res. Grp., Inc., 94 F.4th 218, 227 (2d Cir. 2024) (citation omitted).

"[R]eliance upon conclusory statements or mere allegations" is insufficient to defeat the motion, however. Id. at 228 (citation omitted). Summary judgment will be granted if "after adequate time for discovery, the nonmoving party has failed to

make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Id. (citation omitted). A party cannot manufacture a factual dispute by submitting testimony from an expert that unequivocally and inescapably contradicts the party's previous sworn testimony. Id. at 205 (describing "sham issue of fact" doctrine); In re Fosamax Prods. Liab. Litig., 707 F.3d 189, 194 (2d Cir. 2013) (same).

In Pennsylvania, the elements of negligence include proof of the existence of a duty, breach of that duty, "a causal connection between the conduct and the resulting injury," and "actual loss or damage to the plaintiff." Brewington v. City of Philadelphia, 199 A.3d 348, 355 (Pa. 2018). The plaintiff has a burden to prove these elements by a preponderance of the evidence. Walters v. UPMC Presbyterian Shadyside, 187 A.3d 214, 221 (Pa. 2018). "It is basic to tort law that an injury is an element to be proven." Kazatsky v. King David Mem'l Park, Inc., 527 A.2d 988, 995 (Pa. 1987).

The plaintiff bears the burden of proof "to establish all damages." Mader v. Duquesne Light Co., 241 A.3d 600, 617 (Pa. 2020). "[T]he law does not permit a damages award to be based on mere guesswork or speculation." Vinculum, Inc. v. Goli Techs., LLC, 310 A.3d 231, 254 (Pa. 2024) (citation omitted).

"[S]peculative damages are not cognizable under Pennsylvania law" if "the uncertainty concerns the fact of damages, rather than the amount." Hickey v. Univ. of Pittsburgh, 81 F.4th 301, 316 (3d Cir. 2023) (emphasis omitted) (citation omitted).

I. Sites With MRM Below 20 PPB

The Commonwealth has agreed not to seek restoration damages for a Site where the MRM is below 20 ppb, unless there was a prior detection of MTBE in the groundwater of 2,000 ppb or more. There are 623 Sites that have an MRM at or below 20 ppb but that have an historical detection of 2,000 ppb or more in the groundwater. The defendants move for summary judgment to the extent the Commonwealth seeks restoration damages for these Sites. The MRM of 20 ppb for roughly half of these Sites, or 309 Sites, is already over a decade old.

Under Pennsylvania Law, DEP has the authority to set statewide health standards for contaminated materials in groundwater and publish those standards in the Pennsylvania Bulletin. See 25 Pa. Code. §§ 250.304(c), 250.8. The statewide health standards are "protective of human health and the environment" and they are used for groundwater in aquifers that are "used or currently planned to be used for drinking water or for agricultural purposes." Id. §§ 250.304(a), (c). The DEP may independently calculate statewide health standards or it may

adopt standards already established by the U.S. Environmental Protection Agency. See id. § 250.304(c). As of November 20, 2021, the Pennsylvania Bulletin lists the statewide health standard for MTBE at 20 ppb.

The defendants argue that there is no genuine dispute of material fact that once MTBE levels reach 20 ppb, restoration work is unnecessary because natural attenuation will restore the groundwater. Defendants cite as an exemplar Site the Sunoco Service Station at 2685 Frankford Avenue in Philadelphia ("Frankford Site"). Several USTs were removed in 1996, at which time a gasoline spill was discovered in the soil. The responsible party dug four monitoring wells to check for contaminated groundwater in August 1997, at which point MTBE was detected in groundwater at 25,000 ppb. After nine years of investigative sampling, including the installation of four more wells, a remediation action plan was submitted to DEP in August 2005. Remediation efforts, overseen by the DEP, then took place over the next eleven years. Those efforts included vacuum truck fluid extractions and continuous groundwater samplings. On April 12, 2016, the MTBE in the groundwater was detected at one well as 18 ppb. At seven other wells, MTBE was either not detected or detected at 2 ppb. DEP issued a RACR and closed its file in October 2016.

Summary judgment on the 623 Sites is granted. The testimony given by Brown, the Commonwealth's expert, is unambiguous. He can identify no further restoration work that is needed once MTBE levels in groundwater drop to 20 ppb. In Brown's words: "nature will be enough to take care of" any residual MTBE. Brown never suggested that an historically higher concentration of MTBE in the groundwater at the Site might alter his conclusion.[10]

In opposition to this motion, the Commonwealth makes several arguments. First, the Commonwealth argues that an MRM at or below 20 ppb at the Site does not "rule out the possibility" that an MTBE plume migrated below the detection wells or to the side of the Site. It relies on testimony given during Phase I by its other expert, Fogg, to the effect that plumes of contamination may migrate and move through other parts of the aquifer and other wells. Therefore, while the concentration of MTBE may go down in an individual well, the contamination may have moved on to other locations. Therefore, when a plume appears to have decreased in concentration, that

[10] It is undisputed that the 2,000 pbb maximum threshold that the plaintiff invokes was only mentioned in Brown's testimony when he referred to the statewide health standard for contamination in soil. The Commonwealth is not pursuing restoration damages for the contamination of soil.

may be accurate or it may be that the plume has migrated beyond the monitoring well.

Fogg's testimony does not raise a disputed issue of fact that prevents summary judgment from being granted for the 623 Sites. Fogg's general observations about the potential movement of plumes is not evidence that unremediated contamination actually exists at any particular Site, and therefore, that an award of remediation damages is appropriate for that Site. Brown is the Commonwealth's Site-specific expert. He has been clear that when the MRM is 20 ppb there is no indication that further remediation work is necessary. As described in a previously-issued summary judgment opinion, when the existence of any currently-undetected contamination is speculative the Commonwealth may not recover remediation damages under Pennsylvania law. In re: MTBE Prods. Liab. Litig., 2025 WL 1270541, at *3. Nor may the Commonwealth recover an award to support investigative work to determine whether contamination greater than 20 ppb that has not yet been detected may exist somewhere. Id. at *5.

The Commonwealth's arguments regarding the Frankford Site do not alter this conclusion. Relying on the RACR for the Frankford Site, which was issued when the DEP closed its investigation of the Site ten years ago, the Commonwealth points

out that the Site’s groundwater flows to the southeast and that none of the Site’s eight monitoring wells were ever installed off-Site much less off-Site to the southeast. Again, even if water flows in a southeast direction at this Site, it is entirely speculative whether any MTBE that was once released into groundwater from the Site now exists at a concentration of over 20 ppb off-Site or where it might be located off-Site.

The Commonwealth next argues that Brown opined in New Jersey MTBE litigation that it is necessary to monitor a Site for up to five years to determine whether attenuation has actually happened and that no further remedial activities are required.[11] This argument misconstrue’s Brown’s testimony. Brown testified that when remediation achieved an MRM of 70 ppb, generally no further remediation work would be required. He added, however, that ideally monitoring would continue to confirm that the contamination continued to decrease. Brown did not suggest that monitoring was necessary when the MRM was at 20 ppb. In any event, the plaintiff may not “seek costs incidental to primary restoration where there is no evidence that restorative measures are necessary or will even be implemented.” In re MTBE Prods. Liab. Litig., 2025 WL 1270541, at *3 (quoting

[11] The Commonwealth did not make this specific argument during the briefing of the Phase I motions.

In re: MTBE Prods. Liab. Litig., No. 08cv312, 2014 WL 630636, at *3 (S.D.N.Y. Feb. 18, 2014)).

Finally, the plaintiff points out that Brown identified one Phase I Site -- Focus Site 69 -- where active remedial efforts were required even though the MRM was below 20 ppb. Focus Site 69 is a refinery. Brown's report indicates that the first release of gasoline at the Site occurred in 1986 and remediation efforts at the Site have been ongoing since at least 1990. The focus of Brown's report is on the contamination at the Site from light nonaqueous phase liquid ("LNAPL"). The remediation efforts have involved vacuum trucks, skimmer pumps, soil vaper extraction, and the installation of over 68 monitoring wells. MTBE was first detected at Site 69 in 2003 when monitoring wells were sampled. The MRM dates from April 2007 and was 6 ppb. In his report, Brown opined that future remediation of LNAPL in groundwater is necessary. His report stated as well that there had only been limited testing for MTBE to date, MTBE "may" be present in other areas of the Site, and additional remediation "may" be required if it is found.

Brown's testimony about Focus Site 69 does not raise an issue of fact preventing summary judgment. LNAPL is not the subject of this litigation and the Commonwealth does not suggest that its presence at a Site requires future MTBE remediation at

that Site. It is entirely speculative whether MTBE at a concentration over 20 ppb will ever be located at the Site. This is also an Open Site. As described below, should this become a closed Site and should MTBE at over 20 ppb exist at that point on the Site, then the Commonwealth may seek relief from this ruling.

At bottom, any claim by the plaintiff to recover future remediation costs at the Sites in this category is speculative. Summary judgment is granted for the defendants on the 623 Phase II Sites where the MRM is 20 ppb or less.

II. Sites With MRM Between 20 PPB and 70 PPB

Defendants next move for summary judgment on 642 Sites where the MRM was between 20 ppb and 70 ppb. The defendants contend that Brown's testimony warrants summary judgment at these Sites and cite the Sheetz Service Station at 1701 7th Avenue in Altoona ("Altoona Site") as an exemplar.

MTBE was first discovered in groundwater at the Altoona Site in May 2006 and first measured, at a level of 1,300 ppb, in September 2006. Remediation efforts, overseen by the DEP, took place over the next seven years. Those efforts included creating and conducting tests at eleven wells. In February 2013, the MTBE in the groundwater was measured as 50.7 ppb. DEP issued a RACR and closed its file in June 2013.

The defendants' motion is denied as to Sites with an MRM between 20 and 70 ppb. Although Brown testified that natural attenuation will restore groundwater at most of these Sites, he added that "site specific conditions" may suggest otherwise. Brown will be given an opportunity to determine whether such site-specific conditions exist for any of these 642 Sites.

The defendants argue that summary judgment is warranted because, in Phase I of this litigation, Brown did not identify any Sites with conditions suggesting further remediation efforts were necessary. He either designated those Sites as "zero-dollar" Sites, where no additional work is necessary, or as Sites where an additional investigation might reveal the need for future restoration work. Brown's failure to identify any site specific conditions requiring remediation at the Phase I Sites does not mean that he won't find any of these conditions in the Phase II Sites.[12]

III. Open Sites

Finally, the defendants move for summary judgment on 532 Open Sites at which DEP continues to oversee remediation efforts. The defendants contend that the April 30 Opinion

[12] The defendants alternatively request that the Court order Brown to immediately produce future restoration damages opinions on these Sites. The Court declines the request to disturb the April 3 Scheduling Order.

forecloses damages at these Sites because the Commonwealth is unable to show that future restoration work will be necessary once the DEP closes the Site. They are correct.

Defendants cite as an exemplar an unbranded gas station at 1214 Bristol Pike in Bensalem ("Bensalem Site"). DEP oversight of investigation and remediation efforts began in 1994 and is continuing. These efforts have included digging and testing nine monitoring wells. In addition, 29 vacuum extraction events took place between January 2020 and September 2025. As recently as September 2025, the MTBE in the groundwater was measured as 758 ppb. A Remedial Action Progress Report ("RAPR") created in November 2025 states that the responsible party "is assessing other remedial alternatives to aggressively reduce concentrations in monitoring wells" and that a revised Remedial Action Plan will be prepared for DEP review. In the meantime, the report states that quarterly groundwater sampling, vacuum extraction, and RAPR submissions will continue.

The defendants are entitled to summary judgment for future remediation damages at these Sites because the Commonwealth is unable to offer non-speculative evidence as to what if any further remediation work will need to be done once the current restoration work has concluded. As demonstrated by Brown's testimony in Phase I, Brown is unable to opine on the need for

such damages until the responsible party, in work overseen by DEP, completes the current clean-up process. In re: MTBE Prods. Liab. Litig., 2025 WL 1270541, at *3. The Commonwealth has not shown how that will change in Phase II.

It should be emphasized that DEP retains supervisory and enforcement authority over the Open Sites and will be the agency to decide when remediation is sufficient for closure. Its authority includes the ability to order a responsible party to take additional remediation work. See 25 Pa. Code § 245.313(c)(4) (DEP may order additional remediation work after a responsible party submits a completion report); 35 Penn. Stat. § 6021.1302(a) (DEP may order responsible parties to take corrective action); id. § 6026.905 (DEP enforcement authorization).

In its opposition, the Commonwealth contends that two prior decisions in the MDL, In re: MTBE Prods. Liab. Litig., 725 F.3d 65, 111 (2d Cir. 2013) and In re: MTBE Prods. Liab. Litig., No. 08cv312, 2022 WL 2967103, at *4 (S.D.N.Y. July 27, 2022), permitted claims on Open Sites to move forward. But as the April 30 Opinion explained, "those decisions addressed the distinct issue of whether the claim was prudentially ripe, not whether the plaintiff could meet its burden at trial to prove an injury and damages." In re: MTBE Prods. Liab. Litig., 2025 WL

1270541, at *3 (citing In re: MTBE Prods. Liab. Litig., 725 F.3d at 11, and In re: MTBE Prods. Liab. Litig., 2022 WL 2967103, at *4).

The Commonwealth points to four Sites, the Kittanning Site, the Lamagna Cheese Site, Phase I Focus Site 69, and the Bensalem Site, as exemplars of Open Sites where requests for future restoration costs are not speculative. Focus Site 69 is discussed above. As of Brown's most recent report, it is entirely speculative whether MTBE at a concentration above 20 ppb will be discovered at Focus Site 69. At the Bensalem Site, the defendants' exemplar Site, the responsible party is "assessing other remedial alternatives." It remains entirely speculative whether additional remediation work will be required after the responsible party and DEP have completed their work and oversight. The two new Sites discussed by the Commonwealth are described next.

The Kittaning Site is a tire center that had also been used as a gas station until 1998. It is located along S.R. 85 in Valley Township east of Kittanning, in Armstrong County. At the time the gas station closed, USTs were removed. Also at that time, the responsible party undertook a remediation effort and pumped 8,000 gallons of contaminated groundwater. Since then, minimal work has occurred at the Site. In 2000, the responsible

party used a consulting firm to collect samples from soil and from an existing monitoring well, where it detected MTBE at 4,424 ppb. In August 2007, DEP issued a notice of violation to the responsible party for not submitting a site characterization report that was due eight years earlier, in March 1999. The responsible party submitted the report the following month. Then, in September 2008, DEP issued a notice of violation because the report was incomplete; the report had not provided sufficient data about the extent of the contamination or any discussion of a remediation plan, among other things. No remediation plan has been put in place in the 18 years since DEP issued that 2008 notice of violation. The Site remains open and DEP's oversight of its remediation is ongoing.

The Lamagna Cheese Site is a former gas station located at 6000 Brooktree Road, Suite 110, in Wexford. In May 2013, groundwater contamination was discovered when three USTs were removed. Upon that discovery, the responsible party removed 4,800 gallons of impacted water by vacuum truck. In October 2014, DEP approved a site characterization report, and in February 2019, DEP approved a remediation action plan that had been submitted in October 2018. Remediation efforts have been ongoing since then. These efforts involve vacuum truck removals and repeated testing at 26 monitoring wells. The responsible

party's most recent RAPR, dated May 5, 2026, indicates that it will not be able to achieve its remediation goals under its current strategy and is shifting its focus to piloting in-situ carbon-based remediation technology, an alterntative technological remedy, and that it will submit an update on those efforts in the second quarter of 2026.

The plaintiff's reliance on these exemplars misses the mark. As long as a Site is Open, Brown has understandably been unable to opine with any degree of confidence on what, if any, restoration work will be necessary once the DEP completes its regulatory oversight and closes the Site. At bottom, any damages assessment while that process is ongoing is entirely speculative.[13]

This portion of the defendants' motion is granted with one caveat. Expert discovery is scheduled to close on October 29, 2027. Therefore, if any of the Open Sites close on or before

[13] The plaintiff also points to the Livingston Site, a Site in the New Jersey MDL for which Brown opined in 2012 that future restoration work would be needed even though the Site was Open. Brown's predictions proved to be unreliable. At a Daubert hearing on January 9, 2019 in the District of New Jersey, Brown was asked on cross, "Now, all of the additional investigation and remediation activities that have occurred at the Livingston site since you issued your initial report in 2012 has resulted in significant changes to many of the opinions presented by you in your original report. Correct?" Brown responded, "That's correct. Quite a few of the opinions I presented in 2013 had to be changed in response to the work performed."

July 30, 2027, and if the Site still has MTBE contamination above 20 ppb, then the Commonwealth may request an opportunity to seek remediation damages for this Site. This request should be made within 30 days of the filing of the RACR, but no later than July 30, 2027. Should such an application be made, the Commonwealth shall promptly disclose to the defendants all pertinent documents and an expert report supporting a claim for remediation damages.

## Conclusion

The defendants' May 29, 2026 motion for summary judgment is granted in part. Summary judgment is granted for the 623 Sites at which the MRM is 20 ppb or less and for the 532 Open Sites. It is denied as to the 642 Sites for which the MRM is above 20 ppb.

Dated: New York, New York
July 31, 2026

DENISE COTE
United States District Judge